IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS J. WALNEY and** | ) | |
| **RODNEY A. BEDOW, SR.,** | ) | |
| *individually and on behalf of all* | ) | |
| *others similarly situated,* | ) | CIVIL ACTION No. 13-102 Erie |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| **SWEPI LP** *and* **SHELL ENERGY** | ) | |
| **HOLDING GP, LLC,** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**CONTI, Chief District Judge**

### I. Introduction

This case involves a putative class action brought by plaintiffs Thomas J. Walney

("Walney") and Rodney A. Bedow, Sr. ("Bedow" and together with Walney, "plaintiffs") against

defendants SWEPI LP ("SWEPI") and its general partner and alleged alter ego, Shell Energy

Holding GP, LLC (together with SWEPI, "defendants"). The parties' dispute arises out of

certain oil and gas leases which plaintiffs signed in favor of SWEPI relative to properties located

in Venango County, Pennsylvania. Plaintiffs claim that they are entitled to certain bonus

monies[1] under the terms of their respective leases, which were never paid. The Second

Amended Complaint ("SAC"), plaintiffs' operative pleading, asserts claims for breach of

contract (both express and implied), unjust enrichment, fraud, and promissory estoppel on behalf

---

[1] Throughout its submissions, plaintiffs refer to this money as a "signing bonus," while defendants refer it as a "lease bonus." For purposes of this opinion, the court will use the term "bonus," "bonus monies" or "bonus payments."

of plaintiffs and other similarly situated Pennsylvania landowners who signed oil and gas leases with SWEPI during the putative class period but were never paid bonus monies.

Pending before the court is plaintiffs' motion for class certification (ECF No. 62). For the reasons that follow, the motion will be granted in part and denied in part.

## II. Background Facts and Procedural History

SWEPI is a limited partnership engaged in the business of oil and gas exploration and production. (SAC ¶2, ECF No. 57; Answer to SAC ¶2, ECF No. 58; Decl. of Ian Haney ¶4, ECF No. 66-1.) Between 2011 and 2013, SWEPI sought to acquire mineral leases in certain parts of Pennsylvania, including Venango County. (Haney Decl. ¶4.) To that end, SWEPI utilized the services of independent contractor land companies to acquire oil and gas leases from Pennsylvania landowners. (*Id.* ¶1.) Among these companies was Southeast Land Services, LLC ("Southeast"), which served as SWEPI's principal independent contractor for lease acquisitions in Butler and Venango Counties. (Haney Decl. ¶1; Decl. of Eric Jenevein ¶1, ECF No. 66-2.) Ultimately, Southeast helped SWEPI obtain more than 2,800 oil and gas leases. (Jenevein Decl. ¶2.)

SWEPI provided an account of its normal lease acquisition practices, as set forth in the declarations of Ian Haney, senior land representative for SWEPI (ECF No. 66-1), and Eric Jenevein, vice president and regional manager of Southeast's Appalachian Region (ECF No. 66-2). Those unchallenged declarations establish that, in 2011, Southeast's landmen began contacting individual landowners who, based on county property records, appeared to own oil and gas interests in Butler and Venango Counties. (Haney Decl. ¶6; Jenevein Decl. ¶6.) Based upon their initial contact with landowners, the landmen would determine whether the property in question was already under lease to another company and, if not, whether the landowner was

interested in entering into a lease with SWEPI. (*Id.*) If the landowner expressed interest, the landman and landowner would discuss possible bonus amounts or other potential terms of the lease. (*Id.*) During late 2011 and 2012, landowners were often negotiating with other oil and gas companies at the same time that they were negotiating with SWEPI's contracted landmen, because other companies in competition with SWEPI were actively leasing in the same area during that time frame. (*Id.*)

Once lease terms were finalized, the landman would meet again with the interested landowner. At that time, the landman would obtain the signed lease and a signed memorandum of lease ("MOL") in exchange for a draft instrument issued in the amount of the agreed upon bonus. (Haney Decl. ¶¶ 4, 10; Jenevein Decl. ¶9.) The drafts were payable through SWEPI's bank, Amegy Bank N.A. ("Amegy"), and typically allowed ninety banking days (or sometimes thirty banking days) for payment once the draft was submitted by the landowner's bank to Amegy for collection. (Haney Decl. ¶8.) The landmen would return the signed lease and MOL to Southeast's or SWEPI's administrative offices for processing, and the MOL would normally be recorded in the county records office within a few days' time. (Haney Decl. ¶10; Jenevein Decl. ¶10.)

Following recordation, Southeast would undertake an in-depth records search to confirm that title to the oil and gas interest was in the acreage amount represented and that no other problems existed with respect to the chain of title. (*Id.*) Upon completion of its search, Southeast would provide SWEPI a confidential mineral interest ownership report, title run sheet, and associated analysis relative to each parcel of property in question in order to identify whether a failure of title existed as to the particular property and, if so, whether curative action was required. (Haney Decl. ¶12; Jenevein Decl. ¶11.) Sometimes the title problems could be cured

3

by having the landowner execute a new lease reflecting the correct acreage or the correct ownership names; this curative action would involve cancellation of the original draft and issuance of a new one, if the landowner was agreeable. (Haney Decl. ¶14; Jenevein Decl. ¶13.) In cases where there was a title problem that could not be readily cured, SWEPI would cancel the bank draft and surrender the lease back to the landowner. (*Id.*) In any event, the final decision about what action to take in the case of a title problem was made by SWEPI's own landmen, based upon Southeast's completed title work and analysis. (Haney Decl. ¶ 12; Jenevein Decl. ¶11.)

Walney and Bedow are residents of Venango County, Pennsylvania, who were contacted by Southeast's landmen and signed leases in favor of SWEPI in early 2012. (SAC ¶1; Answer to SAC ¶1; SAC Ex. 1, ¶ 1, ECF No. 57-1; Pls.' Mot. for Class Certification., Ex. 1-2, ECF Nos. 63-1 and 63-2.) Each of the leases in question is a form "Paid Up Oil and Gas Lease" containing the following provision:

> (1) **LEASE** - In consideration of the bonus consideration paid, the receipt of which is hereby acknowledged, and in further consideration of the covenants and agreements herein contained, Lessor does hereby grant, demise, lease and let exclusively to Lessee, its successors and assigns, the lands hereafter described for the purpose of exploring for, developing, producing and marketing oil, gas or other related substances produced in association therewith … in and under the following described land….

(SAC Ex. 1, ¶ 1; Pls.' Mot. Ex. 1-2.) Paragraph 3 of the document establishes the primary lease term of five years which, at SWEPI's option, could be extended "by paying or tendering to Lessor an extension payment of [__insert__] per acre payable at any time prior to the expiration of the primary term." (*Id.* ¶ 3.) Paragraph 4 spells out the lessor's entitlement to a percentage royalty payment for oil and gas produced and marketed from the leased premises. (*Id.* ¶ 4.) The document addresses the parties' various rights and responsibilities with respect to the subject

properties and SWEPI's operations on them. Paragraph 10 of the lease provides that: "Lessee at any time, and from time to time, may surrender this lease as to all or any part thereof by recording an appropriate instrument of surrender in the proper county and thereupon this lease and the rights, rentals and obligations of the parties hereunder shall terminate as to the part so surrendered**.**" (*Id.* ¶ 10.)

Plaintiffs also executed, with respect to each of their leases, a standard MOL form indicating that: "THIS MEMORANDUM OF LEASE has been made to indicate the existence of an Oil and Gas Lease ("Lease") dated [__Insert__] by and between [__Insert__], as Lessor and SWEPI, LP…." (SAC Ex. 2, ECF No. 57-2, Pl.s' Mot. Ex. 1-2.) The document provides that: "Lessor did grant, demise, lease and let exclusively to Lessee, its successors and assigns, the rights to explore, develop, produce and market oil and gas from [the subject property] subject to the provisions contained in the Lease…." (*Id.*) The MOL also provides that it "has been executed for the purpose of providing notice… of the existence of the Lease and shall not be considered in any way a modification or alteration of the Lease." (*Id.*)

Plaintiffs contend that they signed the form leases and MOLs based upon the promise that they would be paid bonus monies, as set forth in Paragraph 1 of the lease. (Walney Decl. ¶2, ECF No. 63-1; Bedow Decl. ¶2, ECF No. 63-2.) Walney maintains that in January 2012 he signed a lease agreement covering 42.18 acres of land in exchange for a promised bonus of $137,085.00. (SAC ¶¶ 17-18 and SAC Ex. 3.) Bedow signed three lease agreements in January 2012 which he claims covered 215.897 acres of land. (SAC ¶17, Pl.'s Mot. to Certify Ex. 2, ECF No. 63-2.) Bedow maintains that he was promised bonuses totaling $701,666.88. (*See* SAC ¶18, SAC Ex. 3.)

At the time they signed their respective leases and MOLs, plaintiffs were given drafts in the amount of the bonus payments that had allegedly been promised to them. (Walney Decl. ¶3; Bedow Decl. ¶3.) Each of the draft instruments provided that "[t]his draft when paid is payment in full for lease or conveyance covering the following described land…." (SAC Ex. 3; Pls.' Mot. Ex. 1-2.) The drafts further provided:

> The payor shall have 90 banking days after receipt of this draft by the collecting bank, whether accompanied by other papers or not, for title examination and for payment. Neither forwarding bank nor payee(s) nor the grantor(s) of such lease or conveyance may demand return of this draft or any accompanying papers prior to expiration of the time fixed. Upon payment hereof collecting bank shall deliver this draft and any accompanying papers to payor and remit payment to forwarding bank. No liability for payment or otherwise shall be attached to any of the parties hereto.

(*Id.*)

Plaintiffs were also given written instructions concerning the draft instruments, which directed them as follows:

> Present the draft and this accompanying letter to your bank and inform them this is a collection item. Your bank will send the draft for collection to Amegy Bank, N.A. If your bank charges a handling fee for this collection item, it should include the fee as a separate line Item in the collection letter sent to Amegy Bank, N.A. The draft allows 90 banking days for title examination and the transfer of funds to your bank. You should instruct your bank as to which account you wish to have the bonus deposited. Please instruct your bank to have the draft dated the day the draft is forwarded to Amegy Bank, N.A. If your bank requires instruction, the contact information is provided below.

(SAC Ex. 4, ECF No. 57-4; Pls.' Mot. Ex. 1-2.) Plaintiffs claim that they followed the advice on the form instruction letter and promptly deposited each of the draft instruments with their respective banks for collection. (SAC ¶21.) Nevertheless, plaintiffs did not receive payment on their drafts. (SAC ¶22.) Instead, plaintiffs contend, SWEPI retained possession of their lease agreements and allowed the MOLs to remain of public record until July 2012, when SWEPI recorded a voluntary surrender of plaintiffs' leases. (SAC ¶¶ 22-23.)

Defendants explain that the title examination process was both cumbersome and time consuming, as it required substantial manual research. (Haney Decl. ¶13; Jenevein Decl. ¶12.) Moreover, in the first half of 2012, the Venango County courthouse experienced significant congestion, as dozens of oil and gas leasing companies undertook title searches and competed for access to public records. (*Id.*) By April 2012, the congestion in the courthouse had become so severe that the Venango County commissioners restricted access to the register and recorder's offices. (*Id.*) As a result of these restrictions, Southeast's landmen were substantially delayed in their efforts to complete their title searches for Venango County properties. (*Id.*) In many cases, landmen could not complete their title searches in Venango County, or SWEPI could not complete its evaluation of Southeast's title analysis, within the time frame specified in the drafts. (*Id.*) Because of these difficulties, SWEPI decided, in or around June 2012, to stop acquiring new leases in most of Venango County and to cancel any outstanding drafts that had not already been paid. (Haney Decl. ¶20.) SWEPI acknowledges that, by June 2012, a drop in the commodity price of natural gas made leasing in Venango County less attractive and this, together with the difficulty of completing timely title analysis, played into its decision to cancel some of the unpaid drafts. (*Id.*)

Walney and Bedow are among the landowners whose bank drafts were returned unpaid. According to plaintiffs, SWEPI sent them form letters on or around August 4, 2012 advising that

> [d]ue to difficulties arising from restrictions placed upon Southeast Land Services at the Venango County Courthouse by the Fire Marshall and the Venango County Commissioners, we have not been able to complete your title [search] in a timely manner. Coupled with a depressed natural gas environment, Shell, at this time, has decided to no longer pursue verifying title to your land in Venango County.
>
> Subsequently, Shell will be issuing you a surrender for your Oil & Gas Lease, which is enclosed. As a result, Shell will be cancelling your Amegy Bank draft.

(SAC Ex. 5, ECF No. 57-5.)

Based upon the foregoing events and averments, Walney commenced this putative class action in the Venango County Court of Common Pleas, asserting claims for breach of contract, fraud, disparagement of title, and promissory estoppel. (Compl. Ex. A, ECF No. 1-1.) The case was subsequently removed to this court on April 12, 2013 (ECF No. 1). After various pretrial proceedings, Walney eventually filed the operative SAC on October 10, 2014, with leave of court (ECF No. 57). The SAC added Bedow as a co-plaintiff and asserted additional claims for breach of implied contract and unjust enrichment.[2]

The pending motion for class certification (ECF No. 62) followed on January 12, 2015. In their motion, plaintiffs propose a certified class based upon the following definition:

> Every person who on or after March 14, 2009[3] signed a Pennsylvania oil and gas lease and/or memorandum thereof in favor of and recorded by SWEPI, LP in exchange for the promise of a signing bonus which was never paid.

(Pl.'s Br. Supp. Mot. Class Cert. 3, ECF NO. 63.)

In support of their motion to certify this proposed class, plaintiffs submitted their own declarations as well as the declarations of seven other landowner clients represented by Joseph E. Altomare, Esq., plaintiffs' attorney of record in this case. (*See* Pl.s' Mot. Class Cert. Ex. 1-9, ECF Nos. 63-1 through 63-9.) These declarations attest that each of the declarants experienced an "identical pattern of fact" relative to the execution of their leases with SWEPI, namely:

- an agent of SWEPI (a "landman") presented each landowner with a pre-prepared oil and gas lease, an addendum thereto, and a memorandum of lease (collectively referred to as the "lease documents");

- each of the landowners agreed to sign the lease documents, and did sign, on the promise that he or she would be paid a signing bonus;

---

[2] The claim for disparagement of title, previously set forth in Count III of the original complaint, was dismissed by the court during pretrial proceedings.

[3] This date corresponds to the statute of limitations for contractual claims that accrued in the four-year period prior to the commencement of this action.

- upon signing the lease documents before a notary public procured by the landman, the latter gave each landowner a draft signed by the landman as SWEPI's agent;

- the drafts were made out in the amount of the signing bonus promised to each respective landowner and were delivered to the landowner together with an instruction letter explaining how the draft should be processed and how it would be paid;

- none of the landowners knew that the signing bonus would be paid by draft until the draft and instructional letter were actually presented;

- after giving each landowner the draft and the instruction letter, the landman retained the executed lease documents; and

- the memoranda of lease were subsequently recorded; however, the landowners were never paid the signing bonuses that had been promised.

(Pls.' Br. Supp. Mot. Class Cert. 2-3, ECF No. 63; *see* Pls.' Ex. 1-9, ECF Nos. 63-1 to 63-9.)

Based upon their class discovery, plaintiffs posit that, during the putative class period, SWEPI engaged in more than 300 recorded lease transactions with landowners wherein SWEPI ultimately failed to pay the promised bonus monies.[4]  (Pls.' Br. Supp. Mot. Class Cert. at 6.)  In each of these transactions, SWEPI allegedly utilized identically worded lease forms and drafts and recorded a uniform MOL.  Plaintiffs believe that these circumstances make the instant case suitable for classwide resolution.

Defendants dispute the feasibility of a classwide resolution of plaintiffs' claims.  They contend that, despite SWEPI's use of form documents, the negotiations between its landmen and the various landowners took place on an individualized basis over the course of days, weeks, or even months.  (Haney Decl. ¶¶ 5-7; Jenevein Decl. ¶ 6.)  According to Haney and Jenevein, the lease addendums contained special terms that varied by landowner depending on the landowner's negotiations with SWEPI or its landmen.  (Haney Decl. ¶ 7; Jenevein Decl. ¶ 7.)  The lease

---

[4] Specifically, plaintiffs represent there are 333 such transactions.  Because the majority of these transactions concern more than one person having an interest in the lease (i.e., the signatory's spouses, life partners, siblings, etc.), plaintiffs represent that the actual number of persons identically situated to them is closer to 600.  (Pls.' Br. Supp. Mot. Class Cert. at 6.)

bonus amounts were also individually negotiated on a dollar-per-acre basis. (Haney Decl. ¶¶ 6, 24; Jenevein Decl. ¶6.) The circumstances of each negotiation and the communications with each of the landowners varied from landowner to landowner and from landman to landman. (Haney Decl. ¶ 5; Jenevein Decl. ¶5.) Often, landowners were negotiating with other oil and gas companies at the same time that they were negotiating with SWEPI's landmen. (Haney Decl. ¶6; Jenevein Decl. ¶ 6.)

Defendants also dispute certain aspects of plaintiffs' analysis relative to class discovery. Whereas plaintiffs refer to the number of "recorded lease transactions" subject to class treatment, SWEPI contends these items are more accurately characterized as individual (or "unique") bank drafts that were issued by SWEPI. (Decl. of Margaret McGehee ¶3, ECF No. 66-3.) SWEPI represents that it has analyzed all the 2,649 drafts that potentially fall within the proposed class definition. (*Id.* ¶¶5-6.) According to SWEPI, all but 260 of these drafts were likely paid, either by virtue of the original draft being honored or by issuance of a replacement draft or check for substantially the same lease parcel. (*Id.* ¶¶ 8-9.)

Defendants assert that there were numerous reasons why the 260 drafts were not ultimately paid, but they were mainly related to title problems. As depicted in defendants' Exhibit D (ECF No. 66-4), some of the documented reasons include:

- "Incorrect Lessor"
- "Lease is being amended"
- "Lease surrendered at Lessor's request"
- "Leased by Chevron until 10/11/12"
- "Liens in excess of 500k"
- "Partial title failure"
- "Per broker, lease is being surrendered due to O&G reservation"
- "Per land department directive"
- "Return – Title failure"
- "Surrendered lease, lessor does not own oil & gas rights"
- "Surrendered upon Lessor request – Venango County"
- "Title & Curative Issues"

- "Title Failure"
- "Venango County – Title not complete"
- "Venango County – reprioritization no redraft."

(*See* Defs.' Resp. Opp. to Pls.' Mot. Class Certification at 7, ECF No. 68.)  Thus, defendants maintain that there was no uniform reason as to why the 260 drafts were returned unpaid.

Defendants assert that those landowners whose drafts were not paid were free to re-lease their interests to other oil and gas companies once SWEPI surrendered their leases.  (Haney Decl. ¶¶ 21, 25, 27; Jenevein Decl. ¶15.)  In fact, defendants posit that between 2012 and 2014 there are at least 30 instances in which property associated with an unpaid draft was re-leased to other companies.  (Haney Decl. ¶ 29.)  According to defendants, there continues to be an active leasing market in Venango County involving more than twenty companies competing for oil and gas leases.  (Haney Decl. ¶25 and Ex. 1.)

### III. Standard of Review

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)).  To be certified, a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a):  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  Fed. R. Civ. P. 23(a).  In addition, the proposed class must fit within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b).  *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 302 (3d Cir. 2005).  Here, plaintiffs seek certification under Rule 23(b)(3), which applies where:

> **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"To determine whether to certify a class, the court must be satisfied 'after a rigorous analysis' that all the requirements for class certification are met." *Royal Mile Co., Inc. v. UPMC*, 40 F. Supp. 3d 552, 580-81 (W.D. Pa. 2014) (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)). The rigorous analysis requires the court to make explicit findings; "'the requirements of Rule 23 must be met, not just supported by some evidence.'" *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008) (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006)); *see Royal Mile,* 40 F. Supp. 3d at 581. The proponent of class certification has the burden of proving each of the prerequisites of a class action under Rule 23(a) and that the class fits within one of the three categories of class actions set forth in Rule 23(b); "[a] party's assurance to the court that it intends or plans to meet the [Rule 23] requirements is insufficient." *In re Hydrogen Peroxide,* 552 F.3d at 316 n.14, 317 (citation omitted); *see Hayes v. Wal–Mart Stores, In*c., 725 F.3d 349, 354 (3d Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit."). In making a class certification ruling, the court has "no license to engage in free-ranging merits inquiries." *Amgen Inc. v. Connecticut Ret. Plans and Trust Funds,* 133 S. Ct. 1184, 1194-95 (2013). Rather, a court can consider merits questions "only to the extent [ ] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195. Finally,

factual determinations in support of the court's Rule 23 findings must be made by a preponderance of the evidence. *In re Hydrogen Peroxide,* 552 F.3d at 307.

## IV. Discussion

### A. Numerosity

Under Rule 23(a), a threshold requirement for class certification is that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Third Circuit Court of Appeals has said that, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice § 23.22[3][a] (Matthew Bender 3d ed.1999)).

Here, plaintiffs maintain that the numerosity requirement is satisfied by virtue of their demonstration that the proposed class consists of as many as 600 persons. Defendants define the relevant number somewhat differently, as they claim that approximately 260 of the 2,649 unique bank drafts issued in connection with recorded lease transactions were not ultimately paid. Defendants do not otherwise appear to dispute that the putative class is sufficiently numerous. Consequently, this court finds that the numerosity requirement is satisfied.

### B. Commonality and Predominance

The parties' primary area of contention relative to class certification concerns the issues of commonality and predominance. Because Rule 23(a)'s commonality requirement is subsumed by and incorporated into the more stringent Rule 23(b)(3) predominance requirement, it is therefore "appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.'" *Sullivan v. DB Invests., Inc.,* 667 F.3d 273, 297 (3d Cir. 2011) (*en*

*banc) (quoting In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004))).

"A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (quoting *Baby Neal v.* Casey, 43 F.3d 48, 56 (3d Cir. 1994)). The bar for establishing commonality is "not high." *In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig. ("Community Bank III"),* No. 13-4273, 2015 WL 4547042, at *12 (3d Cir. July 29, 2015). The relevant inquiry focuses "not on the strength of each class member's claims but instead 'on whether the defendant's conduct was common as to all of the class members.'" *Id.* (quoting *Sullivan*, 667 F.3d at 298 and citing other authority). At the same time, however, "the claims of each class member 'must depend upon a common contention'" that is capable of classwide resolution, *id.* (quoting *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011)), meaning that "'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Sullivan,* 667 F.3d at 335)(Scirica, J., concurring)). "Thus, '[w]hat matters to class certification ... is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Dukes*, 131 S. Ct. at 2551) (emphasis and ellipsis in the original).

Under Rule 23(b)(3), "'[i]ssues common to the class must predominate over individual issues.'" *Community Bank III,* 2015 WL 4547042, at *14 (quoting *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)). This requirement imposes a "far more demanding" standard than the commonality requirement of Rule 23(a)." *Id.* (quoting *Amchem*, 521 U.S. at 623-24). The predominance criterion "'tests whether proposed classes are sufficiently cohesive

to warrant adjudication by representation.'" *Sullivan,* 667 F.3d at 296 (quoting *In re Ins. Broker. Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009)). In assessing predominance, a court "must examine each element of a legal claim 'through the prism' of Rule 23(b)." *Marcus v. MVW of N. Am., LLC,* 687 F.3d 583, 600 (3d Cir. 2012) (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir.2011)); *see Community Bank III*, 2015 WL 4547042, at *14. "'Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" *Marcus,* 687 F.3d at 600 (quoting *In re Hydrogen Peroxide.,* 552 F.3d at 311). "'Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each "elemen[t] of [her] claim [is] susceptible to classwide proof.'" *Amgen Inc.,* 133 S. Ct. at 1196 emphasis in original (quoting *id.* at 1210, Thomas, J., dissenting). "What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" *Id.* (quoting FED. R. CIV. P. 23(b)(3)) (alteration and emphasis in the original).

With these principles in mind, the court will examine each of the legal claims at issue.

### 1. Count I (Breach of Express Contract)

Count I of the SAC asserts a claim for breach of an express contract. "An express contract is formed when the terms of an agreement are declared by the parties either verbally or in writing." *Braun v. Wal-Mart Stores, Inc.,* 24 A.3d 875, 942 (Pa. Super. Ct. 2011); *see Richman v. W.C.A.B. (Charming Shoppes, Inc.)*, No. 540 C.D. 2012, 2013 WL 3946229, at *3 (Pa. Commw. Ct. Feb. 15, 2013) ("'An express contract is formed by either written or verbal communications.'") (quoting *Ingrassia Constr. Co. v. Walsh,* 486 A.2d 478, 483 n.7 (Pa. Super.

Ct. 1984)).[5] "'To show a breach of contract, a party must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.'" *McCausland v. Wagner,* 78 A.3d 1093, 1101 (Pa. Super. Ct. 2013) (quoting *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. Ct. 2005)). "In order to form a contract, there must be an offer, acceptance, and consideration or a mutual meeting of the minds." *Ribarchak v. Mun. Auth. of City of Monongahela*, 44 A.3d 706, 708 (Pa. Commw. Ct.), *appeal denied*, 57 A.3d 73 (Pa. 2012).

Plaintiffs argue that each element of their breach of contract claim can be established through common proof. They contend that the documents evidencing the class members' contracts (*i.e.*, the form lease, MOL and draft) are materially identical, the breach in every case was identical (non-payment of the bonuses), and the resulting injury (loss of the promised bonus money) was also identical. (Pls.' Br. Supp. Mot. Class Certification 12-14, ECF No. 63.)

Defendants contend that Count I is unsuitable for classwide resolution because individualized inquiry is necessary in order to determine, in any particular case, whether an enforceable promise to pay a bonus was made, whether nonpayment actually constituted a breach of SWEPI's alleged payment obligations, whether and to what extent injury resulted to the individual lessors as a result of nonpayment, or whether performance (meaning payment) was otherwise excused. With respect to the issue of contract formation, defendants contend that it will be necessary to engage in transaction-specific inquiries in order to determine whether, in each case, the contracting parties had a mutual understanding concerning the events that would trigger an enforceable contract.

---

[5] Because this court's jurisdiction is based on the parties' diversity of citizenship, the court must apply the appropriate state law to plaintiffs' common law claims, which in this case is Pennsylvania law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

With respect to the issue of breach, defendants point out that both Walney and Bedow understood they would have no right to the bonus monies if SWEPI's title examination revealed that they lacked good title to the oil and gas interests that were the subject of their leases. (*See* Walney Dep.121-23, 131-32, 150-52, ECF No. 66-9; Bedow Dep. at 103-04, ECF No. 69-10.) Defendants maintain that whether or not other landowners had a similar understanding of the payment terms is a question requiring individualized inquiry; moreover, to the extent that payment of the bonus monies was in fact conditioned on a determination of good title, establishing breach would require individualized, property-specific proof that each proposed class member had good, clear title to the minerals at issue. Relatedly, defendants argue that, even if the alleged promise to pay was not specifically conditioned on good title, a defect in title would nevertheless constitute a failure of consideration, and SWEPI's assertion of this defense would, again, require the parties to engage in individualized proof. In addition, defendants observe that some leases were surrendered by SWEPI at the request of the landowner. Defendants maintain that this is another type of individualized circumstance that would bear on whether nonpayment amounted to breach.

With respect to the element of "injury," defendants dispute that the putative class members share an identical injury in the form of nonpayment of the bonus monies. Defendants posit that some landowners may not have suffered any injury at all in cases where good title to the underlying gas and oil interest was lacking, or in cases where the landowner requested and received a surrender of the lease in order to obtain a better leasing deal with another company. Defendants assert that the appropriate measure of damages (assuming breach can be established) is the difference between the contract price and the fair market value for each individual property interest at issue. They posit that, to the extent putative class members *did* suffer injury, the class

members had a duty to mitigate their damages. Thus, defendants insist that the degree of any class member's injury will vary according to individualized factors such as whether the landowner re-leased his or her mineral rights to another company or could have done so, and what value the landowner received or could have received by entering into a different leasing arrangement.

In their reply, plaintiffs counter that no individualized inquiries are necessary relative to contract formation, breach, defenses, or injury. With respect to contract formation, plaintiffs posit that, for each and every lease transaction, the transactional documents (including the pre-signed lease form, the draft, and the MOL) show the existence of an enforceable contract.

With respect to the issue of liability, plaintiffs maintain that SWEPI has no viable defenses (such as lack of clear title) that would require individualized discovery. Plaintiffs theorize that the draft's language unambiguously provided SWEPI only the *opportunity* during the 90-day period to conduct a title examination if it so chose; that is, the draft terms did not obligate SWEPI to actually conduct a title search, or condition payment of the bonus in any way on verification of good title. Plaintiffs argue that, once SWEPI manifested its intent to accept the lease offers and recorded the MOLs, it became legally bound to make the bonus payments irrespective of whether the lessors had good title to the minerals in question; although SWEPI retained limited remedies relative to the covenants that attached to the lease conveyance,[6] it was not relieved of its contractual obligation to pay the bonus monies. According to plaintiffs, this interpretation of the contract is consistent with well-recognized rules of property law, which treat

---

[6] Plaintiffs assert that the leases contained an implied covenant of title, and they acknowledge that the covenant of seisin runs with the land; they also argue, however, that this covenant is not breached unless there is an actual eviction of the purchaser by someone having superior title, citing *Medusa Portland Cement Co. v. Lamantina,* 44 A.2d 244 (Pa. 1945); *Kramer v. Dunn,* 749 A.2d 984 (Pa. Super. Ct. 2000). Plaintiffs argue that there is no evidence of any such ejectment from the leaseholds at issue and, there never will be due to the fact that SWEPI surrendered all the subject leases to the relevant landowners.

the physical delivery of a deed as an absolute and unconditional conveyance. Plaintiffs argue that SWEPI's physical retention of the signed leases should similarly be construed in each case as an unconditional, completed conveyance.

Plaintiffs also insist that the question of "injury" can be resolved on a classwide basis. Because they view each of the transactions in question as completed "conveyances," plaintiffs conclude that the appropriate measure of damages in each case is the "sum certain purchase price" of the contract (*i.e.*, the bonus payment); thus, individualized issues pertaining to mitigation of damages are not a relevant concern. Plaintiffs contend that the word "bonus," as used in the lease form, is a term of art signifying an unconditional payment obligation promised in exchange for the landowner's execution of the lease – an incentive, in other words, for a lessor to sign with a particular company. Because each putative class member gave SWEPI his or her signature, plaintiffs conclude that SWEPI got the benefit of its bargain and now owes each signatory the full amount of the promised bonus money.

Based upon this same reasoning, plaintiffs dispute the notion that a landowner's request for a surrender of the lease could have discharged SWEPI's payment obligation. They argue that bonus payments generally cannot be avoided by termination or abandonment of the lease. Plaintiffs contend that it was SWEPI, not the landowner, who possessed a contractual right to "surrender" the lease and, if SWEPI voluntarily agreed to exercise that right upon the request of a landowner, that occurrence would not necessarily have discharged its payment obligation, especially in the absence of any evidence demonstrating an accord and satisfaction of its obligation. In sum, plaintiffs insist that, in each and every case at issue, SWEPI had an absolute and unconditional obligation to pay the bonus monies.

In Pennsylvania, general principles of contract interpretation govern the interpretation of an oil and gas lease. *Smith v. Steckman Ridge, LP,* 590 F. App'x 189, 193 (3d Cir. 2014) (citing *T.W. Phillips Gas and Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012)). "'Determining the intention of the parties is a paramount consideration' in interpreting a lease." *Id.* (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa. 1986)). "Where the terms of a lease are clear and unambiguous, the parties' intentions can be ascertained from the terms of the lease itself, as manifestly expressed within the lease's four corners." *Id.* (citing *Hutchinson,* 519 A.2d at 389–90 and *T.W. Phillips*, 42 A.3d at 267). Each of those terms should be given its plain meaning. *Id.* (citing *T.W. Phillips*, 42 A.3d at 267). Where a portion of a lease is ambiguous, however, parol evidence is admissible to resolve the ambiguity. *Id.* (citing *Hutchison*, 519 A.2d at 390). Under Pennsylvania law, "'''[t]he interpretation of any contract is a question of law,'''" *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509 (Pa. Super. Ct. 2013) (quoting *Szymanowski v. Brace,* 987 A.2d 717, 722 (Pa. Super. Ct. 2009) (quoting *Abbot v. Schnader, Harrison, Segal & Lewis, LLP*, 805 A.2d 507, 553 (Pa. Super. Ct. 2002)(quoting *Highmark Inc. v. Hospital Serv. Ass'n of Northeastern Pa.*, 785 A.2d 93, 98 (Pa. Super. Ct. 2001), and this includes questions about whether an ambiguity exists. *See Smith,* 590 F. App'x at 193 ("'The court determines as a matter of law whether an ambiguity exists'") (quoting *Hutchinson*, 519 A.2d at 390. "'A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Id.*

In this case, plaintiffs seek to establish the breach of a contractual payment obligation based on form documents, viewed in the light of certain actions by SWEPI which are common to all putative class members. The form documents in question appear to be substantively similar, if not materially identical, at least with respect to those provisions that the parties view as

relevant to SWEPI's alleged payment obligation.[7]  For example, the parties have competing interpretations of the draft instrument's allowance of a specified time period (usually ninety banking days) "for title examination and for payment," its reference to "accompanying papers," and its disclaimer of liability "for payment or otherwise."  (SAC Ex. 3.)  With respect to the form lease, the parties offer competing interpretations relative to, among other things, the document's reference to "bonus consideration paid, the receipt of which is hereby acknowledged," as well as the "surrender clause" in Paragraph 10.  (SAC Ex. 1.)  The parties also have differing views concerning the legal significance, if any, of SWEPI's recordation of the MOLs as well as its physical acceptance and possession of the leases -- actions which are common to all putative class members.

At this stage of the proceedings, the court will not resolve the merits of the parties' arguments.  The court does find, however, that the parties' respective arguments relative to Count I present numerous issues of contractual interpretation that are common to the putative class and that predominate over individualized issues.  Fundamentally, the question whether the form documents objectively demonstrate the existence of a contract is one that is common to all putative class members.  Similarly, common questions exist on this record concerning the meaning of the alleged contract and the parties' respective rights and obligations thereunder.  If an enforceable contract is found to exist, liability questions that are common to the class will have to be addressed at the merits stage, including:  whether, and to what extent, payment of the bonus monies was conditioned upon a determination of good title to the underlying minerals; whether and to what extent SWEPI had the unilateral right to surrender the leases and thereby terminate any payment obligation pursuant to Paragraph 10 of the lease; whether the transactions

_____

[7] Although defendants contend that each lease addendum varied in its terms and was individually negotiated, defendants did not point to any sample addendum in the record which would materially bear on SWEPI's alleged payment obligation.

in question were completed conveyances or executory contracts; whether property concepts such as the doctrine of "merger" affect the parties' rights and obligations under the lease agreements; and, relatedly, whether any defenses to payment that SWEPI might assert based on a lack of good title or a timely "surrender" of the leases were effectively forfeited by virtue of SWEPI's recordation of the MOL or SWEPI's physical possession of the leases. In the event liability is established, certain foundational questions concerning damages will have to be addressed, namely: whether the general measure of damages for breach of the lease agreement is the difference between the contract price and fair market value -- or, alternatively, the full amount of the bonus monies reflected in the underlying draft instruments, and whether landowners had a general duty to mitigate their damages. These latter questions are also common to all class members.

Resolution of the foregoing questions will depend on an interpretation of certain key provisions in the form documents that are materially uniform and applicable to all transactions. The court will have to determine, in the first instance, whether the contractual provisions at issue are ambiguous in their meaning and, if so, what the legal consequences are. As noted, the determination of whether contractual language is ambiguous is a question of law for the court. *Smith,* 590 F. App'x at 193; *see In re Montgomery Ward & Co., Inc.*, 428 F.3d 154, 161 (3d Cir.2005). If the agreements are found to be unambiguous, the court can declare their meaning as a matter of law. *In re Montgomery Ward & Co., Inc.*, 428 F.3d at 161. Moreover, if the court adopts plaintiffs' proposed construction of the agreement, plaintiffs will be able to establish liability on a classwide basis by virtue of nonpayment alone. Thus, plaintiffs' breach of contract theory can potentially be resolved by reference to, and interpretation of, common form documents. At the very least, common, classwide issues are present, the resolution of which will

drive this litigation forward, toward either judgment or a possible settlement. Accordingly, at

this procedural juncture, the court finds that common classwide issues predominate over

questions affecting only individual class members.[8]

## 2. Count I(A) (Breach of Contract Implied in Fact)

Count I(A) asserts a claim for breach of contract implied in fact. "A contract implied in

fact is an actual contract which arises where the parties agree upon the obligations to be incurred,

but their intention, instead of being expressed in words, is inferred from [their] acts in the light of

the surrounding circumstances." *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d

652, 659 (Pa. 2009). Once a plaintiff proves the existence of an implied contract, he must then

satisfy the last two elements of a breach of contract claim: (1) a breach of a duty imposed by the

contract, and (2) damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003); *see*

*Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 658 n.20 (E.D. Pa. Feb. 5, 2010) (citing

*CoreStates Bank, Nat'l Assn. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Defendants contend that Count I(A) is not suitable for classwide resolution because, once

again, individualized issues with respect to each element of the claim will predominate over any

issues common to the class. Among other things, defendants argue that a determination about

the very existence *vel non* of a contract will depend in each instance on an examination of all the

particular facts and circumstances surrounding the subject lease negotiation, including what was

---

[8] The predominance criterion is satisfied notwithstanding that a small minority of putative class members may have
requested a surrender of their leases. As noted, common overriding questions exist at this point in the litigation
about whether enforceable contracts arose between the landowners and SWEPI and, if so, whether SWEPI's alleged
payment obligations under the contracts were unconditional and therefore incapable of being discharged by any
events that occurred subsequent to its recordation of the MOL. Depending upon how these foundational questions
are resolved, SWEPI may or may not have a valid defense as against any landowner who requested a surrender of
his or her lease; however, that question will be decided at a later point in time when the merits of the breach of
contract claim are reviewed. Upon a review of the merits, the court will be able to determine whether those
landowners who requested a surrender of their leases should be certified as a separate subclass or whether their
breach of contract claims should be dismissed altogether.

said and not said by each party. In addition, defendants contend that the same individualized proof problems previously discussed will apply relative to the elements of breach and damages.

The court finds, however, that the commonality and predominance requirements are satisfied with respect to Count I(A). Here, plaintiffs' breach of implied contract theory is premised on a nuance in the alleged contract formation process: under plaintiff's "implied contract" theory, the terms of the form lease and draft constituted an "offer" made by each respective landowner to SWEPI, and SWEPI objectively manifested its "acceptance" of this offer when it executed and recorded the accompanying MOLs. Thus, under plaintiff's theory, the existence (or nonexistence) of a binding contractual agreement will depend upon the court's examination and interpretation of the form documents, together with SWEPI's common act of executing and recording the MOLs. This issue is common to all putative class members and can be resolved on the basis of common, objective proof.

In addition, questions concerning the parties' respective rights and obligations, if any, under the alleged contract, will depend upon the court's examination and interpretation of the same form documents that allegedly gave rise to the parties' express contract. *See DeArmitt v. New York Life Ins. Co.*, 73 A.3d 578, 589 (Pa. Super. Ct. 2013) ("Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement."). Thus, the previously discussed common, classwide issues bearing on breach and injury will apply equally to plaintiffs' claim for breach of implied contract, and these issues will predominate over questions that affect only individual class members. Accordingly, the court finds that Rule 23's commonality and predominance requirements are satisfied with respect to plaintiffs' claim under Count I(A).

3. <u>Count I(B): Breach of Contract Implied in Law (Unjust Enrichment)</u>

Count I(B) of the Second Amended Complaint alleges breach of a contract implied in law, commonly known as unjust enrichment. The elements of unjust enrichment involve "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Lackner v. Glosser*, 892 A.2d 21, 31–32 (Pa. Super. Ct. 2006). "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Id.* "Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in *quantum meruit*." *Id.*; *see Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.,* 832 A.2d 501, 507 (Pa. Super. Ct. 2003) ("'Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred.'") (quoting *AmeriPro Search Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001) (quoting *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328-29 (Pa. Super. Ct. 1995))). "Whether the doctrine applies depends on the unique factual circumstances of each case." *Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. Ct. 2008). In determining whether the doctrine applies, courts focus "not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Id.*

Plaintiffs argue that their unjust enrichment claim is based on the same form documents that serve as the basis for their contractual claims. Plaintiffs maintain that "[a] determination of whether the retention of the leases on record by SWEPI until the gas market collapsed was 'unjust' is a question common to the class, all of whose leases were recorded and held on record

by SWEPI until that eventuality occurred...."  (Pls.' Br. Supp. Mot. Certification 15, ECF No. 63.)

The court is not persuaded that the issue of whether SWEPI was unjustly enriched can be resolved by proof common to the class.  Several courts have found unjust enrichment claims to be unsuitable for class treatment where the claim required a highly individualized inquiry in order to determine whether a defendant had been unjustly enriched in a particular circumstance. *See, e.g., Grandalski v. Quest Diagnostics*, 767 F.3d 175, 184-85 (3d Cir. 2014) (affirming the denial of certification of an unjust enrichment claim where the district court properly found that individual inquiries would be required in order to determine whether an alleged overbilling by the defendant constituted unjust enrichment for each class member); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014) (unjust enrichment claim arising from an automatic surcharge that defendant imposed on its customers for a damage waiver on tool rentals was not amenable to classwide resolution; whether defendant was unjustly enriched by the surcharge would depend on predominant, individualized determinations concerning the language of the contract that customers signed, the placement and content of any signs in defendant's stores, and any oral representations defendant's employees may have made relating to the damage waiver); *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009) (quantum meruit claim was "highly individualized" and not suitable for classwide adjudication where proof of the claim would necessarily entail an inquiry into whether each allegedly underpaid employee of the defendant had expected compensation for non-work-related tasks or for activities performed while he was supposed to be on break and where it would also be necessary to inquire into each employee's familiarity with the defendant's payment policy).

In the context of this case, the evidence shows that recordation of the leases occurred only after the lease terms were finalized following negotiations specific to the individual lessor and one of SWEPI's contracted landmen. Once recorded, the various leases remained of record for differing lengths of time in different counties, and they were ultimately surrendered for different reasons. Under these circumstances, determining what benefit SWEPI actually received in any given instance from holding a recorded lease and whether SWEPI was "unjustly" enriched thereby will depend on numerous individualized factors including, among other things, the information that was imparted by the landman to the landowner during the course of specific lease negotiations, how long each particular lease remained of record, the nature of SWEPI's activities (if any) relative to the subject lease during the period of recordation, SWEPI's reason for surrendering the recorded lease without payment, and whether the affected landowners had other opportunities to re-lease their mineral rights notwithstanding any change in market conditions. In situations where the putative lessor lacked valid title to the mineral rights in question, or where the lease was held only for an extremely short period of time, SWEPI may have received little or no benefit at all. Similarly, if leases were surrendered at the landowner's request because the landowner sought to take advantage of a better opportunity by contracting with a different company, this could affect the determination about whether and to what extent SWEPI was "unjustly" enriched. Thus, resolution of Count I(B) will involve a case-by-case weighing of the equities in which individualized inquiries will predominate over any issues common to the class. For this reason, the court finds that the commonality and predominance requirements are not satisfied with respect to plaintiffs' unjust enrichment claim.

4. Count II: Fraud

Count II of the Second Amended Complaint asserts a claim for common law fraud.  The gravamen of this claim is that SWEPI viewed its draft instruments as "a worthless medium of payment as to which it could at its sole discretion claim to have no payment liability" (SAC ¶34); yet, at the same time, SWEPI "intentionally utilized the Time Drafts as a means of inducing the Plaintiffs to execute, acknowledge and deliver … the Leases and Lease Memoranda to SWEPI without actual payment of the Signing Bonus."  (SAC ¶35.)  Plaintiffs also allege that SWEPI "recorded the Lease Memoranda without the knowledge or permission of Plaintiffs" and "maintained them of record" (*id.* ¶ 36) so that it could "hold itself out as the owner of the Leases" and thereby "forestall its competitors from dealing with Plaintiffs."  (*Id.* ¶ 38.)  During the time period of lease recordation, the market price of natural gas became severely depressed, and plaintiffs thereby suffered pecuniary loss.  (*Id.* ¶¶ 36, 41.)

To establish a Pennsylvania common law fraud claim, the plaintiffs must prove the following elements:  (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury that was proximately caused by the reliance.  *Mason v. Threshman,* Case No. 3:12cv259, 2012 WL 3696177, at *4-5 (M.D. Pa. Aug. 27, 2012) (citing *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534, 540 (Pa. Super. Ct. 2003)); *see also Gibbs v. Ernst,* 647 A.2d 882, 889 (Pa. 1994).  These elements must ultimately be proved by clear and convincing evidence.  *Id.*

Plaintiffs contend that their fraud claim should be certified because it arises from a common course of conduct whereby SWEPI deceptively "obtain[ed] execution and possession of the Lease by creating the false pretense that the landowner would be paid the Signing Bonus."

(Pls.' Br. Supp. Mot. Class Certification at 16, ECF No. 63.)  According to plaintiffs, the

documents of record show objectively that, in each case:

- SWEPI obtained possession of the executed lease documents by tendering a draft in the amount of the signing bonus which contained a fine-printed disclaimer of liability;

- the draft was first given to the landowner upon execution of the lease documents, leaving the landowner no appreciable opportunity to review the fine print of the draft;

- instead of having the *landowner* sign the draft in accordance with the applicable commercial practice, SWEPI  caused its agent to issue the draft on its behalf, creating the false impression that it was as good as a check;[9]

- the draft was given to the landowner together with an instruction letter which in plain English explained how and when the draft would be paid, but eschewed any reference to the disclaimer of liability;

- the instruction letter failed to disclose that the draft was a "documentary draft" designed to facilitate the *escrow* of the executed lease documents with the landowner's bank pending payment by SWEPI.

(*Id.* 16-17.)  Plaintiffs theorize that SWEPI knew its use of drafts was alien to unsuspecting

landowners, and it capitalized on their ignorance by signing the drafts as *buyer* (thus creating the

false pretense that the draft would be payable on demand after the allotted ninety days).

Moreover, SWEPI's agents failed to inform landowners that they had the right to escrow the

signed lease documents through banking channels pending payment of the draft.  In this way,

plaintiffs argue, SWEPI was able to obtain the executed lease documents and record the MOL

without having first made payment.

---

[9] Plaintiffs explain that drafts were commonly used by sellers, particularly merchants, as a means of ensuring that title to their goods would not be transferred until payment was received from the buyer.  Typically,

> the bill of lading [i.e., title to the goods] was attached to a draft that was signed by the seller (the drawer).  Then, the draft, with the attached bill of lading, was placed into banking channels and processed as a collection item.  The collecting bank would not deliver the bill of lading, evidencing title to the goods, to the purchaser until the draft was paid.

(Pls.' Br. Supp. Mot. Class Certification 17-18, ECF No. 63) (quoting Hart and Willier, *Commercial Paper Under the Uniform Commercial Code,* §1.09[7], UCC Serv. (Matthew Bender)).

As this court noted at oral argument, fraud claims are generally ill-suited for classwide resolution because of the predominance of issues requiring individualized proof. *See, e.g., In re St. Jude Med.. Inc.,* 522 F.3d 836, 838 (8th Cir. 2008) ("Because proof often varies among individuals concerning what representations were received, and the degree to which individual persons relied on the representations, fraud cases are often unsuitable for class treatment."); *Slapikas v. First Am. Title Ins. Co.,* 250 F.R.D. 232, 247 (W.D. Pa. 2008) ("fraud, in general, because of the issue of reliance, is seldom amenable to class certification"); *see* Rule 23 Advisory Committee Notes to the 1966 Amendments (stating, in pertinent part, that a fraud case, "although having some common core, ... may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.").

Based upon the evidence of record, the court concludes that certification of plaintiffs' fraud claim is inappropriate in this case as well. Defendants showed, through the declaration of Eric Jenevein, that the lease negotiations at issue were generally conducted on an individualized basis between each landowner and one of at least thirty different landmen. (Jenevein Decl. ¶¶ 5, 14.) Mr. Jenevein states that, during negotiations, the landmen would frequently discuss issues such as payment terms, and landowners sometimes requested, and were given, a copy of the form draft that would be used for payment. (*Id.* ¶¶6, 8.) Southeast generally instructed its landmen to explain the terms of the draft to landowners *prior to* obtaining their signatures on the lease form, and this would include an explanation that payment by draft was not a payment by check. (*Id.* ¶¶ 8, 9.) Sometimes this explanation would occur at the final face-to-face meeting prior to the exchange of documents, but often it occurred in the weeks prior to the final meeting. (*Id.* ¶8) According to Mr. Jenevein, other competing companies were actively leasing properties in the

same areas in late 2011 and 2012, and landowners were often negotiating with these other companies at the same time that they were negotiating with SWEPI's contracted landmen. (*Id.* ¶6.) During this time, most oil and gas companies made payment through the use of bank drafts or "Orders to Pay" which, like SWEPI's drafts, were not immediately payable on demand. (*Id.* ¶16.) Most companies also engaged in the practice of retaining the signed leases and recording a memorandum of lease, after which there would follow a more thorough title search during the time period specified in the bank draft or "Order to Pay." (*Id.*)

What this shows is that any determination about whether material misrepresentations were made to the landowners, and whether the landowners justifiably relied on those misrepresentations, will depend upon an examination of all the circumstances surrounding the various lease negotiations. This examination will include consideration of what each landman told the prospective lessor concerning the use of the draft instrument, the extent to which the landowner was given an opportunity to review the instrument prior to signing the lease, whether or not the landowner was represented by legal counsel during negotiations, and whether the landowner had prior knowledge or experience with draft instruments, either by virtue of general life experience or as the result of negotiating with other competing oil and gas companies. Because plaintiffs also alleged that the MOLs were recorded without the lessor's knowledge or permission (SAC ¶ 36), case-specific inquiries will need to be made concerning this point. All these individualized considerations concerning whether false representations were made will bear on the extent to which fraudulent intent can be inferred in each transactional situation. The fact that each lease was negotiated separately by numerous different landmen makes common classwide proof all the more impracticable.

Although individualized inquiries bearing on reliance often preclude class certification, the court acknowledges an exception whereby reliance on an alleged misrepresentation can sometimes be presumed. One such situation is where a fiduciary relationship exists between the defendant and the plaintiff. *See Slapikas,* 250 F.R.D. at 247. Plaintiffs seek to avail themselves of that presumption here.

In their initial class certification brief, plaintiffs argued that reliance should be presumed because SWEPI allegedly possessed "overmastering influence" vis-a-vis the landowners. This was demonstrated, plaintiffs argued, by virtue of SWEPI preparing every document, electing to use a draft instrument rather than a check as the form of payment, and being vastly more sophisticated than the landowners who comprise the putative class. The declaration of Eric Jenevein suggests, however, that an "overmastering influence" on the part of SWEPI cannot be generally inferred on a classwide basis, because every lease transaction was negotiated individually, and not every landowner was in the same position as all other landowners vis-à-vis SWEPI. *See Basile v. H&R Block, Inc.,* 52 A.3d 1202, 1210 (Pa. 2012) (noting that "the term 'overmastering influence' … implies a relational aspect" which can differ among individuals). For example, the record shows that Mr. Bedow is not only an experienced business owner, but also a prominent landowner who holds some 3,000 acres of land throughout Venango County and elsewhere. (Bedow Dep. 9-11, 18, 20, 38-39, 66, 77-79, 80; Defs.' Ex. J-47, ECF No. 66-50.) Notably, Mr. Bedow entered into lease agreements with several oil and gas companies, including SWEPI and Range Resources, for which he received payments or royalties. (Bedow Dep. 66, 72-75, 77-81, 93, 96-97, 116, 142.) In some of his transactions with SWEPI, Mr. Bedow was paid through a draft identical to the ones at issue here. (*Id.* at 93, 96-97.) It may be fair to assume that many, or even most, class members were less sophisticated or possessed less

business acumen or bargaining power than Mr. Bedow; however, this merely proves the point that an "overmastering influence" on the part of SWEPI cannot be generally inferred relative to all lease transactions.  *See Basile,* 52 A.3d at 1209, 1212 (upholding decertification of an action for breach of fiduciary duty where the existence of a confidential relationship could not be proved on a classwide basis; there was no basis in the record to presume that the defendant's marketing and customer relations had the same impact on each and every putative class member).

In their supplemental post-argument brief, plaintiffs assert a slightly different proposition:  that a fiduciary relationship existed between SWEPI and the individual landowners because, in every case, SWEPI's contracted landmen acted as escrow agents -- and thus, fiduciaries -- for both SWEPI and the individual landowners when they took possession of the signed lease documents.  According to plaintiffs, "[t]he fact that the landmen promptly thereafter recorded the executed documents at SWEPI's behest, without requiring that the signing bonus be paid, inarguably constitutes both a breach of fiduciary duty on the part of the landmen, and a fraud on the part of SWEPI who suborned that breach."  (Pls.' Suppl. Br. Supp. Mot. for Certification at 7, ECF No. 83.)  Plaintiffs conclude that this alleged breach of fiduciary duty lies "at the very heart of the fraud claim against SWEPI" and entitles the putative class to a presumption of reliance in every case.  (*Id.* at 7.)  This argument is not persuasive.

"'In all cases, the question whether an instrument placed with a third person is to be an escrow or a completely executed instrument depends on the intentions of the parties.'"  *Zweifach v. Scranton Lace Co.,* 156 F. Supp. 384, 393 (M.D. Pa. 1957) (quoting 19 AM. JUR. *Escrows,* § 4, p. 421).  "'To establish the existence of an escrow relationship, a plaintiff must establish that an agreement existed between the parties, the conditions of which were communicated to the

depositary, who accepted its terms and agreed to be bound by them.'" *In re Asousa P'ship,* Bankruptcy No. 01–12295, 2006 WL 1997426, at *15 (Bankr. E.D. Pa. June 15, 2006) (quoting *Struck v. Binns*, Civ. A. No. 94-4835, 1995 WL 57481, at *3 (E.D. Pa. Feb. 10, 1995)). "An escrow agreement may be in writing, oral, or partly in both." *Id.* (citing *Struck*, 1995 WL 57481, at *3). Although the third-party depositary may be an agent for one of the parties in other respects, "with respect to the instrument in escrow his powers are solely limited to those stipulated in the escrow agreement." *In re Dolly Madison Indus., Inc.,* 351 F. Supp. 1038, 1042 (E.D. Pa. 1972) (citing *Zweifach,* 156 F. Supp. at 393).

Here, plaintiffs theorize that the terms of the escrow are set forth in the draft, and that this "agreement" required SWEPI's landmen to retain custody of the lease without recordation, pending the specified time period for title examination and acceptance of the lease. Plaintiffs aver that SWEPI instructed its landmen to "prematurely record[ ] the [MOLs] in violation of the escrow for the fraudulent purpose of fending off its many competitors from dealing with landowners." (Pls.' Suppl. Br. Supp. Mot. Class Certification at 1-2, ECF No. 83.) The bank drafts, however, merely acknowledged the possibility that "other papers" might (or might not) "accompany" the draft; the draft's language did not require that any particular documents be submitted into escrow with the draft, or impose any duties whatsoever on the landmen, much less a duty to refrain from recording the MOLs. The record is devoid of any evidence supporting the existence of an oral escrow agreement to which SWEPI's landmen agreed to be bound. *See In re Asousa P'ship,* 2006 WL 1997426, at *15 (a plaintiff must establish that an agreement existed between the parties, the conditions of which were communicated to the depositary, who accepted its terms and agreed to be bound by them). In any event, however, such an agreement would have to be proved on a particularized, case-by-case basis with consideration being given to all

the surrounding circumstances, including the specific communications that transpired between each landowner and landman. The same conclusion applies to the extent plaintiffs seek to establish an implied escrow agreement. While an agency relationship may be implied from "all the attending circumstances," *see Yezbak v. Croce,* 88 A.2d 80, 82 (Pa. 1952), this, too, involves a fact-specific individualized inquiry not suitable for classwide proof. An agency relationship requires "the manifestation by the principal [here, the landowner] that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Scott v. Purcell,* 415 A.2d 56, 60 (Pa. 1980). In the context of this case, determining whether these elements are satisfied would require the parties to delve into particularized proof issues that would predominate over issues common to the class.

In sum, the court concludes there is no basis in this record for inferring the existence of a classwide fiduciary relationship between SWEPI's landmen and the putative class members. Under Pennsylvania law, there are "two primary ways of establishing a confidential relationship." *Basile,* 52 A.3d at 1210. "The first is to demonstrate a legal relation ordinarily known as confidential at law." *Id.* As defendants point out, "'[t]he prevailing view is that the lessor/lessee relationship does not create a fiduciary duty between the parties…" (Defs.' Resp. Opp. to Pls.' Mot. Class Certification at 25, ECF No. 68 (quoting Patrick H. Martin & Bruce M, Kramer, *William & Meyers, Oil & Gas Law* § 656.9 (LexisNexis Matthew Bender 2014)); *see Basile,* 52 A.3d at 1210 (citing *Stinnett v. Colorado Interstate Gas Co.,* 227 F.3d 247, 253 (5th Cir. 2000) ("As mineral lessors and lessee, the [plaintiffs] and [defendant] are not in a fiduciary relationship."); *McWreath v. Range Res.—Appalachia, LLC,* No. 13-560, 2015 U.S. Dist. LEXIS 8563, at *46 (W.D. Pa. Jan. 26, 2015) (stating "there is no fiduciary relationship between Plaintiff and Range; rather it is contractual"); *Healy v. Chesapeake Appalachia, LLC,* No. 1:10-

cv23, 2011 U.S. Dist. LEXIS 759, at *63 (W.D. Va. Jan. 5, 2011) (in Report and Recommendation, court declined to find fiduciary relationship between lessor and lessee in a case involving underpayment of royalties)).

"In the absence of some affiliation pursuant to which a confidential relationship is legally presumed," the party asserting the existence of a confidential relationship is "relegated to the alternative, fact-dependent method of proving such a relationship." *Basile,* 52 A.3d at 1210. This method involves an "intensely fact-specific" inquiry. *Id.*; *see Leedom v. Palmer*, 117 A. 410 (Pa. 1922). For the reasons previously discussed, the court finds no basis in the record for inferring the existence of a fiduciary relationship between SWEPI and all members of the putative class. Because a fiduciary relationship would have to be established, in any event, through individualized proof, plaintiffs did not establish a basis for a classwide presumption of fraud. *See Stratton v. Am. Med. Sec., Inc.,* 266 F.R.D. 340, 352-53 (D. Ariz. 2009) ("[I]n cases involving allegations of fiduciary duty that arise out of the facts of a specific relationship, the claim is not well-suited to a class action."). For the foregoing reasons, the court finds that the predominance requirement is not satisfied with respect to plaintiffs' fraud claim at Count II.

### 5. Count IV: Promissory Estoppel

Count IV of the Second Amended Complaint asserts a claim for promissory estoppel. To maintain this claim, plaintiffs must show that: "'(1) the promisor made a promise that [it] should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.'" *V-tech Servs., Inc. v. Street,* 72 A.3d 270, 276 (Pa. Super. Ct. 2013) (quoting *Crouse v. Cyclops Indus.,* 745 A.2d 606, 611 (Pa. 2000)).

Plaintiffs' promissory estoppel claim, like their unjust enrichment claim, arises from SWEPI's retention of the recorded leases until the gas market collapsed. Until that time, the class members were allegedly prevented from dealing with other companies before the market for oil and gas leases in their localities evaporated. Plaintiffs assert that each member of the class shares this claim based on identical material facts that are demonstrated by materially identical documents and records.

SWEPI maintains that promissory estoppel claims are generally inappropriate for class treatment, and it cites several decisions where certification of that kind of claim was denied.[10] It argues that individualized proof will be required to establish both detrimental reliance on the part of each landowner and that "injustice can be avoided only by enforcing the promise" in each instance.

The court concludes that plaintiffs' promissory estoppel claim, like their unjust enrichment and fraud claims, is not suitable for classwide resolution. In determining the exact dimensions of the alleged "promise," it will be necessary for the fact-finder to examine the negotiation process for each individual lease transaction in order to ascertain, e.g., whether matters such as the specific terms and conditions of payment or the purpose and procedure of recording the MOL were discussed with the prospective lessor. Establishing each landowner's reliance on the alleged promise will also require individualized proof for the reasons previously

---

[10] *See, e.g., Sprague v. General Motors Corp.,* 133 F.3d 388, 398 (6th Cir. 1998) (ERISA estoppel claim was not susceptible to classwide treatment because "[a]n estoppel claim requires proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on the statements to his detriment. ... Because of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment.")(internal citation omitted); *Alday v. Container Corp. of Am.,* No. 87-488-CIV-J-16, 1988 WL 236038, at *3 (M.D. Fla. Sept. 2, 1988) (noting, in the context of an ERISA claim, that "[q]uestions of a person's reliance on oral and written statements are personal and subjective in nature and not ones which can be lumped together into one common understanding"); *Rowell v. Voortman Cookies, Ltd.,* No. 02-C-0681, 2005 WL 1026715, at *2 (N.D. Ill. Apr. 27, 2005) ("Plaintiffs' promissory estoppel claim requires individualized inquiries into the reliance by the individual Plaintiffs on a promise to his or her detriment and whether the reliance was reasonable in numerous individual circumstances.").

discussed in connection with plaintiffs' fraud claim. In addition, each putative class members' "detriment" will have to be individually analyzed. For example, landowners who requested and received a voluntary surrender of their lease may not have suffered any detriment, particularly if they were able to re-lease their rights on more favorable terms. These considerations also bear on the issue whether injustice can only be avoided by enforcing the promise. Accordingly, the court finds that Rule 23(b)(3)'s predominance requirement is not satisfied with respect to the promissory estoppel claim set forth in Count IV.

C. Typicality

The third threshold requirement under Rule 23(a) is that the plaintiffs' claims be typical of those of other class members. In *Marcus v. MVW of N. Am., LLC,* 687 F.3d 583 (3d Cir. 2012), the Third Circuit Court of Appeals explained this requirement as follows:

> The concepts of typicality and commonality are closely related and often tend to merge. *See Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n. 13, 102 S.Ct. 2364. Typicality, however, derives its independent legal significance from its ability to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." 7A Wright, supra, § 1764.

> To determine whether a plaintiff is markedly different from the class as a whole, we consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class. *See Schering Plough*, 589 F.3d at 597. This comparative analysis addresses:

>> three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

> *Id.* at 599. If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992).

687 F.3d at 597-98.

Defendants assert that the various individualized issues that pervade plaintiffs' claims precludes a finding of typicality. They also argue that plaintiffs' testimony is at odds in key respects with the legal theories they are asserting on behalf of the class. As an example, defendants cite Walney's deposition testimony that he viewed the bank draft as part of the lease contract rather than simply a post-contract means of payment; Walney also disclaimed having received any other promises from SWEPI other than what was set forth in the lease and the draft. (Walney Dep. 181-82, ECF No. 66-8.) As for Bedow, defendants state that he initially testified the bank draft was just "a payment of monies promised on the contract"; subsequently, however, Bedow testified that the lease, draft, and MOL were "all one contract." (Bedow Dep. 32, 172, ECF No. 66-10.) Defendants maintain that Bedow is not representative of the allegedly "unsuspecting" landowners who were supposedly defrauded, since Bedow is a sophisticated and experienced businessman with prior leasing experience and familiarity with the use of draft instruments. Finally, defendants argue that both Walney and Bedow are subject to unique defenses in that neither one provided notice to SWEPI prior to filing suit, as is allegedly required by the leases.

Because the court concluded that only Counts 1 and 1(A) satisfy the predominance requirement of Rule 23(b)(3), the court needs to address the typicality requirement only with respect to those counts. At least at this point in the proceedings, the court is satisfied that "typicality" is met. As previously discussed, plaintiffs are asserting their breach of contract

claims under the theory that, in all cases, the terms of the subject leases unconditionally obligated SWEPI to pay the bonus monies, *irrespective* of title issues, requests for surrender by the landowner, or other reasons cited by SWEPI for nonpayment.  Plaintiffs argue that this unconditional obligation arose from the unambiguous terms of the contract, viewed in the context of SWEPI's common act of retaining possession of the leases and recording the MOLs prior to the completion of their title searches.  Thus, the claims of Walney and Bedow are the same as those of the class in terms of both the legal theory being advanced and the factual circumstances underlying their theory.  To the extent SWEPI intends to pursue the defense that Walney and Bedow violated the terms of their leases by failing to provide notice prior to filing suit, the court finds that this particular defense is unlikely to become a major focus of the litigation.

The court also concludes that the interests and incentives of the named plaintiffs are sufficiently aligned with those of the proposed class.  At this point in the litigation, the court is not faced with competing concerns over a limited settlement fund, and it is presently not clear that issues such as title defect will result in different litigation strategies for the class members or differing outcomes relative to liability.  Plaintiffs at this point are seeking a full recovery of the bonus monies that were allegedly promised in connection with every putative class members' lease transaction, and they are also asserting that SWEPI's various reasons for nonpayment are invalid under the contract as a matter of law.  Accordingly, the court finds that the typicality requirement is satisfied relative to Counts I and I(A).

D.  Adequacy of Representation

Rule 23(a)'s fourth threshold requirement is that the representative plaintiffs must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy

requirement concerns both "the experience and performance of class counsel" and "the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170, 181 (3d Cir. 2012) (citing *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005)). "'The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class.'" *Community Bank III*, 2015 WL 4547042, at *7 (quoting *Community Bank II,*, 622 F.3d 275 (3d Cir. 2010)). In fact, "'the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.'" *Id.* (quoting *Dewey*, 681 F.3d at 183).

Here, there is no challenge to the adequacy of putative class counsel;[11] however, defendants contend that the named plaintiffs are inadequate representatives because both Walney and Bedow testified to facts at odds with the legal theories they are trying to advance on behalf of the class and because they failed to display the knowledge required of a class representative. Defendants point to Walney's testimony that he had "never heard of" the promissory estoppel claim and Bedow's difficulty during his deposition identifying the false misrepresentation that serves as the basis of the plaintiffs' fraud claim. (*See* Walney Dep. 182; Bedow Dep. 209.) Defendants also point to Walney's prior criminal conviction as a factor that could negatively impact his ability to effectively represent the class.

---

[11] The court finds that Mr. Altomare is qualified to serve as class counsel consistent with the requirements of Rule 23(a)(4), (g)(1), and (g)(4). In making this determination, the court relied, in part, upon the declaration and curriculum vitae of Mr. Altomare, which are submitted as Exhibit 13 to the pending motion (ECF No. 63-15). The court also considered Mr. Altomare's performance thus far in the pending litigation, including the work he performed in identifying and investigating potential claims on behalf of the putative class members. Based upon Mr. Altomare's performance to date in this case, his broad professional experience in oil and gas matters, his past involvement in handling complex litigation, his demonstrated knowledge of relevant legal principles, and his apparent ability and willingness to commit sufficient resources to this class litigation, the court finds that Mr. Altomare will fairly and adequately represent the interests of the class relative to the claims at Counts I and I(A) of the SAC.

At this juncture, the court is concerned only with plaintiffs' ability to adequately represent the class relative to the breach of contract claims at Counts I and I(A). The court is satisfied that the named plaintiffs will be adequate class representatives with respect to those claims. As noted, plaintiffs' interests as to these claims are presently aligned with those of the class because the liability and damages theories for plaintiffs' breach of contract claims are the same as those being asserted on behalf of the class. *See Community Bank III,* 2015 WL 4547042, at *9 (court found "no reason to believe" that subclass representatives would not "vigorously represent the interests of their fellow class members," since "[t]hey are all pursuing damages under the same statutes and the same theories of liability, and the differences among them will not, at least as things presently stand, pit one group's interests against another"). At this point in the litigation, no intra-class conflicts exist beyond the mere *potentiality* that individualized issues may prove to be both relevant and predominant with respect to the breach of contract claims; however, this is a determination that will be fleshed out in more detail at the merits stage of the proceedings. At that time, the feasibility of class certification or sub-class certification can be revisited, if appropriate. *See In re Ins. Brokerage Antitrust Litig*., MDL No. 1663, 2007 WL 2589950, at *11 (D.N.J. Sept. 4, 2007), *aff'd*, 579 F.3d 241 (3d Cir. 2009) ("[A] conflict will not be sufficient to defeat class action unless that conflict is apparent, imminent, and on an issue at the very heart of the suit." (internal quotation marks and brackets omitted)); Alba Conte & Herbert B. Newberg, Newberg On Class Actions § 3:58 (5th ed. 2011) ("A conflict must be manifest at the time of certification rather than dependent on some future event or turn in the litigation that might never occur.").

The court notes that, while the named plaintiffs do not claim any particular expertise in the oil and gas industry, they appear to possess the minimal degree of knowledge required to

meet the adequacy standard. *See New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 313 (3d Cir. 2007) ("minimal degree of knowledge" by putative class representative is sufficient); *Smith v. Life Investors Ins. Co. of Am.,* No. 2:07-cv-681, 2009 WL 3756913, at *10 (W.D. Pa. Nov. 6, 2009) ("A class representative need only possess a minimal degree of knowledge to meet the adequacy standard."). Accordingly, the court finds that the named plaintiffs are adequate representatives of the putative class relative to Counts I and I(A).

E. Superiority

Rule 23(b)(3) requires that a class action be a superior means of fairly and efficiently adjudicating a controversy as compared to other available methods. Relevant considerations for this criterion include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). "'The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *Community Bank III,* 2015 WL 4547042, at *22 (quoting *Community Bank I,* 418 F.3d at 309).

Plaintiffs argue that it is desirable to bring the litigation in this judicial district because the named plaintiffs as well as the majority of putative class members reside in Western Pennsylvania. There are presently no competing class actions and, although eighteen of Mr. Altomare's clients have filed individual lawsuits in state court as a prophylactic matter, no complaints have yet been filed in those cases because it is Mr. Altomare's intention to discontinue those cases if the class in this action is certified. Plaintiffs maintain that, given the

size of the putative class, there are no disqualifying case management issues, and individual damages will be readily quantifiable from the defendants' records. Plaintiffs contend that, if a class is not certified, the only alternatives will be either: (1) no recourse for individual class members whose more modest claims will make further litigation cost prohibitive, or (2) a multiplicity of scattered suits resulting in the inefficient, and possibly inconsistent, administration of justice.

Defendants dispute that the superiority criterion is satisfied. They point to the lawsuits commenced in state court by Mr. Altomare's clients and note that the amounts in controversy are sufficient to support those individual suits without the need for a class action. Based on their arguments that commonality and predominance are lacking, defendants maintain that resolution of the class members' claims will require individualized discovery and depositions if certification is granted. Additionally, defendants contend that each class member has a substantial interest in controlling his own action and making his own settlement decision because, if any plaintiff demands the full lease bonus amount as settlement, SWEPI would require that plaintiff to enter into a new lease of the oil and gas interest as part of the settlement, and those decisions could only realistically be made on an individual basis, with terms of a new lease being individually negotiated.

The court finds that a class action will be a superior means of fairly and efficiently adjudicating the merits of plaintiffs' breach of contract claims at Counts I and I(A) of the SAC. As previously discussed, numerous issues of law presently exist which are common to the class in that they arise from materially identical form documents and a common course of conduct on the part of SWEPI relative to its lease acquisition process. As matters currently stand, these common legal issues predominate over questions affecting only individual class members,

making classwide treatment of the claims a more efficient means of adjudicating Counts I and I(A). In the absence of class certification, those class members with more modest claims may find litigation to be cost prohibitive or otherwise impracticable. In addition, the federal and state courts in Pennsylvania may face a litany of scattered lawsuits raising similar claims which, as plaintiffs note, will potentially undermine the goals of efficient and consistent administration of justice.

The court agrees with plaintiffs that, given the size of the putative class, no disqualifying case management issues are immediately apparent. In any event, however, this court will have substantial discretion to enter any orders necessary to address class management issues as they arise. *See Community Bank III,* 2015 WL 4547042, at *23 ("Rule 23(d) vests in the Court substantial discretion to enter orders … to manage the class.") (internal quotation mark and citation omitted).

The court is not persuaded by defendants' argument that the class members' interest in individually controlling the prosecution of separate actions is a factor presently weighing against certification. Although defendants argue that any possible settlement for the full bonus payments would necessarily involve individualized leasing decisions, it is premature at this juncture to engage in that assumption. To the extent that subsequent developments in this litigation produce or reveal a lack of uniformity among the class members in terms of their respective litigation strategies, the court can revisit the appropriateness of continued classwide adjudication at that time.

The existence of pending state court lawsuits also does not weigh against certification. As plaintiffs have explained, these lawsuits are in their nascent stage and may be terminated upon class certification in this forum.

Finally, the likely presence of numerous class members in Western Pennsylvania and the corresponding desirability of concentrating litigation in this forum are factors that generally weigh in favor of certification. For all these reasons, the court finds that the superiority criterion of Rule 23(b)(3) is satisfied with respect to the breach of contract claims at Counts I and I(A). By contrast, the court finds that the superiority requirement is not satisfied relative to the claims for unjust enrichment, fraud, and promissory estoppel at Counts I(B), II and IV. The predominance of many individualized issues over those common to the class is an overriding concern and will make classwide management of those claims unfeasible. Accordingly, the court will deny plaintiffs' motion for class certification with respect to Counts I(B), II and IV.

F.  Ability to Ascertain Class Membership

"'A critical need of the trial court at certification is to determine how the case will be tried, . . . including how the class is to be ascertained.'" *Royal Mile Co., Inc. v. UPMC,* 40 F. Supp. 3d 552, 581 (W.D. Pa. 2014) (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (quoting *In re Hydrogen* Peroxide, 552 F.3d 305, 319 (3d Cir. 2008))). The court of appeals has explained the "two important elements" of ascertainability as follows:

> First, the class must be defined with reference to objective criteria. [*Marcus v. BMW of North Am., LLC,* 687 F.3d 583, 598 (3d Cir. 2012)]. Second, there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. *Id*. at 593–94. … "(I)f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id*. at 593; *see also* William B. Rubenstein, Newberg on Class Actions § 3:3 (5th ed.2011) ("Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry."). … [O]ther courts have gone so far as to hold "that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." *Marcus*, 687 F.3d at 593.

*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013).  "It is the Plaintiffs' burden to show by a preponderance of the evidence that the class is currently and readily ascertainable." *Community Bank III*, 2015 WL 4547042, at *10 (citing *Carrera,* 727 F.3d at 306).

Here, the proposed class consists of "[e]very person who on or after March 14, 2009, signed a Pennsylvania oil and gas lease and/or memorandum thereof in favor of and recorded by SWEPI, LP in exchange for the promise of a signing bonus which was never paid."  (Pls.' Br. Supp. Mot. Class Certification at 3, ECF No. 63.)  Defendants contend that persons falling within the latter portion of this proposed class – i.e., those who were "promised a signing bonus which was never paid" – are not readily ascertainable on the basis of objective criteria.  According to defendants, the question of who received a "promise of a signing bonus" is not objectively ascertainable because plaintiffs did not sufficiently define "how these alleged promises were made, who made them, whether they were made orally or in writing, when they were made in the lease offer and execution process, whether any conditions were attached to the promise, how the promisor explained that the signing bonus would be paid, or any other details of the alleged 'promise of a signing bonus.'"  (Defs.' Br. Opp. Mot. Class Cert. 40, ECF No. 68.)  Defendants argue that, because they are forced to guess as to the form, content, and timing of the alleged promise and what persons received such a promise, determining who was given the alleged promise will require highly individualized fact-finding.  They contend that they also cannot objectively ascertain who was "never paid" a bonus, given that the precise nature of the promise is undefined.  Assuming the bank drafts represent the "promise," defendants nevertheless argue that determining what is meant by "payment" is ambiguous because many landowners who executed a lease were issued an initial draft that was not paid but, later, they were issued a replacement draft covering the same (or substantially the same) property.  Replacement drafts

may have been issued following title examination for a variety of reasons, such as to adjust the amount for different acreage, to reflect the proper identity of the landowner, or to correct other miscellaneous errors or omissions. According to defendants, "Plaintiffs' proposed definition is not clear as to whether the class is defined as those who received any draft that was never paid, only those whose initial draft was not paid, only those whose replacement draft was not paid, only those who were not paid due to a reason other than a title defect or similar issue, or some combination of these categories." (Defs.' Br. Opp. Mot. Class Cert. 42, ECF No. 68.)

Defendants' concerns about their ability to ascertain class membership are somewhat overstated. Plaintiffs' breach of contract theories are premised on the idea that an enforceable promise to pay arose from the lease documents (including the form lease, the draft and the MOL), together with SWEPI's uniform act of recording the MOLs. Therefore, the identity of individuals who received a "promise" within the meaning of the class definition can be ascertained by reference to the lease documents and the act of recordation, all of which are objectively verifiable. To the extent the Plaintiffs' proposed class definition is ambiguous in this regard, the definition will be accordingly modified. *See Hicks v. T.L. Cannon Corp.*, 35 F. Supp. 3d 329, 357 (W.D.N.Y. 2014) ("[C]ourts have the discretion 'to construe the complaint or redefine the class to bring it within the scope of Rule 23....'") (quoting *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012)) (ellipsis in the original); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 769-70 (N.D. Ill. 2014) (court noting that, where it was "clear that the class definition proposed by the plaintiffs must be altered," it was "within th[e] court's discretion to do so") (citing *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011)); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *9 (M.D. Pa. Nov. 19, 2007) ("In modifying the class definition, the Court notes it is not bound by Plaintiffs' proposed class

definition and has broad discretion to redefine the class, whether upon motion or *sua sponte*.")(citing authority); see also 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1759 (3d ed. 2005) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23 or it may allow plaintiff to amend in order to limit the class.").

With respect to identifying which individuals were "never paid," the court views this concept as encompassing only those landowners who never ultimately received payment on the draft that was issued in connection with their underlying recorded lease transaction. The record suggests that these individuals can be objectively and reliably identified from SWEPI's or Amegy's payment records.[12] To the extent SWEPI is concerned that certain putative class members may claim nonpayment based on a draft that was actually replaced by a subsequent draft or bank check, this concern need not preclude class certification. The class definition will be modified to exclude those individuals whose initial drafts were eventually replaced by a subsequent draft or check relating to the same (or substantially the same) underlying lease interest.

The class will be defined as:

> Every person who on or after March 14, 2009, signed a Pennsylvania oil and gas lease (labeled "PA Paid Up Lease Rev. 06.09.2011") and/or memorandum thereof in favor of and recorded by SWEPI, LP and received, in exchange therefore, a draft instrument in the amount of the corresponding lease bonus, which draft was neither paid nor replaced by a subsequently issued draft or check relating to the same (or substantially the same) property.
>
> Notwithstanding the foregoing, there shall be excluded from the Class any person electing in writing to be excluded from the Class.

---

[12] In fact, SWEPI represents that it has already ascertained from its records the number of "unique drafts" which in all likelihood were never ultimately paid. According to SWEPI, there are a total of 260 "unique drafts." (*See* Decl. of Margaret McGeHee, ¶¶ 3-9.)

G. Certification of Fewer Than All Claims

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). This provision has been interpreted as allowing district courts to certify a particular claim or claims within a lawsuit, even where other claims asserted in the same action are not appropriate for class certification. *See, e.g., Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) (adhering to the rule that "subsection 23(c)(4) should be used to separate 'one or more' claims that are appropriate for class treatment, provided that within that claim or claims ... the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met"). In surveying the rulings of other jurisdictions on this point, the court in *Gunnells* pertinently observed that "the Third Circuit has twice reversed district courts for . . . failing to consider class certification of individual claims." *Gunnells*, 348 F.3d at 442-43 (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 453(3d Cir.1977) ("Even assuming that the court were correct in its conclusion that the lease claim is not appropriate for class determination, it nevertheless should have considered certification of the trade-mark claim under Rule 23(c)(4)(A)."), and *Geraghty v. United States Parole Comm'n*, 579 F.2d 238, 252–53 (3d Cir.1978) (rejecting district court's conclusion "that a class action is inappropriate" because "not all of the grounds of action alleged in the complaint are applicable to the [proposed] class" because that conclusion "does not properly acknowledge the powers and duties of the trial court under section (c)(4) of Rule 23"), *vacated on other grounds*, 445 U.S. 388, 402–03 (1980)).

District courts within this circuit have similarly adhered to the view that Rule 23 permits certification of fewer than all claims in a lawsuit, provided that each certified claim satisfies Rule 23's requirements. *See, e.g., Sherman v. Am. Eagle Express, Inc.*, Civil Action No. 09-575, 2012

WL 748400, at *1 (E.D. Pa. Mar. 8, 2012) (certifying claim brought under the Pennsylvania's

Wage Payment and Collection Law but denying certification of Minimum Wage Act claims);

*Kalow v. Springut, LLP v. Commence Corp.*, No. 07-3442, 2011 WL 3625853, at *3-4 (D.N.J.

Aug. 15, 2011) ("[I]t is well settled that a district court can partially certify a class as to a single

cause of action within a suit."); *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 544

(D.N.J.1999) ("This court ... has previously rejected the notion that class certification under Rule

23 is 'an all-or-nothing proposition' requiring class certification of all causes of action asserted

in a single pleading.") (citations omitted); *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279, 289-90

n.4, 295 (D.N.J.1997) (granting certification for antitrust claims while denying certification for

other claims; noting that "[d]ifferential treatment of claims is permitted by Rule 23(c)(4)" and

case law does not suggest "that class certification of all asserted causes of action is an all-or-

nothing proposition").

Although defendants acknowledge this court's discretion to certify only the breach of

contract claims at Counts I and I(A), they argue that the court should not do so based upon

certain considerations discussed in *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011).

In *Gates*, the Third Circuit Court of Appeals addressed, in relevant part, the district court's

refusal to certify a liability-only "issue class" in a mass tort lawsuit.  The court refined and

enumerated certain  factors -- previously discussed in *Hohider v. United Parcel Serv., Inc.*, 574

F.3d 169 (3d Cir. 2009) – that district courts should consider when deciding whether or not to

certify an "issue class" under Rule 23(c)(4).  The "non-exclusive list of factors" outlined in

*Gates* includes:

> the type of claim(s) and issue(s) in question; the overall complexity of the case;
> the efficiencies to be gained by granting partial certification in light of realistic
> procedural alternatives; the substantive law underlying the claim(s), including any
> choice-of-law questions it may present and whether the substantive law separates

the issue(s) from other issues concerning liability or remedy; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

655 F.3d at 273.

Defendants maintain that two particular *Gates/Hohider* factors weigh against partial certification in this case: specifically, "(1) the inefficiencies created by litigating only one claim on a class basis and allowing individual plaintiffs to bring individual cases on the remaining non-certified claims, and (2) the potential preclusive effects on non-certified claims of a judgment on the breach of contract action." (Defs.' Supp. Br. Addressing Issue of Whether Less Than All Claims Can Be Certified at 6, ECF No. 82.) Defendants argue that certification of the breach of contract claims would require this court to "adjudicate a cause of action based on the same underlying facts that would presumably need to be alleged by individual plaintiffs that chose to bring individual claims on the non-certified fraud, promissory estoppel, and unjust enrichment claims." (*Id.*) In defendants' view, this presents "complex and insoluable problems" under principles of collateral estoppel and res judicata, and may also raise "serious due process concerns" for absent class members and defendants "due to the uncertain effect of adjudication of a class-wide breach of contract claim on the remaining individual claims." (*Id.*)

Defendants' objections to partial certification are unpersuasive. This case, unlike *Gates* and *Hohider*, does not involve certification of a liability-only "issue class"; rather, this court is certifying a class relative to two of the five claims asserted in the SAC. Consequently, the

factors outlined in *Gates* and *Hohider* are not implicated here.[13]  *See Kalow & Springut, LLP*,

2011 WL 3625853, at *3 (distinguishing *Hohider* and concluding that an analysis of *Hohider's*

additional Rule 23(c)(4) factors was unnecessary because the inquiry was "not whether *specific*

*elements or issues* within a claim should be partially certified, but rather, whether partial

certification of a single *cause of action*, or a claim, is suitable") (emphasis in the original).  For

the reasons previously discussed at length, the court finds that Counts I and I(A) each satisfy all

of the requisite criteria under Rule 23(b)(3), making certification of those claims appropriate.

Taking defendants' articulation of the relevant *Gates/Hohider* factors at face value,

however, they do not counsel against the court's certification of Counts I and I(A).  Defendants'

first point is that partial certification will supposedly result in inefficiencies as a result of the

parties litigating the contract claims on a classwide basis while individual plaintiffs

simultaneously prosecute individual cases on the remaining noncertified claims.  This

arrangement creates no greater inefficiencies than would have otherwise existed without partial

certification; on the contrary, the certification of claims that are common to the class actually

enhances judicial efficiency and is therefore consistent with Rule 23(c)(4)'s underlying

objectives.  *See Gunnells*, 348 F.3d at 441 ("'The theory of Rule 23(c)(4)(A) is that the

advantages and economies of adjudicating issues that are common to the entire class on a

representative basis should be secured even though other issues in the case may have to be

---

[13] The court's discussion in *Gates* of the noted factors occurred in the context of a Rule 23 issue that is not present here.  Specifically, the court was addressing a disagreement among other circuit courts concerning "the extent to which the ability to certify issue classes [under Rule 23(c)(4)] alters the predominance requirement" of Rule 23(b)(3).  *Gates*, 655 F.3d at 272.  The court observed in *Gates* that "[s]ome appellate courts have viewed Rule 23(c)(4) as a 'housekeeping rule' allowing common issues to be certified only when the cause of action, taken as a whole, meets the predominance requirement[,]" *id.* (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n. 21 (5th Cir.1996)), while "[o]thers have allowed certification of issue classes even if common questions do not predominate for the cause of action as a whole."  *Id.* at 272-73 (citing *In re Nassau County Strip Search Cases*, 461 F.3d 219, 226 (2d Cir.2006); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir.2003); and *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996)).  The court recalled that it had previously "noted [this same] split of authority in *Hohider.*"  *Id.* at 273 (citing *Hohider*, 574 F.3d at 200 n.25).  "Rather than joining either camp in the circuit disagreement," *id.*, the court in *Gates* adopted the factors as a means of "provid[ing] the most sound guidance in resolving this complicated area of class action procedure."  *Id.*

litigated separately by each class member.'") (quoting 7B Wright & Miller, Federal Practice and Procedure § 1790). To the extent individual plaintiffs may attempt to litigate related claims during the pendency of this class action, the courts entertaining those individual lawsuits will have the power to enter stays or other appropriate orders, as they see fit, in order to address concerns about judicial efficiency and effective case management.

Defendants' second concern involves the potential preclusive effects which a judgment on the certified claims may have relative to noncertified claims. At present, there is no reason to believe that those courts adjudicating related lawsuits in the future will face any particular difficulty applying well-established principles of res judicata and collateral estoppel where appropriate, and there is no reason to believe that application of those principles will result in injustice either to defendants or to absent class members. To the extent defendants are successful in defending the certified claims, they will enjoy the protection from future liability that is afforded by the doctrines of res judicata and collateral estoppel. Any absent class members who wish to avoid the preclusive effects that may potentially result from an adverse judgment on the certified claims will have an opportunity to opt out of the class in order to preserve their individual claims. To the extent that future developments in this litigation give rise to due process concerns as yet unforeseen, the court can address those concerns through its broad case management authority.

### V. Conclusion

At this procedural juncture, the court finds, with respect to Counts I and I(A) of the SAC, that common classwide issues predominate over questions affecting only individual class members and that all other prerequisites for class certification are satisfied. If it appears, upon a review of the merits, that the underlying forms and documents are not similar in all material

respects or that individual inquiry is otherwise necessary such that the predominance criterion --

or any other criterion for Rule 23(b)(3) certification -- is no longer satisfied, the court, at that

time, will consider a motion to decertify the class.  At this juncture, based upon the foregoing

discussion, plaintiffs' motion for class certification will be granted with respect to the breach of

contract claims at Counts I and I(A) of the SAC.  The motion will be denied in all other respects.

An appropriate order will be entered.


By the court,


<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
Chief United States District Judge


Dated: September 14, 2015