IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS J. WALNEY and** | ) | |
| **RODNEY A. BEDOW, SR.,** | ) | |
| *individually and on behalf of all* | ) | |
| *others similarly situated,* | ) | CIVIL ACTION No. 13-102 Erie |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SWEPI LP** *and* **SHELL ENERGY** | ) | |
| **HOLDING GP, LLC,** | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

This class action is being prosecuted by Thomas J. Walney ("Walney") and Rodney A.

Bedow, Sr. ("Bedow") on behalf of certain Pennsylvania landowners who executed gas and oil

leases for the benefit of SWEPI LP. In this action, Walney and Bedow (collectively, "plaintiffs")

allege that SWEPI LP and its general partner, Shell Energy Holding GP, LLC (collectively,

"SWEPI" or "defendants"), failed to pay bonus monies that were owed to the various class

members under the terms of their respective leases.

Presently pending before the court are cross-motions for summary judgment filed by

plaintiffs (ECF No. 140) and SWEPI (ECF No. 156). For the reasons that follow, plaintiffs'

motion will be granted in part and denied in part; defendants' motion will be denied.

## I.     Factual and Procedural Background

SWEPI LP is a limited partnership engaged in the business of oil and gas exploration and production.  (PCSF ¶2.) [1]  Beginning in 2011, SWEPI sought to acquire mineral leases in certain parts of Pennsylvania with the help of independent contractors, including Southeast Land Services, LLC ("Southeast"), who acted as SWEPI's agents.  (PCSF ¶¶ 4, 5.)  Ultimately, Southeast helped SWEPI obtain more than 2,800 oil and gas leases.  (*Id.* ¶5)

An account of SWEPI's lease acquisition practices is set forth in the declarations of Ian Haney ("Haney"), a Senior Land Representative in SWEPI's Land Department,[2] and Eric Jenevein ("Jenevein"), manager of Southeast's Appalachia Region.  (*See* ECF Nos. 163-9, 163-10, and 150-1.)  According to Haney and Jenevein, in 2011, Southeast's "landmen" began contacting individual landowners who, based on county property records, appeared to own oil and gas interests in Butler and Venango Counties.  (First Haney Decl. ¶ 6, ECF No. 163-9; Jenevein Decl. ¶ 6, ECF No. 163-10.)  Based upon their initial contact with landowners, the landmen would determine whether the property in question was already under lease to another company and, if not, whether the landowner was interested in entering into a lease with SWEPI. (*Id.*)  If the landowner expressed interest, the landman and landowner would discuss possible bonus amounts or other potential terms of the lease.  (*Id.*)  Negotiations might occur over the course of days, weeks, or months.  (*Id.*)  During late 2011 and 2012, other companies in competition with SWEPI were actively leasing in the same area.  (*Id.*)  Consequently,

---

[1] Citations to "PCSF ¶__" refer to plaintiffs' Concise Statement of Facts (ECF No. 144) and defendants' responses thereto (ECF No. 149).

[2] Haney submitted two declarations during the course of this litigation.  His initial declaration, dated February 27, 2015 (hereafter, "First Haney Declaration"), was incorporated into the summary judgment record as plaintiffs' "Exhibit 9," (ECF No. 163-9).  Haney's second declaration (hereafter, "Second Haney Declaration"), dated August 2, 2017, was submitted as defendants' "Exhibit A," (ECF No. 150-1).

landowners often negotiated with other oil and gas companies at the same time that they were negotiating with SWEPI's contracted landmen. (*Id.*)

Most landowners verbally inquired during the course of negotiations about how and when they would be paid their lease bonus. (Jenevein Decl. ¶8.) With respect to these inquiries, Southeast instructed its landmen to explain that payment would be made by a bank draft rather than a check. (*Id.*) According to Jenevein,

> it was the practice of Southeast's landmen to inform the landowner prior to obtaining the written lease that the payment would be made by a bank draft and not be payable until the expiration of a set number of banking days, usually ninety (90) days, that banking days differ from calendar days, and that ultimate payment would not be made if the title examination during the ninety (90) days did not result in a clean title examination acceptable to SWEPI. It was not the usual practice of Southeast landmen to make any representations or promises about the payment of a SWEPI lease bonus different than the terms reflected in the written bank draft.

(*Id.*)

Once lease terms were finalized, the landman would meet again with the interested landowner, usually at the office of a notary public. At that point, the landman would obtain the signed lease and a signed memorandum of lease ("MOL") in exchange for a draft instrument issued in the amount of the agreed upon bonus. (First Haney Decl. ¶¶ 4, 10; Jenevein Decl. ¶ 9.) The lease, MOL and bank draft were usually executed and exchanged at the same time. (Jenevein Decl. ¶9.) The amount of the lease bonus was normally not specified in the lease agreement itself; instead, it was reflected in the bank drafts that landmen issued on behalf of SWEPI. (First Haney Decl. ¶8; Jenevein Decl. ¶7.) The drafts were payable through SWEPI's bank, Amegy Bank N.A. ("Amegy"), and typically allowed 90 banking days (or sometimes 30 banking days) "for title examination and for payment" once the draft was submitted by the

landowner's bank to Amegy for collection.[3]  (ECF No. 150-30; *see* First Haney Decl. ¶8; Jenevein Decl. ¶7.)  The drafts also included the statement:  "No liability for payment or otherwise shall be attached to any of the parties hereto."  (*Id.*)

After the landmen obtained the signed leases and MOLs from the landowners, they would return those documents to Southeast's or SWEPI's administrative offices for processing. (First Haney Decl. ¶ 10; Jenevein Decl. ¶ 10.)  The MOL would typically be recorded in the county records office within a few days thereafter.  (*Id.*)

Following recordation, Southeast would undertake an in-depth records search to confirm that title to the oil and gas interest was in the acreage amount represented and that no other problems existed with respect to the chain of title.  (First Haney Decl. ¶ 10; Jenevein Decl. ¶ 10.) Upon completion of its search, Southeast would provide SWEPI a confidential report and analysis relative to each parcel of property in question in order to identify whether a failure of title existed as to the particular property and, if so, whether curative action was required.  (First Haney Decl. ¶ 12; Jenevein Decl. ¶ 11.)  Sometimes the title problems could be cured by having the landowner execute a new lease reflecting the correct acreage or the correct ownership names; this curative action would involve cancellation of the original draft and issuance of a new one, if the landowner was agreeable. (First Haney Decl. ¶ 14; Jenevein Decl. ¶ 13.)  In cases where there was a title problem that could not be readily cured, SWEPI would cancel the bank draft and surrender the lease back to the landowner.  (*Id.*)  When drafts were cancelled prior to payment and no substitute draft was issued for the same lease, SWEPI or its contract landmen would file written surrenders of the oil and gas lease in the county records.  (First Haney Decl. ¶21.)

---

[3] The court views the 90-day and 30-day distinction as immaterial for purposes of this litigation.  Accordingly, the court will occasionally refer to the "90-day period" throughout this opinion with the understanding that, in some situations, the period for title examination and payment was shorter.

According to SWEPI, the title examination process was both cumbersome and time consuming, as it required substantial manual research.  (First Haney Decl. ¶13; Jenevein Decl. ¶12.)  In the first half of 2012, the Venango county courthouse experienced significant congestion, as dozens of oil and gas leasing companies undertook title searches and competed for access to public records.  (*Id.*)  By April 2012, the congestion in the courthouse had become so severe that the Venango County commissioners restricted access to the register and recorder's offices.  (*Id.*)  As a result of these restrictions, Southeast's landmen were substantially delayed in their efforts to complete their title searches for Venango County properties.  (*Id.*)  In many cases, landmen could not complete their title searches in Venango County, or SWEPI could not complete its evaluation of Southeast's title analysis, within the time frame specified in the drafts.  (*Id.*)  Because of these difficulties, SWEPI decided, in or around June 2012, to stop acquiring new leases in most of Venango County and to cancel any outstanding drafts that had not already been paid.  (First Haney Decl. ¶20.)

Between December 2010 and November 2013, SWEPI funded approximately 4,927 drafts and paid lease bonuses totaling approximately $313,000,000.00.   (Second Haney Decl. ¶23, ECF No. 150-1.)  Approximately 283 drafts that were issued during this time frame (the "Claimed Class Drafts") were never funded for various reasons.  (ECF Nos. 150-7; Second Haney Decl. ¶23.)

Typically, SWEPI made its decision about whether to fund a draft prior to the draft's due date (usually 90 banking days).  (Second Haney Decl. ¶23.)  The most common reason for SWEPI's refusal to fund drafts was a perceived problem with the lessor's chain of title to the underlying minerals.  (*Id.* ¶¶24, 28.)  SWEPI, however, cites other reasons for refusing to fund class members' drafts.  In 17 instances, funds were not paid because SWEPI surrendered the

underlying lease at the landowner's request. (*Id.* ¶31.) In addition, "the inability of [SWEPI's] contract landmen at Southeast to complete courthouse title searches due to difficulty accessing the courthouse in the Spring and Summer of 2012 was a substantial reason why many drafts in Venango County were canceled and not paid." (*Id.* ¶25.) SWEPI also acknowledges that, by June 2012, a drop in the commodity price of natural gas made leasing in Venango County "less attractive," and this -- together with the difficulty of completing timely title analysis -- played into its decision to cancel some of the unpaid drafts. (*Id.*)

Plaintiffs Walney and Bedow are among those landowners who signed lease agreements and MOLs in favor of SWEPI but were never paid. (ECF No. 57 ¶1; ECF No. 58 ¶1; ECF Nos. 150-21, 150-54, 150-56, and 150-60.) Walney alleges that, in January 2012, he signed a lease agreement covering 42.18 acres of land in exchange for a promised bonus of $137,085.00. (ECF No. 57 ¶¶15, 17–18; ECF No. 63-1.) Bedow signed multiple lease agreements in 2011 and early 2012, which he claims covered 215.897 acres of land. (ECF No. 57 ¶17; ECF No. 63-2.) Bedow maintains that he was promised bonuses totaling $701,666.88. (ECF No. 57 ¶18; ECF No. 63-2.)

In March 2013, Walney commenced this civil class action in the Venango County Court of Common Pleas, asserting claims for breach of contract, fraud, disparagement of title, and promissory estoppel. (Compl. Ex. A, ECF No. 1–1.) The case was subsequently removed to this court (ECF No. 1) and, following various pretrial proceedings,[4] Walney filed the operative Second Amended Complaint (ECF No. 57), which added Bedow as a co-plaintiff and asserted additional claims for breach of implied contract and unjust enrichment.

---

[4] Walney filed his First Amended Complaint on April 26, 2013, once again asserting claims for breach of contract, fraud, disparagement of title, and promissory estoppel. (ECF No. 9.) During a proceeding held on November 5, 2013, the court dismissed Walney's disparagement of title claim.

On September 14, 2015, this court entered a memorandum opinion and order certifying a class action relative to the breach of contract claims in Counts I and I(A) of the Second Amended Complaint,[5] pursuant to Rule 23(b)(3). *See Walney v. SWEPI, LP*, No. 1:13-cv-102, 2015 WL 5333541 (W.D. Pa. Sept. 14, 2015). Having engaged in extensive discovery, the parties now seek a summary judgment ruling relative to the breach of contract claims.

To that end, the parties submitted cross-motions for summary judgment (ECF Nos. 140 and 165) and extensive related filings (*see* Doc. Nos. 141-145, 149-150, 153, 155, 157-158, 162-164, 166-167, 169, and 171-174). The issues raised in the parties' motions are now sufficiently joined and ripe for disposition.[6]

## II.    The Transactional Documents

### A. The Form Lease Agreements

At issue in this case are certain form documents that SWEPI utilized in connection with its lease acquisitions during the time period in question. Among the relevant documents are two materially identical lease agreements, *i.e.*, "Paid Up Oil and Gas Lease, Rev. 06.09.2011" and "PA Paid Up Lease Rev. 05.01/2011" (ECF Nos. 150-21 and 150-54, hereafter referred to collectively at times as the "Lease(s)" or the "Lease Agreement(s)").

---

[5] Count I of the Second Amended Complaint sets forth a claim for alleged breach of an express contract, while Count I(A) sets forth a claim for alleged breach of a contract implied in fact.

[6]  In the course of responding to plaintiffs' Rule 56 filings, defendants raised objections to certain evidence, prompting plaintiffs to amend some of their exhibits. To the extent that any outstanding objections remain, they are rendered moot by the fact that this court did not rely on any disputed form of evidence in rendering its opinion.

   In the course of responding to defendants' Rule 56 motion, plaintiffs failed to comply with Local Rule 56(C)(1), which required plaintiffs to submit a "separately filed concise statement" that "responds to each numbered paragraph in the moving party's Concise Statement of Material Facts . . . ." LCvR56(C)(1). Accordingly, for purposes of deciding defendants' motion, the court accepts as "admitted" those material facts in the defendants' Concise Statement of Material Facts (ECF No. 157) that are alleged to be undisputed. *See* LCvR 56(E) ("Alleged material facts set forth in the moving party's Concise Statement of Material Facts . . . , which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."). To the extent defendants' allegations involve legal conclusions about the meaning of disputed contractual terms or otherwise, the court does not deem the allegations "admitted."

The introductory clause of each form Lease stated: "This Lease Agreement is made and entered into this [enter date] between [enter landowner's name] as Lessor (whether one or more), and **SWEPI LP**, having an office at **190 THORN HIILL ROAD, WARRENDALE, PENNSYLVANIA 15086**, as Lessee." (ECF No. 150-21 (emphasis in the original).) Paragraph 1 of the Lease Agreement stated, in relevant part:

> In consideration of the bonus consideration paid, the receipt of which is hereby acknowledged, and in further consideration of the covenants and agreements herein contained, Lessor does hereby grant, demise, lease and let exclusively to Lessee, its successors and assigns, the lands hereafter described for the purpose of exploring for, developing, producing and marketing oil, gas or other related substances produced in association therewith . . . in and under the following described land . . . .

(*Id*.) Paragraph 3 of the Lease established a primary lease term of five years which, at SWEPI's option, could be extended if SWEPI made a specified extension payment, calculated on a "per acre" basis, prior to the expiration of the primary term. (*Id*. ¶3.) Paragraph 4 set forth the lessor's entitlement to an 18% royalty payment for oil and gas produced and marketed from the leased premises. (Id. ¶4.) Paragraph 10 of the Lease provided, in part, that: "Lessee at any time, and from time to time, may surrender this lease as to all or any part thereof by recording an appropriate instrument of surrender in the proper county and thereupon this lease and the rights, rentals and obligations of the parties hereunder shall terminate as to the part so surrendered." (*Id*. ¶10.) Paragraph 14 set forth a "force majeure" clause. (*Id*. ¶14.) Paragraph 15 ensured that "[n]o default shall be declared against the Lessee for failure to make payment or perform any conditions provided for herein unless the Lessee shall refuse or neglect to pay or perform the same for sixty (60) days after having received written notice from Lessor." (*Id*. ¶15.) Paragraph 17 acknowledged:

> This lease contains all of the agreements and understanding of the Lessor and Lessee respecting the subject matter hereof and no implied covenants or obligations, or verbal representations or promises have been made or relied upon

by Lessor or Lessee supplementing or modifying this lease or as an inducement thereto.

(*Id*. ¶17.)

## B.  The Form Draft Instrument

Also relevant is the form draft instrument (hereafter, "Draft(s)" or "Draft Instrument(s)") that SWEPI issued to landowners in exchange for the signed Leases.  Each Draft Instrument contained standard language stating: "This draft when paid is payment in full for lease or conveyance covering the following described land: [enter description]." (ECF No. 150-30.) Each instrument contained the language "No Protest" and "Not a Cash Item." (*Id*.)  The Drafts further provided that:

> [t]he payor shall have ___ banking days after receipt of this draft by the collecting bank, whether accompanied by other papers or not, for title examination and for payment.  Neither forwarding bank nor payee(s) nor the grantor(s) of such lease or conveyance may demand return of this draft or any accompanying papers prior to expiration of the time fixed. Upon payment hereof collecting bank shall deliver this draft and any accompanying papers to payor and remit payment to forwarding bank. No liability for payment or otherwise shall be attached to any of the parties hereto.

(*Id*.)

## C.  The Memorandum of Lease

The third standard document is the form MOL that class members executed and delivered to SWEPI's landmen along with their signed Leases.  The first two sentences of each MOL state that:  "THIS MEMORANDUM OF LEASE has been made to indicate the existence of an Oil and Gas Lease ("Lease") dated [ enter date ] by and between [landowner] of [subject property], as Lessor and SWEPI, LP . . .  as Lessee.  Lessor did grant, demise, lease and let exclusively to Lessee, its successors and assigns, the rights to explore, develop, produce, and market oil and gas

from [the subject property] subject to the provisions contained in the Lease . . . ."  (ECF No. 150-23.)  Paragraph 1 of the MOL further provides that:

> The primary term of the Lease is for a period of Five (5) years commencing on the date immediately set forth above and for so long thereafter as oil, gas or other substances covered by the Lease are capable of being produced in paying quantities from the leased premises or from lands pooled therewith or the Lease is otherwise maintained or prolonged pursuant to the provisions contained in the Lease, including an extension of term contained therein.  Lessee may extend the primary term of the Lease for an additional Five (5) years after the end of the primary term, thereby continuing the term of the Lease to the end of the extended primary term.

(*Id*.)  Elsewhere, the MOL acknowledges that its intended purpose is to "provid[e] notice in the Recorders Office of [enter county] County, Commonwealth of Pennsylvania, of the existence of the Lease," and it "shall not be considered in any way a modification or alteration of the Lease." (*Id*.)

## III.    The Parties' Respective Arguments

Plaintiffs contend that – taken together – the Leases, MOLs and Drafts (collectively, the "Transactional Documents") constituted enforceable contracts as of the time that the documents were signed and exchanged between the various class members and SWEPI's representatives. Plaintiffs theorize that these contracts provided for an unconditional payment of a sum certain (i.e., the amount of the bonus set forth in the draft instrument), deferred to a date certain (i.e., the time period set forth in the draft).  According to plaintiffs, SWEPI breached its contracts when it failed to pay the bonuses.  Consequently, plaintiffs consider the full amounts of the bonuses to be the correct measure of damages in each instance.

SWEPI contests each element of plaintiffs' claims and also asserts various affirmative defenses.  Fundamentally, SWEPI denies that enforceable contracts ever came into existence. Assuming that enforceable contracts did exist, SWEPI denies that it breached the contracts. SWEPI theorizes that good title was a condition of payment in every case and no evidence exists

to show that all class members had good title to the lease rights they purported to convey. On the contrary, SWEPI argues that many class members indisputably *lacked* good title to the gas and oil interests at issue in their leases and, with respect to certain other class members, SWEPI was unable to verify the landowner's title through no fault of its own.

In the alternative, SWEPI challenges plaintiffs' request for summary judgment on the grounds that: (i) factual inquires exist concerning the meaning of the contracts; (ii) class members failed to provide the requisite "written notice" of SWEPI's alleged breach; (iii) SWEPI's payment obligations, if any, were excused in cases where the Leases were surrendered prior to expiration of the time period designated in the Draft Instrument or where they were surrendered at the request of the lessor; and (iv) plaintiffs cannot obtain summary judgment on behalf of landowners who never presented their Drafts for payment or who are not members of the class.

Assuming that its liability can be established, SWEPI contests plaintiffs' calculation of damages. SWEPI maintains that proper measurement is the difference between the contract price (i.e., the bonus amount) and the fair market value of each lease at the time of the alleged breach. SWEPI contends that plaintiffs failed to prove the class's damages because there is no evidence in the record to establish the relevant fair market values of the leases at issue.

## IV.    Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In reviewing the evidence, the court draws all reasonable inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (discussing identical standard of

review under Rule 50). The court may not make credibility determinations or weigh the evidence. *Id.* "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Courts are permitted to resolve concurrently cross-motions for summary judgment. *Johnson v. Federal Exp. Corp.*, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014) (citing authority); *see Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008) (considering cross-motions for summary judgment under the Fair Labor Standards Act); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2014). "When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion." *Johnson,* 996 F. Supp. 2d at 312; *see Lawrence*, 527 F.3d at 310 (noting that the rule for granting summary judgment "is no different where there are cross-motions for summary judgment.").

## V.    Discussion

To succeed on a breach of contract claim, a plaintiff must prove: (1) the existence of a contract; (2) the breach of a duty required by the contract; and (3) damages from the breach. *Zamos v. McNeil-PPC Inc., a Div. of Johnson & Johnson*, 713 F. App'x 133, 135 (3d Cir. 2017) (citing *Williams v. Nationwide Mut. Ins.*, 750 A.2d 881, 884 (Pa. Super. Ct. 2000)). [7] Here, plaintiffs contend that all three elements of the class's claims were

---

[7] As a federal court sitting in diversity, this court must apply the substantive law of the state in which this court sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). Here, the parties have implicitly agreed that Pennsylvania law governs the contractual claims at issue in this case, as they discuss only Pennsylvania law in their respective briefs. Accordingly, the court need not engage in a choice-of-law analysis. *See Schiavone Constr. Co. v. Time, Inc*., 735 F.2d 94, 96 (3d Cir.1984) ("The parties implicitly agree that New Jersey law governs, and the district court applied New Jersey law. Inasmuch as New Jersey has an interest in the outcome of this litigation . . . we have no cause *sua sponte* to

established as a matter of law, while SWEPI contends that none of the elements can be established based on the uncontroverted facts.

### A.  Whether Enforceable Contracts Existed

As a preliminary matter, the court must determine whether plaintiffs can prove the existence of enforceable contracts between SWEPI and the class members.  Because oil and gas leases are in the nature of contracts, they are controlled by principles of contract law.  *See T.W. Phillips Gas & Oil Co. v. Jedlicka,* 42 A.3d 261, 267 (Pa. 2012).  Under Pennsylvania law, a contract is enforceable where:  (1) both parties have manifested an intent to be bound by the terms of the agreement, (2) the contractual terms are sufficiently definite, and (3) consideration exists to support the agreement.  *Cook v. Gen. Nutrition Corp.*, No. CV 17-135, 2017 WL 4340664, at *6 (W.D. Pa. Sept. 29, 2017) (citing *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 657 A.2d 511, 516 (Pa. Super. Ct. 1995)).

Plaintiffs contend that – taken together -- the Leases, MOLs and Drafts constituted enforceable contracts.  They argue that the contracts came into existence when the parties signed and exchanged the Transactional Documents – an event which plaintiffs liken to a real estate "closing."

SWEPI denies that the Transactional Documents constituted enforceable contracts. According to SWEPI, the Lease Agreements did not set forth any binding promise on its part to pay the subject bonuses; rather, the parties contemplated that only *actual payment* of the bonuses would supply the necessary consideration.  Because SWEPI opted not to fund the class

---

challenge that choice of law."); *84 Lumber Co., L.P. v. Bryan Const. Co*., Case No. 2:09–cv–1030, 2011 WL 666209, at *5 (W.D. Pa. Feb.14, 2011) ("In this case, the parties do not dispute that Pennsylvania law applies to this case, and the Court need not engage in a choice of law analysis."); *Tyler v. King*, 496 A.2d 16, 21 (Pa.Super.Ct.1985) ("[P]arties may bind themselves, even by a statement made in court, on matters relating to individual rights and obligations, so long as their stipulations do not affect the court's jurisdiction or due order of business.").

members' Drafts, it posits that the Lease Agreements fail for lack of consideration or mutuality. Additionally, SWEPI argues that there was no completed offer and acceptance to establish its intent to be contractually bound. Alternatively, SWEPI argues that the agreements contained a condition precedent to contract formation that did not occur – namely verification of good title within the time period specified in each draft.

The parties' competing theories raise questions of contract interpretation, the "paramount goal" of which is "to ascertain and give effect to the intent of the parties." *PBS Coals, Inc. v. Burnham Coal Co.*, 558 A.2d 562, 564 (Pa. Super. Ct. 1989). "'[T]he intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'" *Jeddo Coal Co. v. Rio Tinto Procurement (Singapore) PTE Ltd.*, No. 3:16-CV-621, 2017 WL 937737, at *4 (M.D. Pa. Mar. 9, 2017) (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). Accordingly, the court must determine what document or documents comprise the alleged "contracts" in this case.

Under Pennsylvania law, "'[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other.'" *Jeddo Coal Co.*, 2017 WL 937737, at *4 (quoting *Huegel v. Mifflin Const. Co.*, 796 A.2d 350, 354-55 (Pa. Super. Ct. 2002)); *see Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986) ("It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties.").

Here, it is undisputed that the Transactional Documents were typically signed and exchanged contemporaneously as part of a singular transaction between SWEPI and the various class members. In addition, the documents reference one another. The Leases expressly acknowledge the lessor's receipt of a "bonus" in an unspecified amount. (ECF Nos. 150-21, 150-60). The Draft Instruments indicated that, when funded, they would constitute "payment in full for lease or conveyance" covering the specific parcel in question. (ECF No. 163-4). Each MOL was expressly intended to provide public notice of the existence of the corresponding oil and gas lease. (ECF No. 163-3). Because the Leases, Drafts, and MOLs expressly reference each other and were exchanged contemporaneously as part of a singular transaction, the court will construe the writings together for the purpose of ascertaining the parties' intent.[8]

The next question to be answered is whether the Transactional Documents give rise to enforceable agreements in the context of this case. In analyzing the documents, this court must be guided by the plain meaning of the language employed by the parties rather than their "silent intentions." *Jedlicka*, 42 A.3d at 267. If the contractual terms are clear and unambiguous, then the intent of the parties must be gleaned from the agreement itself. *Hutchinson v. Sunbeam Coal Corp.,* 519 A.2d 385, 390 (Pa. 1986). If the contractual terms are ambiguous, however, the court may examine extrinsic evidence to resolve the ambiguity. *Id.*

A contract is ambiguous when its terms are "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchinson,* 519 A.2d at 390. "'This question, however, is not resolved in a vacuum. Instead, contractual terms are

---

[8] This rule applies notwithstanding the fact that the form Lease contains an integration clause. *See Kropa v. Cabot Oil & Gas Corp.*, 609 F. Supp. 2d 372, 378 (M.D. Pa. 2009) (predicting that "the Pennsylvania Supreme Court would not strictly apply the parol evidence rule where two contracts must be read together and only one has an integration clause"), *on reconsideration in part*, 716 F. Supp. 2d 375 (M.D. Pa. 2010); *Amin v. Lammers*, No. Civ. A. 94–5980, 1995 WL 231048, at *4 (E.D. Pa. April 18, 1995)("[T]he presence of integration clauses in the separate agreements is not a bar to the agreements being construed together when the agreements are part of the same business transaction.") (citations omitted).

ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'" *Lee v. Sixth Mount Zion Baptist Church of Pittsburg*, No. CV 15-1599, 2017 WL 3608140, at *21 (W.D. Pa. Aug. 22, 2017) (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429-30 (Pa. 2001)), *appeal docketed*, No. 17-3086 (3d Cir. Sept. 25, 2017). "The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." *Hutchinson,* 519 A.2d at 390; *see Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015) ("Issues of contractual interpretation are questions of law."); *Mason v. Range Res.-Appalachia LLC*, 120 F. Supp. 3d 425, 440 (W.D. Pa. 2015) ("The trier of fact resolves conflicting parol evidence to determine the intent of the parties.").

Under Pennsylvania law, contractual ambiguities are construed against the drafter. *Wert,* 124 A.3d at 1260 (citing *Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 139 (Pa. 1999)); *see* Restatement (Second) of Contracts §206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."). In the context of an oil and gas lease, ambiguities are generally construed in favor of the lessor and against the lessee. *See Mason,* 120 F. Supp. 3d at 440. These rules of construction only apply, however, where an examination of the parol evidence fails to resolve the ambiguity. *See Hutchinson,* 519 A.2d at 390 n.5; *Mason,* 120 F. Supp. 3d at 440.

Here, SWEPI's motion for summary judgment is predicated solely on the theory that no enforceable contracts existed as between itself and any class member. Accordingly, the court

will initially consider whether the alleged agreements fail as a matter of law due to inadequacy of

consideration, an absence of contractual intent, or the failure to satisfy a condition precedent to

contract formation. In undertaking this analysis, the court is mindful that

> the judicial construction of instruments involving oil and gas is particularly
> troublesome. Pennsylvania case law evidences a long and tortured trail of attempts
> to make sense of phrases, parts of phrases, and words of art sometimes used in a
> common sense manner and sometimes used with a precise technical meaning, and
> all used in documents sometimes drafted with care and sometimes quickly scribbled
> by the litigants themselves.
>
> The legal effect of words clearly understood when used in other contexts, therefore,
> becomes murky when considered in the context of oil and gas instruments. ...
> Applying the literal meaning to words and phrases found in oil and gas documents
> is fraught with the opportunity for injustice.
>
> As a result, we must be mindful that the object in interpreting instruments relating
> to oil and gas interests, like any written instrument, is to ascertain and effectuate
> the intention of the parties.

*Swepi LP v. Wood*, No. 1945 MDA 2015, 2016 WL 5929602, at *3-4 (Pa. Super. Ct. Sept. 7,

2016) (citation omitted) (ellipsis in the original).

### 1. Consideration

"The requirement of consideration is nothing more than the requirement for a bargained

for exchange." *EBC, Inc. v. Clark Bldg. Sys.*, No. CIV.A. 05-CV-01549, 2007 WL 4563518, at

*4 (W.D. Pa. Dec. 21, 2007) (citing *Estate of Beck*, 414 A.2d 65 (Pa.1980)). "'Consideration

consists of a benefit to the promisor or a detriment to the promisee.'" *Id.* (quoting *Weavertown

Transport Leasing, Inc.* v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003)). However, "'[i]f

the promise is entirely optional with the promisor, it is illusory, lacks consideration, and is

unenforceable.'" *Hampton Gardens Assocs. v. Kearny Bank*, Civil Action No. 16-323, 2016 WL

3576684, at *4 (E.D. Pa. June 29, 2016) (quoting *Lackner v. Glosser*, 892 A.2d 21, 31 (Pa.

Super. Ct. 2006)).

SWEPI posits that, in the context of this case, it could have provided consideration for the Leases in one of two ways: by rendering a performance (i.e., actually paying the bonus amounts) or by making a binding promise to pay. Since there is no dispute that SWEPI did not pay the bonuses, the only question is whether the Transactional Documents evidence a binding promise to pay. SWEPI insists they do not.

In arguing that it made no binding promise of payment, SWEPI points first to Paragraph (1) of the Lease, which references "bonus consideration paid, the receipt of which is hereby acknowledged." According to SWEPI, this language "plainly demonstrates that the parties intended that actual payment by SWEPI – not an executory promise – would complete the required exchange of consideration. Thus, by its own terms, the lease would become valid and enforceable if and when SWEPI paid the lease bonus – not a moment before." (Defs.' Br. Opp. Pls.' Mot. Summ. J. at 9-10, ECF No. 153.)

SWEPI next points to language in the Draft stating that "[n]o liability for payment or otherwise shall be attached to any of the parties hereto." (ECF No. 150-30.) According to SWEPI, "[t]his exculpatory language plainly allows [it] to cancel the draft without liability, and it therefore negates any possibility that the draft itself constitutes a promise to pay." (Defs.' Br. Opp. At 11.) Thus, even if the Draft contains a promise to pay, SWEPI insists that the "no liability" clause renders any such promise illusory. (Id. at 11 n.10.) In support of its position, SWEPI relies on *Spellman v. Lyons Petroleum, Inc.,* 709 S.W. 2d 295 (Tex. App. 1986), and *Arabella Petroleum Co. v. Baldwin,* No. 04-11-370-CV, 2012 WL 2450803 (Tex. App. 2012), two decisions wherein the Texas Court of Appeals found a lack of mutuality based on similar exculpatory language.

In light of the legal standards discussed above, SWEPI is entitled to summary judgment only if its proffered construction of the Transactional Documents is the only reasonable one. In the circumstances of this case, however, the phrase "bonus consideration paid, the receipt of which is hereby acknowledged" most logically referred to SWEPI's contemporaneous conferment of the Draft which expressly stated that, "when paid," it would constitute "payment in full" for the associated Lease. (ECF No. 150-30.) As discussed, each Draft expressly gave SWEPI a specified number of banking days "for title examination and for payment." (*Id.*) When the Transactional Documents are construed collectively, the Drafts can reasonably be viewed as supplying the contractual terms of payment, pursuant to which SWEPI promised to pay the bonus amounts by the end of the time period specified in the Draft, unless it determined within that time that the lessors lacked sufficiently clean title to the underlying gas and oil interests. Viewed in this light, the Transactional Documents provided valid consideration to each class member in the form of a conditional promise of future payment. *See In re Estate of Rosser*, 821 A.2d 615, 623 (Pa. Super. Ct. 2003) ("A mutuality of obligation exists when both parties to the contract are required to perform their respective promises.") (citation omitted).

The second interpretation is consistent with other language in the Transactional Documents indicating that valid bilateral contracts existed as of the date the documents were signed and exchanged. The Lease, by its terms, was deemed to be "made and entered into" by the parties as of the date the landowner signed the Lease and provided it to SWEPI's agent. (ECF No. 150-21.) [9] Each MOL similarly acknowledged "the existence of an Oil and Gas Lease"

---

[9] The introductory clause of each Lease states that the "Lease Agreement is made and entered into" on a date to be specified by the parties. Based on the court's examination of every signed Lease of record, it appears that the dates specified in the introductory paragraphs coincided with the dates that the Contractual Documents were signed by the landowners, notarized by a notary public, and delivered to SWEPI's agent. (*See* ECF Nos. 150-21, 150-52, 150-56, 150-61, 150-67 and 150-68, 63-3, 63-4, 63-5, 63-6, 63-7, 63-8, and 63-9.) The only (nonmaterial) exception is a

whose primary term commenced on the same date that the Lease Agreement was executed. (ECF No. 150-23.)  The MOLs further stated that the "Lessor did grant, demise, lease and let exclusively to Lessee . . . the rights to explore, develop, produce, and market oil and gas from the premises described below subject to the provisions contained in the Lease . . . ."  (*Id.* (emphasis added).)  SWEPI's interpretation, on the other hand, is at odds with this language, and thus runs afoul of the principle that contractual provisions should be construed in harmony with one another, if possible.  *Lenau v. Co-eXprise, Inc.,* 102 A.3d 423, 430 (Pa. Super. Ct. 2014) ("[I]t is axiomatic that contractual clauses must be construed, whenever possible, in a manner that effectuates all of the clauses being considered.") (internal quotation marks and citation omitted).

SWEPI's interpretation of the Transactional Documents poses another illogicality:  it assumes that the class members, in executing each Lease, expressly acknowledged that bonus consideration had been paid when, in fact, it had not.  Indeed, because the Drafts expressly reserved time for SWEPI to perform its title search, bonus payments could not feasibly be made contemporaneously with the lessor's execution of the Lease.  SWEPI's proffered interpretation nevertheless assumes that lessors had to acknowledge SWEPI's full monetary performance before it had actually been rendered, leaving the lessors at risk that SWEPI might speculate with their mineral interests while holding itself out as party to a valid and binding agreement.  When construing a contract, the court should "adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished."  *Am. Winter Servs., LLC v. Limerick Vill., LP*, No. 947 EDA 2017, 2017 WL 6351308, at *2 (Pa. Super. Ct. Dec. 13, 2017) (internal quotation marks

---

lease executed by Bedow on February 29, 2012, and notarized and "entered into" the following day. (*See* ECF No. 150-60.)

and citations omitted). SWEPI's proposed construction runs afoul of this principle by inferring improbable, if not unreasonable, conduct on the part of the class members.

SWEPI's proposed interpretation of the "bonus consideration paid" clause also runs counter to its own professed understanding of the Lease's "surrender clause." According to Haney, "SWEPI believed it had a right to cancel any drafts prior to the expiration of the ninety (90) banking days allowed by the bank drafts . . . and to exercise its surrender rights of the associated leases as provided in paragraph 10 of the [Lease Agreement]." (Second Haney Decl. ¶25.) "Once the lease surrender was recorded, the landowner was typically notified by letter of the surrender, and then they were free to re-lease the oil and gas rights to another company." (Id. ¶26.) This argument only makes sense, however, if the Lease Agreements were binding contractual documents supported by valid consideration. If the signed Lease Agreements were mere "offers" unsupported by consideration, then the contracts – including the "surrender" provision – would never have come into effect. Additionally, there would be no need to "surrender" the Leases because lessors would have been free, at any point prior to payment of the Draft, to simply revoke their "offers" and lease their properties to another company. Similarly, it would make no sense for SWEPI to honor a landowner's "request" for a "surrender" of the Lease – as SWEPI claims it did with respect to certain class members -- if no binding agreement had ever come into existence.

Two decisions that SWEPI points to as supportive of its position -- *Masciantonio v. SWEPI, LP,* 195 F. Supp. 3d 667 (M.D. Pa. 2016)[10], and *Cardinale v. R.E. Gas Development*

---

[10] This court recognizes that the ruling in *Masciantonio* has since been vacated pursuant to the parties' post-judgment settlement agreement, *see* 2017 WL 2616915 (M.D. Pa., Mar. 13 2017) and, even if the decision had not been vacated, it would have no binding effect in the case *sub judice*. Nevertheless, a discussion of *Masciantonio* is useful insofar as the district court's reasoning is persuasive and informs this court's resolution of the issues disputed here.

*LLC,* 74 A.3d 136 (Pa. Super. Ct. 2013) -- are in fact easily reconcilable with the view that enforceable contracts existed here. *Masciantonio*, like the instant case, involved claims by certain Pennsylvania landowners that SWEPI breached the terms of their oil and gas leases by failing to pay promised bonuses. The two groups of plaintiffs in *Masciantonio* had signed form lease agreements that were substantially similar to the ones at issue in this case with one notable difference: the *Masciantonio* leases contained addenda that included a paragraph ("Paragraph 22") which specifically discussed SWEPI's payment obligation relative to the disputed bonuses. Paragraph 22, entitled "Payment," stated:

> In consideration for the attached paid-up Oil and Gas Lease, Lessee hereby agrees to pay Lessor: *four thousand* and 00/100 dollars ($*4,000.00*) per net mineral acre. Payment shall be due within ninety (90) banking days of the Lessor presenting the Bank Draft to the financial institution of his/her/their choosing. All payment obligations are subject to title verification by Lessee. Said title verification shall be completed within the aforementioned ninety (90) banking day period.

195 F. Supp. 3d at 675 (italicized in the original to denote handwritten additions to the lease addenda).

In *Masciantonio,* SWEPI asserted -- as it has here -- that the subject leases were unenforceable because payment of the lease bonuses was the sole form of consideration contemplated by the parties; absent such payment, SWEPI argued, the leases failed for lack of consideration. 195 F. Supp. 3d at 679. The district court rejected this argument, reasoning that payment of the bonuses was a "post-formation performance obligation," rather than an element of consideration. *Id*. The court concluded that, "[s]ubject only to title verification, SWEPI promised to pay bonus consideration in exchange for its right to possess, explore, and develop plaintiffs' subsurface oil and gas estate . . . . Hence, SWEPI's consideration [was] its promise to perform – *not* performance itself." *Id.* (emphasis in the original).

In arriving at this conclusion, the *Masciantonio* court rejected SWEPI's contention that the granting clause of the leases required an immediate exchange of consideration, rather than an exchange of promises to perform.  The court explained that SWEPI's proffered construction would require the court to examine the granting clause in isolation, separate from the terms of Paragraph 22, which expressly superseded any conflicting terms of the lease.  Doing so, the court noted, would "flout[ ] the maxim that all provisions of a contract must be read together and 'given effect.'" 195 F. Supp. 3d at 680 (quoting *Camp Ne'er Too Late, LP v. SWEPI, LP*, 182 F. Supp. 3d 517, 544 (M.D. Pa. 2016)).

SWEPI insists that the promissory language in the *Masciantonio* lease addenda materially distinguishes those agreements from the Lease Agreements at issue here and dictates a different outcome in the instant case – namely, a determination that only payment of the bonuses could serve as valid consideration because the Leases in this case contained no executory promise of payment.  To buttress this argument, SWEPI relies on footnote 4 in the *Masciantonio* decision which, it insists, leaves "no doubt that the promissory language in the [*Masciantonio*] leases was key to [the court's] decision."[11]

SWEPI's argument is unpersuasive.  Though it is true that the court in *Masciantonio* distinguished the *Walney* leases in footnote 4, it did so in the context of determining whether the

---

[11] The referenced footnote provides, in part:

> The court notes the pendency of a class action asserting similar breach of contract claims against SWEPI in the United States District Court for the Western District of Pennsylvania.  On September 14, 2015, Chief Judge Joy Conti Flowers certified a class of plaintiffs comprising persons who, on or after March 14, 2009, executed an oil and gas lease with SWEPI and in exchange received a bonus draft which "was neither paid nor replaced by a subsequently issued draft." *Walney v. SWEPI LP*, No. 1:13–CV–102, 2015 WL 5333541, at *28–29 (W.D. Pa. Sept. 14, 2015). The *Walney* addenda do not appear to contain a provision dictating the procedure for bonus payments. *See id*. at *1–7. That payment provision is central to the instant dispute and materially distinguishes this case from *Walney*.

195 F. Supp. 3d at 677 n.4.

*Masciantonio* plaintiffs were impacted by the class action proceedings in this court by virtue of having signed similar leases. Because class certification under Rule 23(b)(3) depends on the plaintiff's ability to establish claims on the basis of class-wide proof, the *Masciantonio* court correctly considered whether any unique provisions in the *Masciantonio* leases might require a substantially different analysis than would apply to the claims asserted in *Walney.* The fact that the *Masciantonio* leases are materially distinguishable for class litigation purposes does not necessarily mean that different outcomes must ensue with respect to the substantive claims asserted by class members; the distinction simply means that the court in *Masciantonio* needed to consider an important contractual provision that was not common to the *Walney* class members and would not inform the court's breach of contract analysis in this case. Importantly, the court in *Masciantonio* did not purport to offer any definitive opinion concerning the proper construction of the Leases *sub judice* – a function which falls to this court alone.

To the extent the court's analysis in *Masciantonio* is informative in this case, it in no way conflicts with this court's determination that the subject leases are supported by valid consideration. In *Masciantonio,* the plaintiffs' leases – with the benefit of the superseding payment provision in Addenda Paragraph 22 – unambiguously expressed a promise on SWEPI's part to pay the subject lease bonuses by the end of the 90-day period, subject only to title verification. *See Masciantonio,* 195 F. Supp. 3d at 690 ("The language of the lease agreements *sub judice* is plain and unambiguous, susceptible of only one reasonable interpretation: SWEPI was bound to pay bonus consideration upon execution of the leases, subject only to the condition of title verification.") (citations to the record omitted). In the instant case, this court concludes that the standard contract language, though perhaps less clear, must logically be interpreted in the same manner.

For the same reason, the class members' claims are not in conflict with the ruling in *Cardinale.* There, the plaintiffs' lease agreement stated: "Within sixty (60) days from the date of execution of this lease, Lessee agrees to pay to the Lessor the sum of *One Hundred Five Thousand Eight Hundred Seventy-five and 00/100 Dollars $(105,875.00)* as full and complete bonus payment for this lease for the entire primary term of this lease. This is a paid-up lease and no delay rentals shall be due." 74 A.3d at 140. The Pennsylvania Superior Court found that this language "strongly indicate[d] . . . that valid consideration existed." *Id*. Although the evidence of consideration may have been stronger in *Cardinale* because of the explicit promissory language set forth in the lease, it does not follow that consideration is lacking in the instant case. For the reasons discussed, the contract as a whole is most logically interpreted as incorporating a promise by SWEPI of a future payment, albeit one conditioned on verification of clean title.

SWEPI nevertheless maintains that any promise of payment is rendered illusory by virtue of the Draft's exculpatory clause, which states: "No liability for payment or otherwise shall be attached to any of the parties hereto." (ECF 150-30.) According to SWEPI, this language "plainly allows it to cancel the draft without liability," and "therefore negates any possibility that the draft itself constitutes a promise to pay." (Defs.' Mem. Supp. Defs.' Mot. Summ. J. at 9, ECF 158.) *See Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super. Ct. 1992) ("If the promise is entirely optional with the promisor, it is said to be illusory and, therefore, lacking consideration and unenforceable. The promisor has committed him/herself to nothing."); Restatement (Second) of Contracts §77 cmt. a ("Words of promise which by the terms make performance entirely optional with the 'promisor' do not constitute a promise . . . . Where the apparent assurance of performance is illusory, it is not consideration for a return promise.").

Under this view of the contract, either party could have abandoned the Lease Agreement with impunity unless and until SWEPI paid the bonus money.

The court is not persuaded that SWEPI's proposed interpretation reflects the unambiguous intent of the parties, particularly when the "no liability" clause is read in the context of the contract as a whole. As discussed, both the Lease and the MOL contain language indicating that an agreement was formed, and the primary lease term began to run, on the date that the Transactional Documents were signed and exchanged. The Draft expressly afforded SWEPI a specified number of banking days following presentment "for title examination and for payment." (ECF No. 150-30.) During this time, "[n]either forwarding bank nor payee(s) nor the grantor(s) of such lease or conveyance [could] demand return of this draft or any accompanying papers . . . ." *Id.* The Draft further provided that, "when paid" (not "if" paid), it would constitute "payment in full" for the corresponding "lease or conveyance." All these provisions are rendered superfluous if SWEPI's proposed interpretation is adopted.

Well established principles of contract interpretation counsel against such a result if there is another reasonable interpretation of the exculpatory clause that gives meaning and effect to the contract as a whole. *See Hampton Gardens Assocs. v. Kearny Bank,* No. CV 16-323, 2016 WL 3576684, at *4 (E.D. Pa. June 29, 2016) ("[C]ourts should 'avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract.'") (quoting *M&G Polymers USA, LLC v. Tackett,* 135 S. Ct. 926, 936 (2015)); *Com. ex rel. Kane v. UPMC,* 129 A.3d 441, 467–68 (Pa. 2015) ("[W]e do not countenance the interpretation of a contract which would render it illegal or incapable of performance, but, rather, construe a contract to give legal effect to every provision therein, . . . ."); Restatement (Second) of Contracts §203(a) ("In the interpretation of a promise or agreement or a term thereof, . . . an

interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect . . . ."). Consequently, the more logical construction of the "no liability" language is that it signifies a narrower intent – namely, an intent to preclude any liability predicated on the instrument itself in the event it was returned unpaid.

The latter interpretation was adopted by the court in *Masciantonio*. There, the court considered the effect of a "no liability" clause that was identical to the one at issue in this case. The court rejected SWEPI's argument that the clause voided its contractual obligations and concluded that "the 'no liability' language most logically pertains to the draft itself, precluding independent litigation thereon." 195 F. Supp. 3d at 685. The court noted that "[t]he majority of courts presented with this question have reached the same result." *Id.* (citing *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208 (8th Cir. 2012), *Davis v. Meagher Oil & Gas Props., Inc.*, No. 08–1638, 2010 WL 819403, at *4 (W.D. La. Mar. 4, 2010); and *St. Romain v. Midas Expl., Inc.*, 430 So.2d 1354, 1357–58 (La. Ct. App. 1983), but acknowledging a contrary ruling in *Spellman v. Lyons Petroleum Inc.*, 709 S.W. 2d 295 (Texas App. 1986)). The court found the reasoning of the Eighth Circuit Court of Appeals and the Louisiana courts to be "persuasive and most consistent with Pennsylvania's rules of contract interpretation," *id.* (citations omitted), which require courts to construe all terms of an agreement in conjunction with one another, "giving full and fair effect to each provision." *Id.* (citing *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 332, 759, 790-91 (W.D Pa. 2004)).

In *Smith v. Arrington Oil & Gas Properties, Inc.* – the Eighth Circuit Court of Appeals' decision cited in *Masciantonio*, the draft contained an exculpatory clause which read, "In the event this draft is not paid within [the designated time period], the collecting bank shall return

the same to forwarding bank and no liability for payment or otherwise shall be attached to any of the parties hereto." 664 F.3d at 1211. The defendant lessee argued, unsuccessfully, that this language precluded either party to the lease agreement from having any contractual obligations, unless and until the drafts were paid. The court rejected the defendants' proposed interpretation because it was "belied" by other terms in the agreement:

> For example, the lease agreements recite an immediate exchange of the lease "for and in consideration of a cash bonus in hand paid, the receipt of which is hereby acknowledged." Furthermore, the duration of the lease and the renewal periods, recited respectively in Paragraphs 1 and 21, begin to run on the date of execution. The lease agreements affirmatively declare in Paragraph 13 that "[t]his lease shall be effective as to each Lessor on execution hereof as to his or her interest and shall be binding on those signing." The lessors' obligations upon signing included the duty in Paragraph 15 to warrant and defend the title to the property and the duty in Paragraph 16 to give [the defendant] "a reasonable period of time within which to comply with [any] covenant, condition, obligation, or requirement" of the lease before terminating the lease. Viewing the contract as a whole, these provisions indicate that a contract was formed when the landmen accepted the lease agreements in exchange for the bank drafts.

664 F.3d 1213-14. Whereas the defendant's reading of the exculpatory clause would have negated the foregoing provisions, in *Arrington Oil & Gas* the court adopted an alternative construction which allowed it to "harmonize" the exculpatory clause with the other lease terms in compliance with Arkansas' principles of contract interpretation: *i.e.,* the court viewed the exculpatory language as "most naturally appl[ying] only to eliminating any potential liability created by return of the draft, something analogous to 'returned check' liability." 664 F.3d at 1214. Adhering to this construction, the court held that the defendant was obligated under the leases to pay the promised cash bonuses unless it disapproved of title in good faith within the time prescribed on the face of each bank draft. 664 F.3d at 1213.

In contrast to *Masciantonio* and *Arrington Oil & Gas* are two decisions rendered by the Texas Court of Appeals, *Spellman v. Lyons Petroleum Inc*., 709 S.W. 2d 295 (Texas App. 1986*),* and *Arabella Petroleum Co., LLC v. J.H. Baldwin*, No. 04-11-00370-CV, 2012 WL 2450803

(Tex. App. June 27, 2012), wherein the courts determined that a "no liability" clause in a draft instrument caused the corresponding leases to fail for lack of mutuality. Both *Spellman* and *Arabella* involved draft instruments which provided: "In the event this draft is not paid within said time, the collecting bank shall return the same to forwarding bank and no liability for payment or otherwise shall be attached to any of the parties hereto." *Spellman,* 709 S. W. 2d at 297; *Arabella Petroleum Co.,* 2012 WL 2450803, at *1. In both cases, the courts construed the drafts in conjunction with the leases and determined that the "no liability" language rendered the contracts unenforceable. *See Spellman,* 709 S.W. 2d at 297-98; *Arabella Petroleum Co.,* 2012 WL 2450803, at *4-5. Because the Leases and Drafts in this case are likewise being construed together as part of a single transaction, SWEPI urges this court to follow the rulings of *Spellman* and *Arabella.*

This court declines to do so, because it is questionable whether Pennsylvania courts would adopt the reasoning of the Texas Court of Appeals in the context of the present litigation. In *Spellman* and *Arabella,* the drafts were expressly made payable upon the lessor's approval of the lease agreement as well as approval of title. *See Spellman,* 709 S.W. 2d at 296-97; *Arabella Petroleum Co.,* 2012 WL 2450803, at *1. The drafts further provided that they were "subject alone to the acceptance of payment" by the "drawee" within a specified time frame. *Spellman,* 709 S.W. 2d at 297; *Arabella Petroleum Co.,* 2012 WL 2450803, at *1. In the context of these contractual provisions, which vested complete discretion in the oil and gas company relative to acceptance of the lease and payment of the corresponding draft, the courts appropriately determined, as a matter of law, that the exculpatory clauses evidenced a lack of mutuality. Notably, the subject contracts did not impose a duty upon the lessor to make a reasonable effort to perform, and no such duty could be implied under Texas law. *See Spellman,* 709 S.W. 2d at

29

297; *Arabella Petroleum, Co.,* 2012 WL 2450803, at \*4.  Indeed, in *Arabella* the court conceded

that, "[h]ad the draft or the lease contractually imposed such a good faith or reasonable effort

requirement, the outcome of this case might be different."  2012 WL 2450803, at \*4.

Critically, however, Pennsylvania appears to apply a different legal standard relative to

the duty of good faith and fair dealing.  Although the Pennsylvania Supreme Court has not

expressly decided the matter, the Third Circuit Court of Appeals has concluded that

Pennsylvania courts recognize an inherent duty of good faith and fair dealing in all contracts

governed by Pennsylvania law.  *See, e.g., Tuno v. NWC Warranty Corp.,* 552 F. App'x 140, 144

(3d Cir. 2014) ("Pennsylvania courts have recognized 'the general duty of contracting parties to

perform their contractual obligations in good faith.'") (quoting *Baker v. Lafayette Coll.*, 504

A.2d 247, 255 (Pa. Super. Ct. 1986)); *W. Run Student Hous. Assocs., LLC v. Huntington Nat.

Bank,* 712 F.3d 165, 170 (3d Cir. 2013) ("'[E]very contract imposes upon each party a duty of

good faith and fair dealing in its performance and its enforcement . . . .'") (quoting *Kaplan v.

Cablevision of PA, Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996)); *Northview Motors, Inc. v.

Chrysler Motors Corp.,* 227 F.3d 78, 91 (3d Cir. 2000) ("Pennsylvania courts have cited

Restatement (Second) of Contracts §205 for the proposition that every contract has an implied

term that the parties will perform their duties in good faith . . . ."); Restatement (Second) of

Contracts §205 ("Every contract imposes upon each party a duty of good faith and fair dealing in

its performance and its enforcement.").[12]  Consequently, this court is not persuaded that the

---

[12] There is some authority to suggest that this duty may be immutable and incapable of waiver.  *See Northwest, Inc. v. Ginsberg,* 134 S. Ct. 1422, 1432 and n.2 (2014) (observing that some states preclude parties from waiving the obligations of good faith and fair dealing and citing authority); *Masciantonio v. SWEPI LP*, Civil Action No. 4:13-cv-0797, 2014 WL 4441214, at \*14 (M.D. Pa. Sept. 9, 2014); (noting that Pennsylvania's Uniform Commercial Code, 13 Pa. Cons. Stat. §1302(b), precludes disclaimer by agreement of the general obligation of good faith and fair dealing and opining that "it is reasonable to infer that a similar rule may apply under the common law");  Peter Linzer, *"Implied," "Inferred," and "Imposed": Default Rules and Adhesion Contracts – the Need for Radical Surgery*, 28 Pace L. Rev. 195, 198 n.10 (2008) (characterizing the implied covenant of good faith as an "immutable" rule that cannot be dispensed with at the option of contractual parties).

Pennsylvania Supreme Court would adhere to the reasoning of *Spellman* and *Arabella* in the context of this case.

While this court construes the Drafts and the Leases together as part of the same transaction, it does not necessarily follow that the "no liability" clause negates all contractual obligations set forth in the Lease. Unlike SWEPI, this court does not view the Draft in mutually exclusive terms, *i.e.,* either as a medium of payment or as a contractual document; rather it is both. The Draft sets forth the amount of the bonus as well as the terms of payment, and thereby supplies important contractual terms, but it is also a specific and distinct medium of payment. As the courts recognized in *Masciantonio* and *Smith*, construing the "no liability" clause in a limited manner – i.e., pertaining to the Draft only as the medium of payment and precluding independent litigation thereon -- is consistent with Pennsylvania principles of contract construction inasmuch as it allows the various terms of the agreement to be construed together, giving "full and fair effect to each provision." *Masciantonio,* 195 F. Supp. 3d at 685 (*citing Jacobs,* 332 F. Supp. 2d at 790-91).

SWEPI contends, however, that its interpretation of the Transactional Documents is the only one that is consistent with Pennsylvania industry practice and, thus, the only one that reflects the parties' true, objective intent. Under Pennsylvania law, "custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts," even where no ambiguity otherwise exists. *Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 781 A.2d 1189, 1193 (Pa. 2001). In support of its motion, SWEPI submitted the declaration of Lisa C. McManus, Esq., a lawyer engaged in the area of Pennsylvania oil and gas industry, who attests that:

> [ ] Certified checks or cashier checks are not usually given upon the execution of
> an oil and gas lease because leases are generally conditioned upon the ability of the

lessee to proceed with development, as that is the intent of the parties to the lease. As a result, lessees, in lieu of a check, usually provide an Order of Payment or bank draft that contains terms that allow for a delay while the lessee investigates whether to proceed with the lease and provides for a definite time at which the payment is due, should all conditions set forth in the Order of Payment or draft be met.

[ ] Often the language in an Order of Payment or bank draft fails to protect the lessor. Nonetheless, an Order of Payment or bank draft could be negotiated by the lessor to allow for greater protections for the lessor.

[ ] My experience with drafts in Pennsylvania is that many include "No Protest" notices and language that provides that "no liability for payment or otherwise shall be attached to any of the parties" to the draft, like the bank drafts in this case. In other words, that draft language, which is construed in conjunction with the other lease instruments, means that the lessee may opt not to fund the draft and will not be liable for any payment to the lessor, as a matter of industry custom, usage, and practice. The use of a bank draft to pay a bonus allows the lessee to cancel, void, or surrender the lease and not pay the bonus, with no consequences or liability, where the draft utilizes the term "No Protest" and contains language absolving all parties of liability, according to Pennsylvania oil and gas industry custom, usage, and practice.

(McManus Decl. ¶¶ 25-27, ECF No. 150-3.)

The Pennsylvania Supreme Court has instructed that, "[i]f words have a special meaning or usage in a particular industry, then *members of that industry* are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words." *Sunbeam Corp.,* 781 A.2d at 1193 (emphasis supplied). As the court's statement indicates, however, this rule of construction has application only where both parties to the contract are familiar with the particular trade usage by virtue of being engaged in a particular industry, or otherwise have reason to know of it. *See Swiss Reinsurance Am. Corp. v. Airport Indus. Park, Inc.,* 325 F. App'x 59, 65 (3d Cir. 2009) ("Parties working in [the specialized field of business, government construction contracts] may understand the argot of their business and see no need to define terms. They may be able to juggle multiple meanings of a term, with no need for explanation."); *Resolution Trust Corp. v. Urban Redev. Auth.*, 638 A.2d 972, 975-76 (Pa. 1994) ("Where terms are used in a contract *which are known*

*and understood by a particular class of persons* in a certain special or peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject matter . . . . [I]n the absence of an express provision to the contrary, custom or usage, once established, is considered a part of a contract and binding on the parties though not mentioned therein, the presumption being that they knew of and contracted with reference to it.") (emphasis added); Restatement (Second) of Contracts §220(1) ("An agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage and neither party knew or had reason to know that the meaning attached by the other was inconsistent with the usage."); *id.* at Comment b ("[A] party is not bound by a usage unless he knows or has reason to know of it. Hence a party who asserts a meaning based on usage must show either that the other party knew of the usage or that the other party had reason to know of it.").

Here, no conclusive inferences can be drawn regarding the class members' awareness of the proffered oil and gas industry customs and usages. While SWEPI is clearly engaged in the industry of gas and oil leasing and exploration and may profess an awareness of the industry's customs and common usages, the same cannot necessarily be said of the class members based on the limited record before the court. Indeed, Ms. McManus' acknowledgement that she routinely advised her clients not to accept drafts as a medium of payment suggests that lay persons outside of the oil and gas industry may have no reason to know of the industry practices to which Ms. McManus attests. (*See* McManus Decl. ¶¶22, 28.) Accordingly, SWEPI's evidence of trade usage and custom is not dispositive.

To the extent that SWEPI's interpretation of the "no liability" clause can be considered reasonable, giving rise to an ambiguity in the contract, the relevant extrinsic evidence fails to support SWEPI's interpretation. *See Gillis v. Respond Power, LLC,* 677 F. App'x 752, 755 (3d

Cir. Feb. 1, 2017) (recognizing that courts can consult extrinsic evidence in order to resolve a contractual ambiguity); *Hutchinson*, 519 A.2d at 390 (same). "Relevant extrinsic evidence would include that which shows 'the purpose of the [contract], its subject matter, the situation of the parties, ... the circumstances surrounding the making of the contract,' and the negotiation process (if there was any negotiation)." *Gillis,* 677 F. App'x at 756 (alteration and ellipsis in the original) (quoting *Northbrook Ins. Co. v. Kuljian Corp*., 690 F.2d 368, 372 (3d Cir. 1982), and citing Restatement (Second) of Contracts § 2 cmt. b). On the other hand, "to the extent that extrinsic evidence reflected only '[t]he uncommunicated subjective understanding or intent of one party' about the meaning of ambiguous contract language, such evidence would be irrelevant, since the court's objective is to discover the meaning 'that ... each party had reason to know would be given to the words by the other party.'" *Id.* (alteration and ellipsis in the original) (quoting *Celley v. Mut. Benefit Health & Accident Ass'n*, 324 A.2d 430, 435 (Pa. Super. Ct. 1974)).

Here, the court is somewhat limited in terms of the relevant extrinsic evidence that it can consult. Although plaintiffs submitted certain forms of extrinsic evidence, such as a form instruction sheet (ECF No. 163-5) and cancellation letter (ECF No. 163-7), it is not clear from the record that these forms were utilized in connection with all the transactions at issue in this litigation, and therefore SWEPI reasonably objects to their use. SWEPI, on the other hand, has submitted a declaration from Ian Haney wherein Haney attests to, among other things, SWEPI's general leasing practices as well as its understanding that it could elect to deny payment of the lease bonuses for any reason whatsoever, based on the "no liability" language in the Draft. (Second Haney Decl. ¶¶15, 24.) Because this evidence appears to involve the undisclosed

subjective intent and understanding of SWEPI's agents, it "cannot be used to substantiate a particular interpretation of that language." *Gillis,* 677 F. App'x at 756.

Somewhat more relevant is the declaration of Eric Jenevein. Like Haney, Jenevein attests to SWEPI's general lease acquisition practices, but he provides more specific detail about the negotiation process. Pertaining to the terms of payment, Jenevein states:

> Most landowners in the course of negotiations of the leases asked orally about the how and when they would be paid for the lease bonus. Southeast instructed its landm[e]n to explain to landowners that payment would be made by a bank draft, not checks, and to explain the terms of the bank draft prior to obtaining signed leases from the landowners. . . . Precisely what each Southeast landman told each landowner about the bank drafts and about the circumstances and terms of payment of the lease bonus would vary from one landman to the next and often from one landowner to the next. *But it was the practice of Southeast landmen to inform the landowner prior to obtaining the written lease that the payment would be made by a bank draft and not be payable until the expiration of a set number of banking days, usually ninety (90) days, that banking days differ from calendar days, and that ultimate payment would not be made if the title examination during the ninety (90) days did not result in a clean title examination acceptable to SWEPI.* It was not the usual practice of Southeast landmen to make any representations or promises about the payment of a SWEPI lease bonus different than the terms reflected in the written bank draft. To the contrary, Southeast instructed its landmen to accurately inform the landowners about the payment terms reflected in the SWEPI bank drafts.

(Jenevein Decl. ¶8 (emphasis supplied).) As the italicized excerpt shows, Southeast's landmen typically explained to landowners that payment would be made by a bank draft in accordance with a certain time frame and would be conditioned upon a "clean title examination acceptable to SWEPI," but no mention is made of any other substantive conditions or limitations on payment. Nothing in Jenevein's declaration suggests that Southeast shared – or conveyed to landowners – SWEPI's subjective understanding that Drafts could be cancelled for reasons entirely unrelated to title examination.

In sum, to the extent that the meaning of the "no liability" clause is ambiguous, the ambiguity cannot be conclusively resolved in SWEPI's favor by a resort to the relevant extrinsic

evidence. Consequently, the "no liability" clause must be construed in favor of the class and against SWEPI, since SWEPI is both the lessee and the party that supplied the form Draft. *See Hutchinson,* 519 A.2d at 390 n. 5; *Mason*, 120 F. Supp. 3d at 440. In doing so, the court concludes that the Transactional Documents evidence a binding promise on the part of SWEPI to pay the Drafts in accordance with the time period specified in each Draft, subject only to SWEPI's verification of clean title within that time frame. Because SWEPI did not demonstrate that the putative contracts fail for lack of consideration, a grant of summary judgment is not warranted on that basis.

### 2. Offer and Acceptance

SWEPI next challenges the enforceability of the Leases on the ground that there was no contractual intent. This element of contract formation usually manifests as "'an offer or proposal by one party followed by an acceptance by the other party.'" *Guzzi v. Morano*, Civil Action No. 10-1112, 2013 WL 4042511, at *10 (quoting *Bayliss–Allen v. Cadence Design Sys., Inc*., No. Civ. A. 99-3240, 2000 WL 1156857, at *4 (E.D. Pa. 2000)). In ascertaining intent, the inquiry focuses on "the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd*., 584 F.3d 575, 582 (3d Cir. 2009). "A contract exists if a party's overt actions suggest its existence and provide evidence on which a reasonable jury could find the party manifested his intent to form the contact." *Maxwell v. Adapt Appalachia, LLC*, No. CIV. A. 14-85, 2015 WL 1444388, at *7 (W.D. Pa. Mar. 30, 2015) (internal quotation marks and citation omitted).

In this court's view, that intent can be reasonably inferred from the language of the Transactional Documents and the actions of the parties. There is no dispute that each class member, upon signing and delivering their Leases and MOLs, was given a Draft, signed by

SWEPI's agent, in the amount of the negotiated bonus payment.  As discussed, each Lease was, by its own terms, expressly "made and entered into" by the parties as of the date that the Transactional Documents were signed and exchanged, and each Lease specifically stated that the lessor "does hereby grant, demise, lease and let exclusively to Lessee . . .  the lands hereafter described . . . ."  (ECF No. 150-21.)  Each MOL similarly acknowledged "the existence of an Oil and Gas Lease" whose primary term commenced on the same date that the Lease Agreement was executed.  (ECF No. 150-23.)  In addition, each MOL expressly stated that "Lessor did grant, demise, lease and let exclusively to Lessee . . . the rights to explore, develop, produce, and market oil and gas from the premises described below subject to the provisions contained in the Lease . . . "  (*Id.*)  Collectively, this language is sufficient to demonstrate contractual intent on the part of SWEPI.

SWEPI insists, however, that no contractual intent can be inferred because, as a matter of law, the Lease Agreements that the class members signed were simply offers that it never accepted.[13]  To that end, SWEPI cites three decisions where courts construed landowners' signed agreements as mere offers to lease.  *See Hollingsworth v. Range Res.-Appalachia, LLC,* No. 3:09cv838, 2009 WL 3601586, at *4 (M.D Pa. Oct. 28, 2009); *Lyco Better Homes, Inc. v. Range Res.-Appalachia, LLC,* No. 4:09-CV-249, 2009 U.S. Dist. LEXIS 110425, at *7-8 (M.D. Pa.

---

[13] SWEPI points out that, at an earlier point in this litigation, plaintiffs themselves espoused the view that the executed Lease Agreements constituted "offers" -- albeit offers that, in plaintiffs' view, SWEPI had accepted when its landmen took physical delivery and recorded the MOLs.  (*See* Defs.' Br. Supp. Mot. Summ. J. at 17-18 (ECF No. 153) (citing Pls.' Reply to Defs.' Resp. Mot. Class Cert.).)  This observation, while accurate, is of no moment to the court's analysis because plaintiffs are not judicially estopped from arguing their alternative theory of contractual interpretation.  *See Checker Cab Phila. v. Phila. Parking Auth.*, Civil Action No. 16-4669, 2018 WL 587298, at *28-29 (E.D. Pa. Jan. 29, 2018) (noting that the doctrine of judicial estoppel may be applied on a discretionary basis only if: (1) the party to be estopped took two positions that are irreconcilably inconsistent, (2) the estopped party changed his or her position in bad faith, *i.e.,* with an intent to play fast and loose with the court, and (3) application of the doctrine is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done) (citing *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779–80 (3d Cir. 2001)).

May 21, 2009); *Spellman, supra.* Each of these decisions, however, involved materially distinguishable facts.

Both *Hollingsworth* and *Lyco Better Homes* involved transactions in which the putative lessee, Range Resources – Appalachia, LLC, sent landowners a "Dear Property Owner" ("DPO") letter indicating that an upfront lease payment would be rendered to the landowner if: (a) good title was established and (b) the company's management approved the lease.[14] The courts in *Hollingsworth* and *Lyco* ultimately construed the pre-executed leases as offers by the landowners that had not been accepted by the defendant oil and gas company. *See Hollingsworth,* 2009 WL 3601586, at *4, 11-12; *Lyco,* 2009 U.S. Dist. LEXIS 110425, at *7-8. As the court explained in *Hollingsworth,* "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intent to conclude a bargain until he has made a further manifestation of assent." 2009 WL 3601586, at *4 (district court quoting the Restatement (Second) of Contracts §26 (1979)). Thus, the defendant's act of "[p]reparing a lease and giving it to plaintiffs for their signature [was] not plausibly an offer where the defendant did not sign the lease and stated that plaintiff's signed lease would be subject to review." *Id.; see also id.* at *12 (court explaining that "Defendant made it quite apparent that it did not intend to form a contract with Plaintiffs simply upon their execution of the lease agreement and DPO letter; rather, Defendant clearly indicated that it did not intend to form a contract with Plaintiffs until it obtained a further manifestation of assent, *i.e.,* approval by its management"). The court's ruling in *Lyco Better Homes* appears to be

---

[14] As explained in *Hollingsworth*, the DPO letter stated that Range Resources "hereby agrees to pay the following oil and gas owner the amount below set forth subject to approval of title and management lease review . . . ." 2009 WL 3601586, at *1. Although the Lyco decision does not discuss the specifics of this letter, this court can take judicial notice of the fact that the DPO letter in Lyco contained substantially identical language to that cited in *Hollingsworth. See Lyco Better Homes, Inc. v. Range Res.- Appalachia, LLC,* No. 4:09-cv-249 (M.D. Pa.) (ECF No. 1-2 at 30).

predicated on similar reasoning, although the court did not elaborate on the subject. *See* 2009 U.S. Dist. LEXIS 110425, at \*7-8 ("There is no contract here. Plaintiffs, the land owners, each made an offer when they signed the documents. The offer[ee], defendant, could have accepted or rejected the offers. Defendant communicated a rejection of the offers by returning the documents to plaintiffs marked with the 'void' stamp.").

*Spellman* is consistent with *Hollingsworth* and *Lyco Better Homes* and distinguishable from the case *sub judice.* In *Spellman,* the landowner signed a lease and received a draft directing that payment be made "[o]n approval of lease . . . and on approval of title to same" by the lessor within 10 days after presentation to the lessor's bank. 709 S.W. 2d at 296-97. The draft required the collecting bank to hold the instrument in escrow "subject alone to acceptance of payment" by the lessor within a specified time frame. *Id*. As previously discussed, the draft also included an exculpatory clause that expressly prevented liability from attaching to any of the parties in the event that it was not paid within the specified time frame. *Id*. at 279. In addition to determining that the lease failed for lack of mutuality, in *Spellman* the court held that the landowner's pre-executed lease was merely an offer that had been revoked prior to presentment to the lessor for his acceptance. 709 S.W. 2d at 298. The court did not explain its reasoning, but the "lease approval" requirement in the draft logically supported its determination that the lease, once signed by the landowner, constituted only an unaccepted offer. Like the DPO letters at issue in *Hollingsworth* and *Lyco Better Homes,* the contractual language at issue in *Spellman* plainly demonstrated that the lessor did not intend to be contractually bound unless and until some further manifestation of "lease approval" occurred in the future, and the lessee was not bound by an implied duty of good faith under Texas law. 709 S.W. 2d at 297 (following *Sterling Computer Systems of Texas, Inc. v. Texas Pipe Bending Co*., 507 S.W.2d 282 (Tex. App.1974)).

In this case, by contrast, none of the Transactional Documents contained language that expressly made SWEPI's acceptance of the Lease contingent upon a purely discretionary review and "lease approval."  Both the Lease and the MOL suggested that an agreement had been effectuated.  The Draft evidenced SWEPI's promise to pay the Lease bonus at a date certain, absent the discovery of title problems.  SWEPI's decisions relative to title analysis were limited both by the time restraints in the Draft and by its implied duty to exercise its discretion in good faith.  *See Tuno,* 552 F. App'x at 144; *W. Run Student Hous. Assocs., LLC,* 712 F.3d at 170.  For the reasons discussed, SWEPI's payment obligations were not rendered illusory by virtue of the exculpatory language in the Draft.  Thus, the contractual documents in this case did not unambiguously advise landowners that SWEPI's intent to conclude a bargain would require "a further manifestation of assent."  *Hollingsworth,* 2009 WL 3601586, at *4; Restatement (Second) of Contracts §26.

In essence, SWEPI views the pre-signed Leases as unilateral contracts which could only be "accepted" by its payment of the Drafts.  *See Giant Eagle, Inc. v. Comm'r Internal Revenue*, 822 F.3d 666, 673 (3d Cir. 2016) ("'[U]nilateral contracts . . . involve only one promise and are formed when one party makes a promise in exchange for the other party's act or performance.  Significantly, a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance.'") (quoting *First Home Sav. Bank, FSB v. Nernberg*, 648 A.2d 9, 14 (Pa. Super. Ct. 1994)) (ellipsis in the original); *Pacitti v. Macy's*, 193 F.3d 766, 774-75 (3d Cir. 1999) (a unilateral promise results in an enforceable contract if the offeree performs the required action before the offer is withdrawn).  As support for its assertion that it lacked any contractual intent, SWEPI points to several decisions which hold that the mere act of recording a lease does not constitute "acceptance" of the lease.  *See Sun Exploration & Prod. Co. v. Benton,*

728 S.W. 2d 35, 37 (Tex. 1987) ("The effect of recording an instrument is to give notice to all persons of the existence of the instrument"; the recordation "cannot alter the rights and obligations of the parties.") (internal quotation marks and citation omitted); *Brice v. Pugh,* 354 P.2d 1024, 1027 (Colo. 1960) ("Recording alone is not, as a matter of law, an acceptance of title nor does it necessarily constitute exercising dominion over a lease.") (internal quotation marks and citation omitted); *Martin v. Turner Oil & Gas Props.,* No. 1:11-cv-102, 2013 WL 1183786, at *4 (D.N.D. Mar. 21, 2013) ("This court believes the North Dakota courts would follow *Sun Exploration* and *Brice* and conclude that the mere recording of a lease in this situation would not amount to a final acceptance of a lease or a waiver of conditions precedent set forth in the other leasing documents if it is done simply to give notice of the pending transaction to third parties.").

SWEPI's argument is misplaced, however, as this court already determined that the Transactional Documents must be construed as a bilateral contract. *See Giant Eagle, Inc*., 822 F.3d at 673 (3d Cir. 2016) (distinguishing unilateral contracts from bilateral contracts, "which are premised on reciprocal promises").  Inasmuch as SWEPI made a promise to pay each Draft on a date certain, subject only to verification of clean title, its promise is valid consideration given in exchange for the class members' conferment of leasing rights, for the reasons previously discussed.  It makes no difference whether (A) the court construes the Leases which SWEPI provided to class members as offers that were accepted by class members when they signed and returned the Leases in exchange for the Drafts, or (B) the court construes the signed Leases as offers that SWEPI accepted when it took the Leases in exchange for the Draft instruments; in either case, manifestation of contractual intent is present.

The decisions on which SWEPI relies do not hold otherwise.  *Sun*, *Brice*, and *Martin* stand for the proposition that, where a lease payment is expressly conditioned upon good title to

the underlying mineral interest, recordation does not cause a lessee to lose its right to refuse payment based on nonsatisfaction of the condition. This rule, although accurately stated in *Sun, Brice, and Martin*, is inapposite to the issue of contract formation in the instant case. Here, SWEPI manifested its intent to be contractually bound when it made a binding, albeit conditional, promise to render payment in exchange for leasing rights that commenced upon the date the Transactional Documents were executed. Although SWEPI may have retained the right to refuse payment for title-related reasons, that issue relates to SWEPI's performance obligations rather than its contractual intent. Because the record demonstrates the existence of contractual intent, SWEPI's second argument for summary judgment lacks merit.

### 3. Condition Precedent to Contract Formation

SWEPI's third theory is that the Draft Instruments contained a condition precedent to contract formation that never occurred – namely, verification of the class members' good title within the time periods stated in each Draft. According to SWEPI, its inability or failure to verify title within the 90-day period prevented any obligations from arising under the Lease Agreements.

Pennsylvania courts have recognized that "conditions usually deal with duties of performance," although "they may relate to the existence of contracts as well." *Vill. Beer & Beverage, Inc. v. Vernon D. Cox & Co*., 475 A.2d 117, 122 (Pa. Super. Ct. 1984) (citing 5 Williston on Contracts §666 (3d ed. 1961)); *see Cardinale,* 74 A.3d at 141 (acknowledging that conditions precedent "can relate directly to the existence of an actual agreement," but more often limit only the duty of performance) (citing *Vill. Beer & Bev., Inc.,* 475 A.2d at 122); 13 Williston on Contracts §38:4 (4th ed.) ("Generally in contracts, when reference is made to conditions, what is meant are conditions to performance – that is, conditions which become operative after

formation of the contract and qualify the duty of immediate performance of a promise or

promises in that contract – not conditions to the creation or formation of a contract or promise.").

One commentator has explained the distinction:

> [T]he classic unilateral contract is perhaps the quintessential example of a condition precedent to formation (although it is also, in a broad sense, a condition precedent to performance).[ ] If a promisor bargains for the promisee to do an act, the doing of that act may be viewed as an express condition precedent to the formation of the contract. Unless and until the promisee does the act exactly as requested, the promisor is not bound, and as soon as the promisee completes the act, the unilateral contract is formed. The doing of the act by the promisee is also a condition to performance—not only does the promisee's completion of the act form the contract with the promisor but it also triggers the promisor's duty to perform its promise. But a condition to performance is typically thought of as existing in conjunction with a bilateral contract. In that case, the exchange of promises creates the contract between the parties, but if one of the parties' performances is due only on the happening of some act or event, as often occurs, that act or event is properly considered a condition precedent to that party's performance.

13 Williston on Contracts § 38:4 (4th ed.) (internal footnote omitted).  As with any issue of

contractual interpretation, the court must "first look to the language" of the putative contract to

determine intent.  *See Vill. Beer and Bev.,* 475 A.2d at 108-09 (determining that commercial

lease language, which made the parties' "Agreement . . . contingent upon the transfer [of a beer

distributors' license] being approved by the Liquor Control Board of Pennsylvania," created a

condition that related to the lease agreement itself, rather than any selected performance

thereunder).

In this case, the Draft expressly afforded SWEPI a certain amount of banking days "for

title examination and for payment."  This language plainly relates to SWEPI's obligation to fund

the Drafts, not the formation or existence of the Lease Agreements themselves.  Although

SWEPI appears to view the lease agreements as unaccepted unilateral contracts, the court already

determined that the transactions at issue are properly viewed as bilateral agreements supported

by mutually adequate consideration.  Consequently, to the extent SWEPI's payment obligation

was conditioned on the outcome of its title examination, the latter was a condition of SWEPI's duty of performance, not a condition precedent to the formation of a valid contract. *See Masciantonio,* 195 F. Supp. 3d at 681 (determining, based on language in parties lease addenda, that SWEPI's verification of lessors' title was a condition of its payment obligation, and did not negate the effectiveness or validity of the leases); *Cardinale,* 74 A.3d at 141 (holding that language in lessor's order of payment conditioned the lessee's payment obligation on "its inspection, approval of the surface, geology and title" of the plaintiffs' property, but did not affect the formation of the parties' lease). Because SWEPI failed to establish the absence of a condition precedent to contract formation, it cannot obtain summary judgment on that basis.

4. Conclusion

In light of the foregoing discussion, the court concludes, as a matter of law, that enforceable contracts existed between SWEPI and the various class members, inasmuch as the Transactional Documents: (i) demonstrate the parties' mutual intent to be contractually bound, (ii) set forth sufficiently definite terms, and (iii) establish the existence of legally sufficient consideration. *See Cook,* 2017 WL 4340664, at *6. As noted, SWEPI's motion for summary judgment is predicated solely on its assertion that the Lease Agreements are not legally enforceable. Because the court has concluded otherwise, SWEPI's motion will be denied.

B. *Whether SWEPI is Liable on a Class-wide Basis*

The court will next consider whether plaintiffs have shown that the class members' Lease Agreements were breached. Plaintiffs contend that a class-wide contractual breach occurred, as a matter of law, when SWEPI failed to fund the 283 Drafts at issue in this litigation. Plaintiffs' theory is that, at the moment the Transactional Documents were signed and exchanged, SWEPI became unconditionally obligated to pay the negotiated bonus amounts upon expiration of the

time periods stated in each Draft. Fundamentally, plaintiffs view the signed Leases as akin to deeds, inasmuch as they involve the conveyance of a property interest. *See, e.g., Hutchinson,* 519 A.2d at 387 ("[U]sing the term 'lease' with regard to the conveyance of mineral rights is in some respects a misnomer [because] what is really involved is a transfer of an interest in real estate, the mineral in place."). They posit that "[l]ike a deed, each Lease provides for specific consideration to be paid for its *execution*." (Pl.s' Br. Supp. Mot. Summ. J. at 10 (emphasis in the original), ECF No. 145.) Thus, "[w]hen each plaintiff signed, SWEPI got what it bargained for, the execution of the Lease, but it failed to perform its side of the bargain now sued upon." (*Id.* at 11.) In essence, plaintiffs view each bonus payment as "a 'signing bonus' not unlike those paid up-front to professional athletes as an incentive for signing with a *particular team*." (*Id.* at 10 (emphasis supplied).)

SWEPI strongly disputes plaintiffs' interpretation of the Transactional Documents. It counters that, even if enforceable contracts existed, a number of title-related and other issues make an award of summary judgment in favor of the class inappropriate. The court agrees and will address these factual disputes *seriatim*.

### 1. Title-Related Challenges

The parties' most significant disagreement concerns the extent to which defects in the class members' title impacts their ability to establish a contractual breach. SWEPI maintains that verification of clean and marketable title was a condition precedent to its payment obligation, if not to formation of the contracts themselves.

Plaintiffs dispute that good title was a condition of payment. They insist that the Draft's allowance of 90 banking days "for title examination and for payment" merely gave SWEPI the opportunity to examine the title and avoid payment "if it took steps to keep the contract

executory and susceptible of rescission" by, for example, utilizing an escrow arrangement. (Pls.' Br. in Supp. Mot. Summ. J. at 14.) Plaintiffs posit that SWEPI waived any condition precedent to its payment obligation by accepting "delivery" of the executed Leases and thereby "consummating" each transaction prior to conducting its title search. (*See id.* at 13-16.) In essence, plaintiffs view the exchange of Transactional Documents as a "closing," whereby title – whether clean or unclean -- passed to SWEPI at the moment its landmen took physical possession of the signed Leases and MOLs. (*See id.* at 5-6;13-16.) In support of their theory, plaintiffs invoke the principle of "merger" – applicable in transfers of real property – whereby warranties of title are lost if not incorporated into the property deed. *See In re Mihordin,* 162 A.3d 1166, 1171 (Pa. Super. Ct. 2017).

In this court's view, plaintiffs' argument is an attempt to rewrite the terms of the Lease by invoking general principles of property law that have no overriding applicability in the face of express contractual language. The law in Pennsylvania is clear that, while oil and gas leases effectuate the conveyances of a property interest, they are controlled by principles of contract law. *See Jedlicka,* 42 A.3d at 267. Accordingly, the court must construe the Leases in accordance with the terms of the parties' agreement as manifestly expressed. *Id.*

Here, the Draft supplied relevant terms of payment for each transaction and provided that the "payor" (SWEPI) would have a specified number of banking days after presentment of the Draft to Amegy "for title examination and for payment." Although the word "condition" is not expressly used, the only reasonable interpretation of this clause is that SWEPI expressly reserved the right to refuse payment of the Lease bonuses if it discovered title problems during the time periods established on the face of the Drafts. *See Am. Leasing v. Morrison Co*., 327, 454 A.2d 555, 559 (Pa. Super. Ct. 1982) ("No particular form of words is necessary to make a term of an

agreement a condition of a duty; and, in general, the usual rules of contract interpretation should be employed in light of the general purpose of the agreement.") (citing Restatement, Second, Contracts § 226, Comment a (1981)).  As SWEPI points out, the Drafts did not "defer" payment solely for the sake of delay but with the obvious purpose of allowing SWEPI time to conduct a title examination.  The clear intent was to allow SWEPI an opportunity to surrender the lease without any payment obligation where it found defects in the chain of title.  Construing the "90-day" clause in this manner is the most reasonable interpretation and wholly consistent with the purpose of the parties' agreement, which was to allow SWEPI the opportunity to explore and develop the leased premises during the five-year term of the Lease.  *See Am. Winter Servs., LLC,* 2017 WL 6351308, at *2 ("In construing a contract, . . .  the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished.") (internal quotation marks and citation omitted).

The court finds no merit in plaintiffs' theory that SWEPI somehow waived this condition by taking physical possession of the Leases instead of "escrowing" them.  In fact, the Drafts expressly afforded SWEPI time "for title examination and for payment" irrespective whether the Draft, when presented to Amegy, "was accompanied by other papers or not . . . ."  (ECF No. 150-30.)  The parties plainly contemplated that, even in cases where the Lease and MOL were not placed in escrow, SWEPI would be afforded an opportunity to examine title, and "[n]either [the] forwarding bank[,] nor [the] payee(s)[,] nor the grantor(s)" of the Lease would be permitted to demand return of the Draft, or the Lease, in the interim.  (*Id.*)

Also unfounded is plaintiffs' theory that SWEPI forfeited its right to contest payment on the ground of title deficiency by operation of the "merger" doctrine.  Pursuant to this doctrine:

> "The general rule, in the absence of fraud or mistake, and of an intent to the
> contrary, is that an antecedent contract for the purchase of land is merged in the
> deed . . . upon the delivery and acceptance of the deed, there exists a 'prima facie
> presumption' of merger." *Dobkin v. Landsberg*, 273 Pa. 174, 182, 116 A. 814, 817
> (1922) (internal citation and quotation marks omitted). The law presumes that
> delivery and acceptance of a deed consummates the prior agreement and precludes
> the parties "from looking behind the conveyance to subjects of strife suggested by
> their previous . . . contracts"; this preclusion applies to all parties in interest, even
> third parties. *Id.* at 185, 116 A. at 818. "When a deed has been executed in
> pursuance of a prior agreement, it is prima facie evidence the latter has so merged
> that no action could be maintained on any of its covenants. . . ." *Id.* at 186, 116 A.
> at 818.

*In re Mihordin*, 162 A.3d at 1171 (ellipses in the original). As the foregoing authority indicates,

the merger doctrine applies to contracts of sale that are antecedent to delivery of a deed. In this

case, the contractual provision which makes SWEPI's duty of payment conditioned upon

verification of good title is not part of an antecedent contract of sale; rather, it is part of the very

contract upon which plaintiffs are suing.

In any event, however, the rule of merger is not absolute and can be overridden when the

evidence shows that the parties did not intend for merger to occur. *See In re Mihordin,* 162 A.3d

at 1171 ("'Merger is said to be the rule, except when the intention of the parties is otherwise, or

where the stipulations in the contract sought to be enforced are collateral to the functions

performed by the deed.'") (quoting *Carsek Corp. v. Stephen Schifter, Inc.*, 246 A.2d 365, 370

(Pa. 1968)). "The intention of the parties is evidenced by the attending circumstances of each

transaction." *Id.* (citing *Dobkin v. Landsberg,* 116 A.814, 817 (Pa. 1922)). It "'may be shown by

their declarations, acts, or conduct at the time of execution of the agreement in question or from

the terms of the writing itself.'" *Id.* (quoting *Dick v. McWilliams,* 139 A.745, 746 (Pa. 1927)).

Because this analysis involves proof on an individualized basis, it would be impracticable for

this court to draw any conclusions about the parties' intentions on a class-wide basis, even if the principle of merger were applicable here.[15]

In sum, plaintiffs did not demonstrate that the payment condition set forth in the Draft is irrelevant as a matter of law. SWEPI, meanwhile, produced evidence indicating that title defects of varying degrees were pervasive among the Drafts at issue in this litigation. The record shows that, in at least 120 instances, SWEPI cancelled Drafts based on outright failures of title or defects that SWEPI considered serious. (*See* Defs.' Br. Opp. Pls.' Mot. Summ. J. at 38-43; Second Haney Decl. ¶¶24, 28.) According to Ian Haney, an additional 42 transactions were "cancelled per Land Department directive," which often was used as an indication of title-related problems. (Second Haney Decl. ¶27.) Thus, SWEPI may have a potentially viable defense relative to a substantial number of the Drafts held by class members, the merits of which this court cannot presently adjudicate. For this reason as well, plaintiffs' request for a class-wide judgment must be denied.

### 2.  SWEPI's Surrender of the Leases Upon Request of the Lessors

In approximately 17 transactions, SWEPI surrendered Leases at the request of the lessor. (*See* Second Haney Decl. ¶31.) SWEPI asserts that, with respect to these transactions, material issues of fact preclude a finding of contractual liability on its part.

---

[15] To the extent there is evidence on the question of intent, the record supports an inference that representatives of the class, of Southeast, and of SWEPI all viewed SWEPI's verification of good title as an operative condition of payment. (*See* Walney Dep. at 123:2-5, 124:9-20, 131:16-132:6, 150:19-152:4, ECF No. 150-8 (witness acknowledging his understanding, based on information received from landman and Draft language, that payment would be made after title came back clear and that defective title would preclude payment); Bedow Dep. at 103:25-104:13, ECF No. 150-9 ("What I read, it would be 90 banking days. And then if everything cleared, I would get paid. . . . if the title wasn't there, then I guess they wouldn't have to pay me."); Second Haney Decl. ¶11, ECF No. 150-1 (stating that "the bank drafts provided that payment was conditioned on 'title examination.'"); Jenevein Decl. ¶8, ECF No. 150-2 ("[I]t was the practice of Southeast's landmen to inform the landowner prior to obtaining the written lease that . . . [among other things] ultimate payment would not be made if the title examination during the ninety (90) days did not result in a clean title examination acceptable to SWEPI.").)

Plaintiffs dispute that the express terms of the Lease permit SWEPI to avoid its payment obligation under these circumstances. Pointing to Paragraph 10 of the Lease, which gives the "Lessee" the right to surrender the Lease "at any time, and from time to time, . . . as to all or any part thereof by recording an appropriate instrument of surrender," plaintiffs observe that this provision does not afford a right of surrender to *lessors.* Plaintiffs posit that, if any class members requested a surrender, SWEPI's acquiescence therein would not result in a rescission of the Lease *ab initio,* but would merely result in a contemporaneous termination of the agreement, which would not negate SWEPI's previously accrued payment obligation. In addition, plaintiffs argue that SWEPI's payment obligation cannot be discharged unless there is consideration to support it and unless the requesting class member expressly agreed to exonerate SWEPI in a signed writing that complies with the Statute of Frauds. *See* 33 Pa. Stat. §1. According to plaintiffs, "the Statute not only imposes the necessity of a writing on a lessee where it unilaterally surrenders a lease (because it is in effect a re-conveyance), but also upon bi-lateral agreements to do so." (Pls.' Br. Supp. Mot. Summ. J. at 21 (citing *In re Whatever, LLC,* 478 B.R. 700 (Bankr. W.D. Pa. 2012).)

The court is not persuaded that plaintiffs demonstrated an absence of genuinely disputed material facts relative to this issue. Under Pennsylvania law, the parties to a contract may agree to rescind the agreement by mutual assent. *See In re Bridgeport Fire Litig.,* 8 A.3d 1270, 1282 (Pa. Super. Ct. 2010) ("[A] contract can be repudiated by mutual agreement of all parties to it.") (citing *Kirk v. Brentwood Manor Homes, Inc.,* 159 A.2d 48 (Pa. Super. Ct. 1960)). A rescission "need not be expressed in words but may be inferred from the parties' acts and declarations[.]" *Johnston v. Johnston*, 499 A.2d 1074, 1077 (Pa. Super. Ct. 1985). This generally involves a factual inquiry. *See id.* ("Whether or not the parties have so agreed [to a contractual rescission]

is an issue for the factfinder.") (citing *Kirk*,159 A.2d at 51). Although the rescission of a contract must be supported by consideration, a surrender of mutual rights by the parties generally satisfies this requirement. *See Fedun v. Mike's Cafe, Inc.*, 204 A.2d 776, 781 (Pa. Super. Ct. 1964), *aff'd*, 213 A.2d 638 (Pa. 1965).

Here, plaintiffs contend that any request by class members to surrender their leases "would ostensibly arise from SWEPI's unwillingness to pay the bonus," (Pls.' Br. at 20), but the court cannot make a definitive determination in that regard based on the present record. As noted, this determination involves a factual inquiry that must be resolved at the fact-finding stage of litigation. The court cannot conclude that consideration was lacking to support such a rescission, since SWEPI's agreement to surrender its bargained-for lease rights presumably satisfies this requirement.

Finally, the court cannot conclude as a matter of law that this line of defense is precluded by Pennsylvania's Statute of Frauds. In pertinent part, the statute provides that "no leases, estates or interests, either of freehold or terms of years, or any uncertain interest, of, in, to or out of any messuages, manors, lands, tenements or hereditaments, shall . . . be assigned, granted or surrendered, unless it be by deed or note, in writing, signed by the party so assigning, granting or surrendering the same . . . ." Although the statute applies to oil and gas leases, *see In re Tayfur*, 599 F. App'x 44, 49 (3d Cir. 2015) (citing 33 Pa. Stat. § 1 (West 2014)), only the party granting the interest must sign the relevant writing to satisfy the statute's signature requirement. *Id.* (citing *Nolt v. TS Calkins & Assocs., LP*, 96 A.3d 1042, 1047 (Pa. Super. Ct. 2014)). SWEPI's filing of a surrender document presumably satisfies this requirement. Plaintiffs' attempt to invoke the Statute of Frauds based on the reasoning in *In re Whatever, LLC,* 478 B.R. 700 (Bankr. W.D. Pa. 2012), is unavailing. That case involved an attempt by a debtor to enforce an

alleged prepetition agreement with its mortgage lender pursuant to which the mortgage lender had supposedly agreed to a satisfaction of the debtor's loan obligations in exchange for a reduced payoff of the loan. The court ruled that the debtor's arguments were barred by the Statute of Frauds, because there were no writings to evidence the mortgage lender's surrender of its interest in the subject party. Here, by contrast, the party who allegedly surrendered its interest in property (SWEPI) *can* document the surrender of the Leases in question. The ruling in *In re Whatever, LLC* is therefore inapposite.

For these reasons, SWEPI adduced sufficient evidence to establish the existence of a genuinely disputed issue relative to its liability on the claims asserted by the 17 class members in question.

### 3. Class Members Who Never Presented Their Drafts for Payment

SWEPI also represents that approximately 18 of the disputed Drafts were never presented to SWEPI's bank for payment or, at the very least, an issue of fact exists as to whether they were ever presented. SWEPI posits that plaintiffs cannot obtain summary judgment on behalf of the class members who hold these Drafts because presentment of the Drafts was a condition of payment.

SWEPI's argument in this regard has potential merit. The Drafts are clearly collection items, as noted by the language "payable through collecting bank (Amegy Bank N.A.)." Pursuant to the express terms of the Draft, SWEPI's 90-banking day period for title examination and payment commenced upon Amegy's receipt of the instrument. Thus, for class members who never presented their Drafts, the designated period for payment never began to run, and no payment due date could ever have arrived.

Plaintiffs' suggestion that presentment of the Draft was excused or unnecessary is unpersuasive. In their brief, plaintiffs rely on Article 3 of the UCC as authority for the proposition that presentment of an instrument is excused where the maker has already cancelled the instrument. (*See* Pl.'s Br. Supp. Mot. Summ. J. at 23 (citing 13 Pa. Cons. Stat. Ann. §3504(a)(2)). Even assuming that Article 3 principles have application in this case, there is no evidence to establish that SWEPI ever cancelled the Drafts in question. On the contrary, Haney attested in his second declaration that SWEPI had no internal record of the due dates or amounts of these Drafts, most likely because it never received notice of presentation from Amegy; therefore, SWEPI never rendered a decision to cancel or refuse to pay these Drafts. (Second Haney Decl. ¶30.) Accordingly, genuine issues of fact exist about whether these disputed Drafts were cancelled or whether the payees' failure to present them was otherwise excused.

### 4. Persons or Drafts That Are Not in the Class

SWEPI also asserts that certain of the transactions listed in plaintiffs' Exhibit 11, designated "Class Claims Analysis," involve payees who were paid bonuses through replacement drafts. More specifically, SWEPI represents that the following transactions should be removed from the list of class claims: Count Nos. 93 (Duffola), 119 (Grentz), 188 (McGinnis) and 210 (Peirish). (*See* Decl. of Daniel M. McClure ¶3, ECF No. 150-86; Second Haney Decl. ¶41, ECF No. 150-1.)

Plaintiffs do not appear to disagree with this point and, to that end, class counsel has removed the aforementioned transactions from the most recent iteration of plaintiffs' Exhibit 11. (*See* Decl. of Class Counsel ¶ 4(b), ECF No. 163-14; Pls.' Second Amended Ex. 11, ECF No. 167.) Accordingly, plaintiffs' motion for summary judgment is moot and must be denied insofar as it relates to those claims.

SWEPI next contends that at least 6 Drafts involved Leases and MOLs that were never recorded in the public record. (*See* Second Haney Decl. ¶40, ECF No. 150-1; *see also* SWEPI Ex. G ("not found" in column K), ECF 150-7.) These Drafts include Count Nos. 226 (Rhodes), 240-241 (Schwabenbauer), 197 (Dan Miller), 239 (Schry), and 245 (Smerker). (*Id.*) SWEPI maintains that Drafts for Leases that were not recorded are not included in the class definition, making a grant of summary judgment as to these claimants inappropriate.

With the exception of Count No. 240 (Schwabenbauer),[16] plaintiffs dispute that judgment should be denied relative to the non-recorded Leases and MOLs. Plaintiffs implicitly recognize that these transactions fall outside the class as it is currently defined, but they submit that the court should amend the class definition to include these claimants inasmuch as plaintiffs no longer view public recordation as an essential requirement of the class claims.

The court declines plaintiffs' invitation to amend the class definition at this juncture. This matter is more appropriately addressed, if at all, through the filing of a separate motion. For present purposes, it is sufficient simply to observe that the record supports the existence of a genuine dispute about SWEPI's liability as it relates to the foregoing claimants.

### C. *Entitlement to the Requested Damages as a Matter of Law*

Plaintiffs' motion for summary judgment requests an award of damages in the aggregate amount of $34,737,550.84,[17] along with prejudgment interest. This figure is predicated on plaintiffs' assumption that each of the class claimants should recover the full amount of his or her Lease bonuses without regard to issues of damage mitigation. Given the various factual

---

[16] Class counsel concedes that this claim is duplicative of Count 241, which covers the same property. (*See* Decl. of Class Counsel ¶4(b), ECF No. 163-14; Second Haney Decl. ¶40, ECF No. 150-1.)

[17] Plaintiffs originally sought $35,585,232.64 in damages but, as set forth in their reply brief, they have excluded six particular transactions from their Amended Class Claims Analysis (ECF No. 143), such that their aggregate claims have now been reduced to $34,737,550.84. (*See* Pl.'s Reply Br. Supp. Mot. Summ. J. at 15, ECF No. 166.)

issues that exist relative to the enforceability of the Lease Agreements and SWEPI's liability thereunder, the court cannot say that plaintiffs are entitled, as a matter of law, to the aggregate damages award they are seeking.

**VI.    Conclusion**

For the reasons set forth above, SWEPI's motion for summary judgment will be denied. Plaintiffs' motion for summary judgment will be granted insofar as the court has concluded, as a matter of law, that enforceable contracts existed between SWEPI and the various class members. The plaintiffs' motion will otherwise be denied.  An appropriate order follows.


Dated:  April 20, 2018


<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
Chief United States District Judge