IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS J. WALNEY** and **RODNEY A. BEDOW, SR.**, *individually and on behalf of all others similarly situated,* | )<br>)<br>)<br>)    CIVIL ACTION No. 13-102 Erie |
| Plaintiffs, | ) |
| v. | ) |
| **SWEPI LP** and **SHELL ENERGY HOLDING GP, LLC,** | ) |
| Defendants. | ) |

MEMORANDUM OPINION

**Conti, Chief United States District Judge**

Presently pending in the above-captioned class action is a motion filed by SWEPI LP and its general partner, Shell Energy Holding GP, LLC (Collectively, "SWEPI" or "defendants") seeking reconsideration of the court's April 20, 2018 ruling wherein the court granted partial summary judgment in favor of the class. For the reasons that follow, defendants' motion for reconsideration will be denied.

**I.    Background**

This civil action is being prosecuted by Plaintiffs Thomas J. Walney ("Walney") and Rodney A. Bedow, Sr. ("Bedow" and together with Walney, "plaintiffs") on behalf of a class of Pennsylvania landowners who executed gas and oil leases (the "Leases") and memorandums of understanding ("MOLs") for the benefit of SWEPI LP and received in return draft instruments (the "Drafts") in the amount of a predetermined bonus. Plaintiffs contend that class members were promised the bonus monies as an incentive for signing their Leases, but the bonuses were

1

never paid. In their operative pleading, they asserted claims for breach of contract, among other things. On September 14, 2015, the court certified a Rule 23(b)(3) class relative to plaintiffs' breach of contract claims. *See Walney v. SWEPI LP*, No. Civ. A. 13-102, 2015 WL 5333541 (W.D. Pa. Sept. 14, 2015); Fed. R. Civ. P. 23(b)(3).

Following extensive pretrial proceedings and a period of discovery, the parties filed their respective motions for summary judgment. (ECF Nos. 140 and 156). Plaintiffs' theory was that – taken together -- the Leases, MOLs and Drafts (the "Transactional Documents") constituted enforceable contracts as of the time the documents were signed and exchanged by the individual landowners and SWEPI's agents. Plaintiffs construed the contracts as setting forth an unconditional promise that SWEPI would pay the amount of the bonus set forth in each Draft upon expiration of the time period therein. By failing to make the payments, plaintiffs argued, SWEPI had breached the Leases, rending SWEPI liable for the full amount of the bonuses.

SWEPI, by contrast, disputed the existence of any enforceable agreements. To the extent that enforceable contracts existed, SWEPI denied any breach. SWEPI theorized that verification of good title to the underlying mineral rights was a condition of payment in every Lease and that the failure of plaintiffs to demonstrate satisfaction of this condition excused any payment obligation that might otherwise have existed. In the alternative, SWEPI argued that plaintiffs' request for summary judgment was inappropriate because: (i) issues of fact existed concerning the terms of the alleged contracts; (ii) class members had not complied with the Lease provisions requiring that SWEPI be given notice and an opportunity to cure the alleged breach; (iii) any payment obligations were excused as to class members who had requested a surrender of their Leases; and (iv) plaintiffs could not obtain judgment in favor of lessors who never presented their Drafts for payment or who were not members of the class.

On April 20, 2018, this court entered a memorandum opinion and order denying SWEPI's motion for summary judgment and granting plaintiffs' motion for summary judgment in part. (ECF Nos. 177, 178.) The court ruled that enforceable contracts existed between SWEPI and the class members as a matter of law, but that disputed issues of fact relative to SWEPI's alleged breaches and resulting damages precluded the court from granting plaintiffs' request for a class-wide monetary judgment.

On May 11, 2018, SWEPI filed the pending motion for consideration (ECF No. 179.) The parties have since engaged in extensive briefing in support of, and in opposition to, the motion. (ECF Nos. 180, 182, 187, 205, and 208.) The matter is now ripe for adjudication.

**II.     Standard of Review**

Where, as here, a party seeks reconsideration of an interlocutory order, the governing standard is supplied by Rule 54(b) of the Federal Rules of Civil Procedure. *See Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016) ("[M]otions for reconsideration of interlocutory orders — whether denials of summary judgment, grants of partial summary judgment, or any other non-final orders — are motions under Federal Rule of Civil Procedure 54(b)."); *Cezair v. JP Morgan Chase Bank N.A.*, Civ. Action No. 13-2928, 2014 WL 4955535, at *1 (D. Md. Sept. 30, 2014) ("It is well-established that the appropriate Rule under which to file motions for reconsideration of an interlocutory order is Rule 54(b)."). Pursuant to Rule 54(b):

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

Although "district courts have more discretion in reconsidering interlocutory orders than in revising final judgments, . . . the law of the case doctrine guides courts to exercise their discretion with a light hand, even with respect to interlocutory orders, and only to grant motions for reconsideration in 'extraordinary circumstances.'" *Foster v. Westchester Fire Ins. Co.*, Civ. Action No. 09-1459, 2012 WL 2402895, at *4 n.1 (W.D. Pa. June 26, 2012) (citing *In re Anthanassious*, 418 F. App'x 91, 95–96, 96 n. 5 (3d Cir. 2011), and quoting *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 438–39 (3d Cir. 2009)). Thus, while "'[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice.'" *In re Pharmacy Benefit Managers Antirust Litig.*, 582 F.3d at 439 (3d Cir. 2009) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).

### III. Discussion

At issue is the court's treatment of SWEPI's trade usage evidence as it relates to exculpatory language in the Drafts. An account of SWEPI's lease acquisition practices, including its use of the form Drafts, was previously discussed by the court. (*See* Mem. Op. dated 4/20/18 at 26, ECF No. 177.)

In brief, SWEPI began acquiring mineral leases in certain parts of Pennsylvania in 2001 with the help of independent contractors, including Southeast Land Services, LLC ("Southeast"), who acted as SWEPI's agents. (*See* Mem. Op. dated 4/20/18 at 2.) Most landowners verbally inquired during the course of negotiations about how and when they would be paid their lease bonuses. (*Id.* at 3.) According to Eric Jenevein, manager of Southeast's Appalachia Region:

> it was the practice of Southeast's landmen to inform the landowner prior to obtaining the written lease that the payment would be made by a bank draft and not

4

be payable until the expiration of a set number of banking days, usually ninety (90) days, that banking days differ from calendar days, and that ultimate payment would not be made if the title examination during the ninety (90) days did not result in a clean title examination acceptable to SWEPI. It was not the usual practice of Southeast landmen to make any representations or promises about the payment of a SWEPI lease bonus different than the terms reflected in the written bank draft.

(*Id.* (quoting Decl. of Eric Jenevein ¶8, ECF No. 163-10).)

Relevantly, each Draft bore the phrase "no protest" and indicated that it was "Not a Cash Item." (Mem. Op. dated 4/20/18 at 9.) Additionally, each Draft stated:

[t]he payor shall have ___ banking days after receipt of this draft by the collecting bank, whether accompanied by other papers or not, for title examination and for payment. Neither forwarding bank nor payee(s) nor the grantor(s) of such lease or conveyance may demand return of this draft or any accompanying papers prior to expiration of the time fixed. Upon payment hereof collecting bank shall deliver this draft and any accompanying papers to payor and remit payment to forwarding bank. No liability for payment or otherwise shall be attached to any of the parties hereto.

(*Id.*)

SWEPI's primary argument at the summary judgment stage was that it never entered into any enforceable agreements with class members.[1] In SWEPI's view, the Transactional Documents unambiguously evidenced the parties' understanding that no enforceable contract would come into existence unless and until SWEPI honored the Drafts and paid the bonuses. According to SWEPI, the Draft's exculpatory language precluded a finding of contractual intent or valid consideration because it gave SWEPI the unfettered right to abandon the prospective lease agreement and forego payment without incurring any liability.

In advancing this position, SWEPI argued (among other things) that its interpretation of the "no liability" clause was the only one that was consistent with Pennsylvania industry practice

---

[1] This was SWEPI's sole basis for seeking summary judgment and its primary argument, among others, in opposition to the plaintiff's motion for summary judgment.

and usage. To that end, SWEPI submitted the unrebutted declaration of Lisa C. McManus, Esq., a Pennsylvania lawyer who practices oil and gas law. In pertinent part, Ms. McManus attested:

> [ ] Certified checks or cashier checks are not usually given upon the execution of an oil and gas lease because leases are generally conditioned upon the ability of the lessee to proceed with development, as that is the intent of the parties to the lease. As a result, lessees, in lieu of a check, usually provide an Order of Payment or bank draft that contains terms that allow for a delay while the lessee investigates whether to proceed with the lease and provides for a definite time at which the payment is due, should all conditions set forth in the Order of Payment or draft be met.
>
> [ ] Often the language in an Order of Payment or bank draft fails to protect the lessor. Nonetheless, an Order of Payment or bank draft could be negotiated by the lessor to allow for greater protections for the lessor.
>
> [ ] My experience with drafts in Pennsylvania is that many include "No Protest" notices and language that provides that "no liability for payment or otherwise shall be attached to any of the parties" to the draft, like the bank drafts in this case. In other words, that draft language, which is construed in conjunction with the other lease instruments, means that the lessee may opt not to fund the draft and will not be liable for any payment to the lessor, as a matter of industry custom, usage, and practice. The use of a bank draft to pay a bonus allows the lessee to cancel, void, or surrender the lease and not pay the bonus, with no consequences or liability, where the draft utilizes the term "No Protest" and contains language absolving all parties of liability, according to Pennsylvania oil and gas industry custom, usage, and practice.

(Mem. Op. dated 4/20/18 at 31-32 (quoting McManus Decl. ¶¶ 25–27, ECF No. 150–3).)

In the course of addressing this evidence, the court observed that "'custom in the industry or usage in the trade is always relevant and admissible [under Pennsylvania law] in construing commercial contracts,' even where no ambiguity otherwise exists." (Mem. Op. dated 4/20/18 at 31 (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001)).) Thus, "'[i]f words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.'" (*Id.* at 32 (quoting *Sunbeam Corp.*, 781 A.2d at 1193).) At the same time, however, the court noted that "this rule of construction has application only where both parties to the contract are familiar with

6

the particular trade usage by virtue of being engaged in a particular industry, or otherwise have reason to know of it." (*Id.* (citing authority).)

> Based on its review of the summary judgment record, the court opined that
>
> no conclusive inferences can be drawn regarding the class members' awareness of the proffered oil and gas industry customs and usages. While SWEPI is clearly engaged in the industry of gas and oil leasing and exploration and may profess an awareness of the industry's customs and common usages, the same cannot necessarily be said of the class members based on the limited record before the court. Indeed, Ms. McManus' acknowledgement that she routinely advised her clients not to accept drafts as a medium of payment suggests that lay persons outside of the oil and gas industry may have no reason to know of the industry practices to which Ms. McManus attests. (See McManus Decl. ¶¶ 22, 28.) Accordingly, SWEPI's evidence of trade usage and custom is not dispositive.

(Mem. Op. dated 4/20/18 at 33.) The court went on to conclude that, to the extent SWEPI's interpretation of the Draft's exculpatory language was reasonable and thereby gave rise to an ambiguity in the contract, the relevant extrinsic evidence failed to support its interpretation. (*See id.* at 33-36.) Consequently, the disputed language was construed in favor of the class and against SWEPI because SWEPI was both the lessee and the party that had supplied the form. (*Id.* at 36 (citing *Hutchinson v. Sunbeam Coal Corp.,* 519 A.2d 385, 390 n.5 (Pa. 1986), and *Mason v. Range Resources-Appalachia, LLC,* 120 F. Supp. 3d 425, 440 (W.D. Pa. 2015)).)

SWEPI now argues that the court should vacate its entry of partial summary judgment in favor of the class and deny plaintiffs' motion for summary judgment in its entirety. This argument is predicated on the court's determination that no conclusive inferences could be drawn about class members' awareness of the proffered industry usage. SWEPI reasons that, if class members' knowledge is determinative of whether custom and usage is binding and dispositive, then the lack of any "conclusive inferences" on the matter means that a genuine issue of material fact exists in this case. (Defs.' Mot. Reconsideration ¶10, ECF No. 179.)

7

Upon consideration of all arguments raised in the parties' respective briefs, the court is not persuaded that reconsideration is warranted. As was previously explained by the court, SWEPI's proposed interpretation of the "no liability" clause is disfavored under Pennsylvania's rules for contract construction because it would render certain other contractual provisions superfluous or illusory. (*See* Mem. Op. dated 4/20/18 at 26.) SWEPI nevertheless sought to impute its subjective (and disfavored) interpretation to the class by demonstrating that it comported with standard usage within the oil and gas industry. As the proponent of custom and usage evidence, SWEPI had the burden to show that members of the class knew of the usage or had reason to know of it. *See* Restatement (Second) of Contracts §220, Comment b (1981) ("[A] party who asserts a meaning based on usage must show either that the other party knew of the usage or that the other party had reason to know of it."); 12 Williston on Contracts § 34:16 (4th ed.) ("At common law, there is no general presumption that the usages of a particular trade or business are known to those not in that trade or business.[ ] . . . Consequently, proof of actual knowledge on the part of one outside the trade or business is necessary,[ ] unless it has such notice of the custom or usage that the other party reasonably believes the custom or usage is known.[ ]") (internal footnotes and citations to authority omitted); *see Holiday Homes of St. John, Inc. v. Lockhart*, 678 F.2d 1176, 1185 n.8 (3d Cir. 1982) (citing the rule: "if A . . . used or understood the words in a particular sense and asserts that B . . . , without having actual knowledge, had reason to know A's usage and meaning, the only way to establish such 'reason to know' is to convince the court that a 'reasonable' man in B's position under exactly similar circumstances would in fact have known A's usage and meaning. A's evidence must show the common usage of other men in like circumstances.") (quoting 3 A. Corbin, Contracts §538, at 73 (1960)).

In observing that "no conclusive inference can be drawn regarding the class members' awareness of the proffered oil and gas industry customs and usages," the court acknowledged that it could not draw any definitive conclusions either in favor of or against such awareness because of the paucity of evidence on the point. The court did not determine, however, that the record would support a reasonable inference of class members' actual or constructive knowledge. In fact, the court noted that "[n]othing in Jenevein's declaration suggests that Southeast shared – or conveyed to landowners – SWEPI's subjective understanding that Drafts could be cancelled for reasons entirely unrelated to title examination." (Mem. Op. dated 4/20/18 at 35.) Thus, there was no basis for inferring that class members learned about the industry usage through SWEPI's agents. The court further observed that "Ms. McManus' acknowledgment that she routinely advised her clients not to accept drafts as a medium of payment suggests that lay persons outside of the oil and gas industry may have no reason to know of the industry practices to which Ms. McManus attests."[2] (Id. at 33.) As a case in point, Walney testified in his deposition that he had no particular understanding of what the "no liability" clause meant prior to presenting it to his bank and never discussed the provision with SWEPI's landman. (See Walney Dep. at 152-53, ECF No. 150-8.) Bedow testified that he never read the contents of the Draft after receiving it and prior to presenting it to his bank. (Bedow Dep. at 157-59, ECF No. 150-9.)

SWEPI nevertheless contends that "the existence of the custom is itself evidence that at least some class members knew of it – class members who, for example, sought the advice of

---

[2] The court is not persuaded by SWEPI's assertion that "the McManus declaration, with its reference to a 'common understanding' concerning the use of drafts in 'oil and gas leasing,' clearly implies that both lessors and lessees were aware of the custom." (ECF No. 208 at 4.) In fact, the opposite is true: while the usage of "no liability" drafts may give rise to a "common understanding" of their intended meaning within the oil and gas industry, Ms. McManus' clients were presumably not privy to the usage; otherwise, she would not have felt the need to "uniformly" advise them not to accept drafts as a form of payment. (ECF NO. 150-3, ¶28.)

9

someone like Ms. McManus, were involved in prior leasing, or worked in the industry (or consulted someone who did)." (ECF No. 208 at 4.) SWEPI also suggests that the court should infer class members' awareness based on evidence that at least some of the class members negotiated specialized lease terms pertaining to surface, crop or timber damages, spud fees, and Pugh clauses. (ECF 180 at 4 n.2.) The inferences that SWEPI asks this court to draw, however, are based solely on speculation. As such, they are insufficient to support the existence of a genuine issue of fact concerning the applicability of the proffered industry usage.

Equally unavailing is SWEPI's suggestion that its proffered usage must control because plaintiffs offered no evidence on the matter. According to SWEPI, "Plaintiffs' failure to respond to the counter-statement of material facts in opposition to Plaintiffs' motion for summary judgment (ECF No. 149) should mean that the industry custom, practice, and usage were deemed admitted for purposes of Plaintiffs' motion . . . ." (ECF No. 208 at 3.) This assertion is accurate insofar as the court *did* accept the *existence* of the industry usage as an admitted and uncontroverted fact. (See Mem. Op. dated 4/20/18 at 7 n.6 (explaining that the court accepted as "admitted" those material allegations in the defendants' Concise Statement of Material Facts that were factual, as opposed to legal, in nature).) SWEPI's assertion misses the broader point, however, that the established usage is only binding to the extent that class members had reason to know of it. As discussed above, SWEPI bore the burden of demonstrating actual or constructive knowledge on the part of class members, but it offered no evidence that could give rise to a genuine issue of fact on that point.

In sum, because the court could not reasonably infer that class members were aware of the industry usage concerning drafts with "no liability" language, the court could not infer that the industry usage supplied the intended meaning. In the absence of a controlling usage, the

10

exculpatory language was most reasonably construed in a narrow fashion – i.e., "as pertaining to the Draft only as the medium of payment and precluding independent litigation thereon." (Mem. Op. dated 4/20/18 at 31.) *See Williams Pontiac Co. v. Patriot Buick Pontiac GMC, Inc*., No. 1459 EDA 2017, 2018 WL 3234214, at *3 (Pa. Super. Ct. July 3, 2018) ("In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished."). As previously explained, this narrower construction is preferred under Pennsylvania law because it gives effect to the contract as a whole and avoids an illusory agreement. (Mem. Op. at 26-27 (citing *Hampton Gardens Assocs. v. Kearny Bank*, No. CV 16-323, 2016 WL 3576684, at *4 (E.D. Pa. June 29, 2016) ("[C]ourts should 'avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract.'") (quoting *M&G Polymers USA, LLC v. Tackett*, ––– U.S. ––––, 135 S. Ct. 926, 936 (2015)); *Com. ex rel. Kane v. UPMC*, 129 A.3d 441, 467–68 Pa. (2015) ("[W]e do not countenance the interpretation of a contract which would render it illegal or incapable of performance, but, rather, construe a contract to give legal effect to every provision therein . . . ."); Restatement (Second) of Contracts § 203(a) ("In the interpretation of a promise or agreement or a term thereof, ... an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect....")).) To the extent the Draft's exculpatory clause could be considered ambiguous, SWEPI still failed to demonstrate the existence of a material factual issue. As discussed, the court found nothing in the relevant extrinsic evidence to suggest a mutual understanding on the part of the parties that SWEPI had an unfettered right to cancel the Drafts for any reason without liability. Accordingly, the court was obliged to construe

the exculpatory provision in favor of the class, the non-drafting party. *See Hutchinson,* 519 A.2d at 390 n.5; *Mason,* 120 F. Supp. 3d at 440.

In arguing for reconsideration, SWEPI suggests – incorrectly – that this court's prior ruling created the need for further discovery. SWEPI posits that "[t]he Court's ruling that each person's knowledge is relevant to the question of whether industry, custom, usage, and practice applies *now provides a basis for allowing this discovery* . . . ." (ECF No. 208 at 5 (emphasis supplied).) The court, however, did not construct its "ruling" out of whole cloth; rather, the authorities previously cited by the court establish the rule that a particular trade usage is generally binding only on members of the trade unless the party to be charged otherwise had reason to know of it. *See supra,* at 8 (citing authority); Mem. Op. dated 4/20/18 at 32-33 (citing authority).

Having chosen to assert the existence of an industry custom and usage relative to the Draft's exculpatory language, SWEPI should have known that this usage could be imputed to class members only to the extent they were aware of it when they exchanged the Transactional Documents. SWEPI never sought to obtain any discovery concerning absent class members' actual or constructive awareness of the relevant industry usage, even though the identities of class members have been known to SWEPI for some time.[3] Alternatively, SWEPI could have attempted to demonstrate class members' awareness of the industry usage through affidavits from its landmen or through a more specific declaration from Mr. Jenevein, assuming those sources could corroborate its theory. SWEPI insists that "the timing of Plaintiffs' motion for

---

[3] As SWEPI acknowledges, discovery of absent class members is generally disfavored in a class setting, but it is not uniformly precluded. *See, e.g.*, 3 Newberg on Class Actions §911 (5th ed.) (observing that "[m]ost courts . . . hold[ ] that discovery from absent class members is not forbidden but rather is disfavored,[ ] with limited discovery being permitted on certain showings in particular circumstances.") (internal footnote omitted); *id*. §9:13 (discussing the various multifactor tests that courts apply when adjudicating a defendant's request for discovery from absent class members). Thus, the court is not persuaded by SWEPI's argument that it did not previously have sufficient "free reign" to conduct the relevant discovery. (ECF No. 208 at 5.)

12

summary judgment, coming as it did on the heels of class notice and the opt-out period, did not allow for depositions of absent class members." (ECF No. 208 at 5-6.) SWEPI, however, never requested an extension of discovery for the purpose of obtaining the information it now seeks.

IV. **Conclusion**

In sum, the court remains of the view that there is no genuine dispute concerning the existence of enforceable Lease Agreements. SWEPI's interpretation of the "no liability" clause may be consistent with the usage that is ascribed to such provisions within the oil and gas industry, but SWEPI failed to adduce evidence that would support an inference that class members intended to incorporate that usage into their agreements. SWEPI did not present any persuasive reason for revisiting this issue or reopening discovery at this late stage of the proceedings. Accordingly, for the reasons set forth above, SWEPI's request for reconsideration will be denied. An appropriate order follows.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge